# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| NORTHERN NATURAL GAS COMPANY,<br><br>                    Plaintiff,<br><br>v.<br><br>Approximately 9117.53 acres in Pratt, Kingman, and Reno Counties, Kansas and as further described herein;<br><br>Tract No. 1062710 containing 80.00 acres more or less, located in Kingman County, Kansas, and as further described herein, et al.<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 10-1232-WEB-DWB

## REPORT AND RECOMMENDATION

Plaintiff, Northern Natural Gas Company has filed a Supplemental Motion to Confirm Condemnation Authority and Grant Preliminary Access to Implement Water Injection Program (hereafter "Supplemental Motion"), along with a supporting memorandum and exhibits.  (Doc. 202, 203).   Responses and briefs in opposition to the supplemental motion were filed by the Huff Landowner Group (Doc. 292), L.D. Drilling, Inc, Nash Oil & Gas, Inc. and Val Energy, Inc. (Doc.

293), and an additional response was filed by L.D. Drilling, Inc.  (Doc. 305.)[1]
Northern filed a Reply in support of its Supplemental Motion.  (Doc. 312.)

Northern also filed a Motion to Set Hearing on the Supplemental Motion.
(Doc. 247.)  In response, Defendants stated that they had no objection to the
request for an evidentiary hearing, but stated that the hearing should not be held
until Defendants had a sufficient opportunity to prepare.  (Doc. 253, at 2.)

A scheduling conference was held in this case before the undersigned
magistrate judge on August 11, 2011.  As part of the parties' Planning Report in
preparation for the scheduling conference, requests were made for certain
discovery prior to any hearing on the Supplemental Motion, including a request
for depositions of any expert witnesses who were to testify at the hearing.  In its
Scheduling Order, the court allowed the parties to depose any of the expert
witnesses identified by the parties, *e.g.*, Randall Brush, Tom Cook, Bernie Shaner,
John Paul Dick and Kim B. Shoemaker.  (Doc. 306, at 14.)  At a subsequent
telephone conference, the court set a schedule for the depositions of four of the
expert witnesses, all of which were to be concluded by September 19, 2011.  (Doc.

---

[1]  Five Star Energy, Inc. and Northern entered into a Stipulation whereby Five Star
did not object to Northern's supplemental motion, but noted that this in no way waived
any argument by Five Star concerning just compensation, damages, the effective date of
taking or Five Star's right to receive compensation and/or damages.  (Doc. 304.)

316.)[2]

The assigned trial judge, Hon. Wesley E. Brown, Senior United States District Judge, subsequently entered an Order referring Northern's Supplemental Motion to the undersigned U.S. Magistrate Judge for a Report and Recommendation.  (Doc. 322.)  In that Order, Judge Brown directed  that the magistrate judge could conduct any hearings, including evidentiary hearings, as were deemed necessary in connection with the Report and Recommendation.

The undersigned magistrate judge thereafter granted the Motion to Set Hearing, and scheduled a hearing on the Supplemental Motion for October 5 & 6, 2011.  (Doc. 332.)  At the two-day hearing, the parties presented testimony from the following witnesses and introduced the following exhibits:

<u>Northern</u>:   Randal Brush and Brush Exhibits 1-25 (including Exhibits 5A, 6A, 13A, 15A-H, 16A, 21A);

Tom Cook and Cook Exhibits 1-6 (including Exhibits 2A&B);

Denise Faulkner and Faulkner Exhibits 2-5;

Bernie Shaner and Shaner Exhibits 1-5 (including Exhibit 5A); and

---

[2] No party indicated a desire to depose one of the identified experts, Bernie Shaner.

Shoemaker Cross Examination Exhibit 1.

Nash Oil & Gas:          J.P. Dick and Defendants' Exhibit H;

Jerry Nash.

L.D. Drilling:          J.P. Dick and Defendants' Exhibit I;

Kim Shoemaker and Defendants' Exhibits E, F, G, J, and K; and

L.D. Davis and Defendants' Exhibit L.[3]

Val Energy, the Huff Landowner Group, the Group B Landowner Group, the Group C Landowner Group and Five Star Energy did not present witnesses or exhibits at the hearing.  However, Huff Landowner Group read into the record at the beginning of the hearing an agreement between Huff and Northern as follows:

> (1) Neither Northern nor the Huff Group will seek to preclude the other party from deposing a witness in this matter because the witness has previously been deposed for purposes of the October 5 and 6, 2011, hearing on Northern's motion for preliminary access.

---

[3] L.D. Drilling sought to introduce testimony of witness James Remsberg which would be substantially the same as testimony he gave in Case No. 08-1405-WEB at an evidentiary hearing held on October 7, 2010.  Northern objected on the ground that L.D. Drilling had not notified the court or counsel that Remsberg would testify at this hearing as an expert witnesses and that Northern had not had an opportunity to depose him.  The Court did not allow Remsberg to testify but stated that he could review Remsberg's prior testimony in the related case where Northern had the opportunity and did in fact, cross-examine Remsberg.  To assist the court, L.D. Drilling then filed a Notice of Correction to Valuation Testimony of James Remsberg removing any valuation of the Section 28 wells of L.D. Drilling.  (Doc. 356.)

(2)  Neither Northern nor the Huff Group will seek to preclude evidence introduced by the other party regarding just compensation because such evidence was not introduced at the upcoming October 5 and 6, 2011, hearing on Northern's motion for preliminary access.  In other words, a determination by the Court of what constitutes a reasonable deposit or bond for purposes of access does not preclude Northern or the Huff Group from presenting additional, different or contrary evidence regarding the ultimate award of just compensation.

(3)  Northern and the Huff Group agree that the appeal pending before the Kansas Supreme Court in <u>Northern Natural Gas vs. One Oak Field Service, et al</u>, may impact or alter the ultimate issues of just compensation in this case.

(4)  Northern and the Huff Group agree that the issue of the "date of taking " is not ripe for decision at the October 5 and 6, 2011, hearing on Northern's motion for preliminary access.

(5)  Without impacting the Huff Group's arguments regarding the date of taking, the Huff Group does not object to preliminary access by Northern.

(6)  In the event the Huff Group landowner decides to draw down on the amount deposited with the Court by Northern, such decision is not a concession by the parties that the amount drawn/deposited is a final determination of just compensation and damages.

(7)  In the event a Huff Group landowner decides to draw down on the deposit by Northern and a determination is later made that just compensation is lower than the amounts deposited by Northern, then the

landowner will be obligated to repay any amounts drawn
in excess of the just compensation.

(8) the Huff Group will not object to the bonds
proposed by Northern because the Huff Group is of the
opinion that Northern is financially capable of satisfying
any award of just compensation above and beyond the
bond proposed.

Transcript (Oct. 5-6, 2011), at 15-17.  Northern confirmed that this was the

agreement reached with the Huff Group.  Transcript (Oct. 5-6, 2011), at 18.

At the beginning of the hearing, Northern also announced that it was

removing the Zink 1-A well from the request for immediate possession.

Transcript (Oct. 5-6, 2011), at 18.  Over Northern's objection, L.D. Drilling had

re-entered this well to test the Lansing-Kansas City (Swope Layer) formation

which is located above the Viola/Simpson formations.  *See* Doc. No's 341-343.

At the time of the hearing, the Zink 1-A was producing oil from that formation.

*See* Defendants' Exhibit L.  L.D. Drilling has agreed to file status reports with the

court on a weekly basis concerning production from the well.

At the conclusion of the two-day hearing, the court directed that by October

12, 2011, Defendants were to file a detailed statement of the amount of bond

and/or deposit which they claim should be required if Northern is granted the right

to immediate access of the subject properties.   The format of this submission is to

6

mirror the proposed bond and deposit details set out in Northern's memorandum brief in support of the Supplemental Motion, and particularly the table at the end of the discussion.  (Doc. 203, at 25-30.)  This submission shall not exceed 10 pages in length.  Defendants L.D. Drilling, Nash Oil & Gas and Val Energy timely filed the required pleading.  (Doc. 362.)  Both the Huff Landowner Group and Five Star Energy filed pleadings reciting that pursuant to their agreements and/or stipulations with Northern, they had no suggestions for the amount of any bond and/or deposit.  (Doc. No's 363, 367.)

The court also directed that Northern could reply to Defendants' filings concerning the amount of any bond and/or deposit not later than October 19, 2011, in a document that does not exceed ten pages in length.  Northern timely filed a reply pleading.  (Doc. 387.)

## THE PARTIES' POSITIONS AND ARGUMENTS

Northern's Supplemental Motion seeks two separate types of relief -- supplemental confirmation of its condemnation authority and immediate access to the subject property.  The parties' positions concerning each of these requests will be outlined separately.

**I.      Confirmation of condemnation authority.**

In its initial Complaint, Northern defined the "Property to be Taken" as the right, title and exclusive possession of the Viola and Simpson Formations underlying the subject tracts located in the expansion area approved by the FERC. Judge Brown entered an Order granting Northern's initial motion to confirm condemnation authority as to the "Property to be Taken" as described in the initial Complaint.  (Doc. 183.)[4]

Northern subsequently filed an Amended Complaint (Doc. 188), which expanded the interests to be condemned to include not only the "Property to be Taken" as previously defined,  but also to include "Property to be Taken to Implement Water Injection Program."  The water injection program involved installation of water withdrawal wells, water pipelines across the surface of the authorized expansion area, water injection wells, conversion of nine existing wells into observation wells, one new observation well and the installation of electrical and/or telecommunication lines.  The program also sought the right to inject water

───────────────

[4]  In the Order granting the initial motion to confirm condemnation authority, the court held that FERC's approval of an expanded buffer zone in the 2010 Order "must be construed to include the rights appurtenant to exclusive possession and use of these formations as part of the storage field, including the aforementioned right to use the surface of the land to the extent reasonably necessary to operate and maintain the storage field. (citation omitted)."  (Doc. 183, at 16.)  In so holding, the court stated: " Of course, construction of any facility by Northern within the Expansion Area would require FERC's approval, and would also require Northern to pay damages at that time to any particular landowner effected by Northern's use of the surface." (Doc. 183, at 16-17.)

into the Viola formation, along with the right of ingress and egress across the

Expansion Area for access to facilities and to maintain communications lines by

the cutting and trimming of trees and shrubbery.

A.    Northern's Position.

Northern argues that all of the rights it seeks to condemn in this case, both

initially and later as part of Amended Complaint and its proposed containment

plan, are authorized by a combination of three Certificates issued by the FERC.

*See* Doc. 203, at 17.  Two of those certificates, issued in 2008 and 2010,

authorized the expansion of the Cunningham Storage Field by 1,760 acres and

creation of a certificated buffer zone of 12,320 acres (referred to as the "Expansion

Area.") (Doc. 203-2 and 203-4, Ex's A & C.)  The other certificate, a Blanket

Certificate issued September 1, 1982, was a Certificate of Public Convenience and

Necessity authorizing routine activities specified in Subpart F of Part 157 of the

Commission's Regulations.  (Doc. 203-3, Ex. B.)  Northern further relies on what

is known as a "delegated order" issued pursuant to 18 C.F.R. § 375.308(y)(1), on

April 29, 2011, in which the FERC staff  "confirms that Northern's proposed

construction activities detailed in the report [Northern's Third Quarterly Report

dated April 26, 2011] can be undertaken pursuant to section 157.203(a) of

Northern's blanket certificate authority."  (Doc. 312-5, Ex. C.)   Finally, Northern

argues that certain activities, such as installation of electrical and communications equipment and buildings which are for the purpose of obtaining more efficient or economical operation of authorized facilities, are considered "Auxiliary Installations" which are excluded from the definition of "facilities" in Section 7© of the Natural Gas Act and therefore are not considered as separate facilities that require a certificate to be issued.  (Doc. 203, at 10-11.)    Because the interests it seeks to condemn are all authorized by a combination of the above FERC orders and regulations, and because Northern has been unable to acquire these interests by agreement, Northern submits that it has complied with all prerequisites to its condemnation of the above-described interests and the court should so find.

> B.    <u>Joint Position of Defendants L.D. Drilling, Inc., Nash Oil & Gas, Inc.,
> and Val Energy, Inc.</u>

These defendants argue that Northern's Blanket Certificate does not give it the authority to implement the activities described in "Property to be Taken to Implement Water Injection Program" as outlined in the Amended Complaint.  The regulation defining the type of automatic authorization allowed by a blanket certificate, 18 C.F.R. § 157.213(a), states that

> the [blanket] certificate holder may acquire, construct,
> modify, replace, and operate facilities for the remediation
> and maintenance of an existing underground storage

> facility, provided the storage facility's certificated
> physical parameters -- including total inventory,
> reservoir pressure, reservoir and buffer boundaries, and
> certificated capacity remain unchanged -- and provided
> compliance with environmental and safety provisions is
> not affected.

Defendants argue that the Blanket certificate only gives Northern certain rights to act within the boundaries of an existing facility, and it expressly provides that the physical parameters of the facility are to remain unchanged.  They further argue that the 2010 FERC Order was a certificate of public convenience or necessity that only conferred on Northern the right to acquire property rights by exercising the right of eminent domain by court proceedings if the property could not be acquired by agreement with the property owners, and therefore Northern has no property rights in the Expansion Area until the present condemnation proceeding has been completed.  As such, Defendants argue that the Blanket Certificate can not be authority for constructing wells in the Expansion Area, since that area is outside the existing boundaries of the Cunningham Storage Field.  (Doc. 293, at 6.)

B.   Separate Position of L.D. Drilling, Inc.

L.D. Drilling raises issues as to Northern's rights to acquire its well-bores which it argues have value either for "up-hole" production above the Viola/Simpson formations, or for "down-hole" water disposal below the

Viola/Simpson formations.  They cite Northern's Amended Complaint which states that Northern does not seek to acquire any leasehold obligation and/or any royalty, working, revenue, overriding royalty, or other mineral interest in the formations above or below the Viola and Simpson formations.  (Doc. 188, at ¶ 67.) Therefore, L.D. Drilling argues that Northern does not have any right to acquire its entire wellbores and equipment through eminent domain procedures, and if Northern does require wellbores as part of its water injection program, it could drill new wells at its own cost.  Instead, L.D. Drilling argues that Northern is attempting to obtain the existing wellbores at "scrap" prices.

C.     Position of Huff Landowner Group

These landowners argue that Northern is now seeking to take rights to the surface in the Expansion Area under its Amended Complaint without joining parties such as agricultural tenants who have surface rights to the land in the expansion area.  If Northern is granted immediate access to implement its water injection program, landowners argue that it is their tenants who grow crops and graze livestock on the property who will feel the immediate impact of Northern's actions, yet those tenants are not parties to this condemnation proceeding. Therefore, landowners argue that the motion to confirm and for immediate access should be deferred until all tenants have been joined as parties to this

condemnation action so that they may protect their interest in any compensation to be awarded.  (Doc. 292, at 3.)

    D.    <u>Northern's Response to Defendants' Contentions</u>

As to Defendants' position concerning Northern's Blanket Certificate, Northern argues that the Cunningham Storage Field is an existing facility that currently includes the Expansion Area by virtue of the issuance of the 2010 Certificate by FERC.  Northern further argues that Northern will not alter or enlarge the physical parameters of the storage filed through use of the Blanket Certificate, and therefore the motion is not premature.

As to L.D. Drilling's position concerning condemnation of their wellbores, Northern argues that FERC has specifically authorized Northern to seek condemnation of the designated wellbores which were identified by Northern in its Quarterly Reports and Containment Plan submitted to FERC and which Northern argues have been specifically approved by FERC and therefore which FERC has found to be necessary as part of the Containment Plan.  Northern also argues that L.D. Drilling can access formations other than the Viola/Simpson formations through use of its other wells in the area or by drilling new wells.

As to Landowner Defendants' position concerning joinder of their tenants, Northern argues that Fed. R. Civ. P. 71.1 only requires that a plaintiff must add as

defendants all those persons who have or claim an interest in the property to be

acquired before any hearing on compensation.  Northern argues that the tenants

are already parties to this action as Unknown Owners.  Finally, Northern argues

that the present motion may be heard without delay because the court has ordered

the current landowners to provide Northern with the names of addresses of all

tenants and has ordered Northern to serve on those tenants a copy of the pending

motion.[5]  As such, the tenants are advised of the substance of the motion and may

appear at any hearing to address issues related to their claimed interests.  Northern

admits that prior to the ultimate hearing on the determination of just

compensation, any interest owner who becomes known to Northern must be added

as a defendant.

## II.     Request for Immediate Possession.

### A.     Northern's Position.

Relying mainly on the case of E. Tenn. Natural Gas Co. v. Sage, 361 F.3d

808 (4th Cir. 2004), *cert denied* 543 U.S. 9778 (2004), Northern argues that once it

has established its right to condemn the subject property by court order, it has a

---

[5] Northern has filed its certificate of service of the Supplemental Motion on the tenants identified by the various Landowner Defendants.  *See* Doc. 331.  Some of the tenants identified by the Landowner Defendants have now filed Answers and Amended Answers in this case.  *See e.g.,* Doc. 328 (Morgan J. Trinkle);  Doc. 334 (Gregg Meireis);  Doc. 337 (Morgan J. Trinkle); and Doc. 338 (Kenneth Glenn).

substantive right of taking which may be protected by an equitable remedy fashioned by the court where the prescribed legal remedies are inadequate.  Sage states that in order to show entitlement to such an equitable remedy a condemnor must satisfy the strict requirements for issuance of a preliminary injunction. 361 F.3d at 865.  Northern argues that it can meet all four requirements for issuance of a preliminary injunction: (1) a likelihood of success on the merits; (2) a likelihood that Northern will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tip in Northern's favor; and (4) that the injunction is in public interest

As to the first requirement, Northern argues that this court has already recognized Northern's rights to use of the surface in the Authorized Expansion Area as part of the easement for operation of a storage facility, and that Northern has shown that it is entitled to an order confirming its right to condemn the "Property to be Taken" and the "Property to be Taken to Implement Water Injection Program" all as defined in Northern's Amended Complaint.  These findings show that likelihood of success on the merits is therefore established.

As to the second requirement, Northern argues that in the 2010 Order, the FERC ordered Northern to develop an aggressive containment and migration control plan and to begin affirmative steps within six months of the date of the

15

2010 Order.  While Northern has succeeded in halting production of gas by third parties in the Authorized Expansion Area by virtue of an earlier preliminary injunction issued in the related Case No. 08-1405-WEB, it argues that FERC has determined that halting production alone was not an adequate plan, and that FERC has subsequently approved Northern's Containment Plan which includes a water injection program outlined by Northern in quarterly reports to FERC.  Because of the time required to complete the construction of facilities necessary to begin the water injection program, Northern states that it will not be able to comply with the FERC's required timetable without issuance of a preliminary injunction allowing them immediate access and possession of the condemned interests, and that failure to obtain immediate possession will result in irreparable harm to the Cunningham Storage Field and to Northern.

As to the third element, Northern argues that the equities tip in Northern's favor because entry of the requested preliminary injunction will result in little if any damage to defendants.  Such damage is merely a matter of timing, and defendants will be protected by Northern's payment of a required bond and deposit.  Furthermore, Northern argues that if it would later fail to pay any amount awarded by the court over and above the amount of the deposit and bond, the defendants will not be harmed because defendants could then proceed against

Northern as a trespasser.

As to the fourth and final element, Northern argues that granting the preliminary injunction will ensure that the FERC-approved Containment Plan and water injection program will not be delayed and that this protects the Cunningham Storage Field from any further gas migration which is in the public interest.

Finally, if allowed immediate access to the subject properties, Northern proposes to deposit into the registry of the Court the sum of $771,700, which Defendants should be entitled to withdraw without awaiting the completion of the case, and to post a bond in the amount of $7,498,870.  *See* Doc. 387-1.[6]

B.      Defendants' Position.

Defendants[7] assert that even if the court holds that Northern has authority to condemn the subject interests, the court does not have the inherent power to grant a preliminary injunction that would give Northern immediate access to the property.  (Doc. 293, at 3.)  Defendants acknowledge that some courts have

_____

[6]  The amount of the deposit and bond were reduced from Northern's original proposal after the October 5-6 hearing, to account for Northern's withdrawal of its request for immediate possession of the Zink 1-A well.

[7]  As previously noted, at the hearing, the Huff Landowner Group announced an agreement between it and Northern whereby Huff did not object to Northern's immediate possession of the property or to the amount of the proposed bond and deposit.  Likewise, defendant Five Star Energy does not object to Northern's request for immediate possession or the amount of the proposed bond and deposit.

granted such injunctions in condemnation actions, but the Tenth Circuit has not

addressed the issue and this court should conclude that it has no authority to enter

the requested injunction.  Defendants contend that the balance of harms to them

would be greater from entry of a preliminary injunction than any harm to

Northern, and requiring Northern to complete the condemnation and pay any

required compensation before obtaining possession would not cause Northern any

irreparable harm.  In that regard, Defendants argue that since third-party

production in the expansion area has been halted by the injunction issued in Case

No. 08-1405-WEB, Northern is not and will not suffer irreparable harm from any

delay in obtaining possession of the subject properties.  Finally, Defendants argue

that the bond and deposit proposed by Northern in its motion is "grossly

inadequate" and the amount of the bond should be set by an independent valuation

of all the property to be taken in the condemnation.


## DISCUSSION

**I.    Confirmation of condemnation authority.**

A.    "Property to be Taken" in Newly-Added Tracts.

As previously noted, Judge Brown has already confirmed Northern's right

to condemn the "Property to be Taken" as described in the initial Complaint in this

case.  *See* Doc. 183.  It appears, however, that three tracts of land have now been added to the "Property to be Taken" in this condemnation by the Amended Complaint.  These are Tract No's 3152711, 1232611 and 3232611-A.  *See* Doc. 203, at 4 n. 4.  At the hearing, the court inquired if anyone representing these three tracts of land wished to present additional evidence or arguments concerning Northern's authority to condemn the "Property to be Taken" by these three tracts. No one responded.  Therefore, the court recommends that Northern's authority to condemn the "Property to be Taken" as to these three tracts be confirmed for the reasons set out in Judge Brown's prior Order.

B.    Property to be Taken to Implement Water Injection Program."

The present dispute concerning Northern's authority to condemn focuses on the property sought to be condemned for purposes of installing and operating a water injection program approved by the FERC as a result of the filing of Quarterly Reports by Northern after issuance of the June 2, 2010 FERC Order. The water injection program proposed by Northern in its Quarterly Reports was approved by means of a "delegated order" issued by FERC staff on April 29, 2011, which also stated that construction activities outlined in the proposed plan could be undertaken pursuant to section 157.203(a) of Northern's blanket certificate authority.  (Brush Exhibit 13.)   The blanket certificate was issued in 1982.  (Doc.

203-3.)

It is mainly the gas producers -- L.D. Drilling, Val Energy and Nash Oil & Gas -- who attack the application and validity of these certificates of authority and contend that they do not give Northern the right to acquire rights to install the water injection program.  These gas producers all had moved to intervene in the FERC proceedings filed by Northern in FERC Docket CP09-465-000, and therefore became parties in that docket pursuant to FERC's rules of practice and procedure.  (Brush Exhibit 1, June 2, 2010 FERC Order, at 3-4, ¶¶ 6 & 8.)  Prior to issuance of the June 2, 2010 Order by FERC, those companies had made timely comments, protests or both in that FERC docket.  *Id.*

These parties now claim that Northern's blanket certificate does not authorize construction of the water injection facilities because FERC's rules limit the application of such blanket certificates to situations where the storage field's reservoir and buffer boundaries remain unchanged.  *See* 18 C.F.R. § 157.213(a). Defendants argue that until the condemnation is completed and Northern has paid all required compensation, the boundaries of Northern's Cunningham Storage Field remain as it was prior to the June 2, 2010 FERC Order, and the property certificated as an additional buffer zone (commonly referred to as the Expansion Area) on which the water injection facilities are to be constructed is not part of the

reservoir or buffer boundaries.  Therefore, to allow construction of facilities on the

Expansion Area would effectively violate the limited purpose of a blanket

certificate as set out in the FERC rules and regulations since it would effectively

expand the reservoir and buffer boundaries.[8]

Before this court can address such an argument, it must consider the court's

jurisdiction in this condemnation proceeding under the Natural Gas Act.  Judge

Brown addressed that issue in his initial order confirming Northern's authority to

condemn the "Property to be Taken:"

> As noted in *Williams Natural Gas Co. v. City of Oklahoma City*, 890 F.2d 255 (10th Cir. 1989), the exclusive avenue for judicial review of a FERC order is a timely appeal to the appropriate circuit court of appeals. *Id*. at 261 (*citing* 15 U.S.C. § 717r(b)). As a result, a district court may not entertain any collateral attack upon a FERC order; its only function in a condemnation proceeding based on a FERC Certificate is to provide for enforcement of the FERC order.  *Id*. at 264.

(Doc. 183, at 12-13.)  In <u>Williams</u>, the Tenth Circuit discussed the exclusive

judicial review provisions of the Natural Gas Act.  The Court noted that the

---

[8]  The defendants cite no authorities to support their interpretation of the FERC rule.  Likewise, Northern cites no authorities to support its argument that the issuance of the June 2, 2010 FERC Order is all that is necessary to expand the buffer zone of the field, notwithstanding the requirement that Northern file and complete the present condemnation action.

structure Congress provided to litigate and resolve disputes arising under the

Natural Gas Act should not be lightly disregarded, and held that the party

contesting the validity of a FERC order or certificate should have raised the issue

before FERC originally or upon a motion for rehearing.  It then concluded

> We also hold that a collateral challenge to the FERC
> order could not be entertained by the federal district
> court.  We agree with the appellants that the eminent
> domain authority granted the district courts under § 7(h)
> of the NGA, 15 U.S.C. § 717f(h), does not provide
> challengers with an additional forum to attack the
> substance and validity of a FERC order.  The district
> court's function under the statue is not appellate but,
> rather, to provide for the enforcement.

890 F.2d at 264.

In this case, the gas producers who now contest the application of

Northern's blanket certificate should have raised that issue before the FERC by a

timely appeal of the April 29, 2011 delegated order.  They have produced no

evidence to indicate that they did so.  Therefore, they are not allowed now to

collaterally attack the FERC's order in these condemnation proceedings.[9]

---

[9]  As previously noted, in his earlier order confirming Northern's authority to condemn the "Property to be Taken," Judge Brown specifically stated that any construction of facilities in the Expansion Area "would require FERC's approval. . . ." (Doc. 183, at 16-17.)  Even though that approval has occurred through an old blanket certificate and a "delegated order" by "FERC staff, that approval has been obtained.  If the procedure for obtaining FERC approval is to be contested, it must first be raised before the FERC and in this case it was not.

The same reasoning applies to L.D. Drilling's argument that Northern should not be allowed to convert three of its wells into observation wells where those wells may have the potential of producing hydrocarbons in paying quantities from other zones either up-hole or down-hole from the Viola/Simpson formations. There is no evidence that this issue was presented to FERC in any manner. Therefore, L.D. Drilling's attempt to collaterally attack FERC's approval of the water injection program submitted by Northern in its Third Quarterly Report, is beyond this court's jurisdiction.[10]  As a result, this court cannot modify the FERC-approved plan by requiring Northern to drill new wells for observation or injection purposes rather than condemn the existing wellbores.  Also, while defendants

---

[10]  The court is not without some concern as to the procedure leading up to the FERC approval of the water injection plan.  Rather than being initiated by a separate motion or petition, the containment plan or water injection plan was submitted by Northern simply through a quarterly report to FERC.  The court has seen no documentation to show what type of notice, if any, was given to parties who had entered an appearance in the existing docket, or what kind of deadline, if any, was given for the filing of protests or objections to Northern's proposed plan.  When questioned at the hearing, Northern's counsel noted that information on the filings in the FERC docket were available to all parties electronically, and also added that copies of the Quarterly Reports were also included as attachments to the regular status reports required by the Court in the related Case No. 08-1405-WEB.  The Status Report filed by Northern in that related case on May 17, 2011 (Doc. 476) contains copies of the Third Quarterly Report dated April 25, 2011 and the delegated order by FERC staff dated April 29, 2011, and that report was served on counsel for L.D. Drilling, Val Energy and Nash Oil & Gas. While the noticing provisions in the FERC docket are unclear, the three defendants who had entered appearances in that FERC docket clearly should have been alert to any FERC filings in that docket and should have been aware of the need to appeal any FERC order with which they had a dispute or disagreement.

argue that there are no reported cases where potentially producing wellbores have been condemned for conversion to observation or injection wells by a storage operator, they have cited no authority to indicate that such a provision in a FERC certificate is beyond FERC's authority under the Natural Gas Act.

Finally, the court finds that the Landowner defendants' objection to an order confirming Northern's authority to condemn the "Property to be Taken to Implement Water Injection Program" until after the formal joinder of any other parties who may claim an interest in the surface of the area affected is not required by the provisions of Fed. R. Civ. P. 71.1. While all such parties must be joined prior to any final determination of value of the property taken -- whether determined by a jury or a commission -- there is no requirement that they be formally joined at this stage of the proceedings. In addition, by requiring Northern to serve copies of the pending Supplemental Motion on all known tenants of any landowners in the affected area, those tenants now have notice of the pendency of the motion and these proceedings and can take such actions as they deem necessary to protect their interests in the subject property. There is no need to defer ruling on the Supplemental Motion.

For the above reasons, the undersigned magistrate judge recommends that the court enter an order confirming that Northern has the authority to condemn all

of the property described in its Amended Complaint.

## II.   Request for Immediate Possession.

Having recommended that the court confirm Northern's right to condemn the property described in its Amended Complaint, the court must now determine whether Northern is entitled to immediate possession of the subject property prior to the final determination and payment of just compensation.  This determination requires consideration of three separate sub-issues: (1) is there legal authority to allow a private company to obtain immediate possession of property prior to completion of the condemnation; (2) if so, what are the requirements the condemnor must meet to gain immediate access and has Northern met all of the required conditions; and (3) if Northern has met all the required conditions for immediate possession, what bond and/or deposit must it post to assure the rights of the condemnees.  These sub-issues will be discussed in order.

### A.   Legal Authority for Immediate Possession.

It appears that this legal issue has never been addressed by the Tenth Circuit; however, it has been the subject of  two apparently conflicting decisions by other circuit courts of appeal.  *Cf.* E. Tenn. Natural Gas Co. v. Sage, 361 F.3d 808, *rehearing* denied 369 F.3d 357 (4th Cir. 2004), *cert denied sub nom.* Goforth

v. E. Tenn. Natural Gas Co., 543 U.S. 978 (2004) and Joyce v. E. Tenn. Natural
Gas Co., 543 U.S. 978 (2004), *with* Northern Border Pipeline Co. v. 86.72 Acres
of Land, 144 F.3d 469 (7th Cir. 1998).[11]  Sage holds that a federal court may grant
a request for immediate access by a private condemnor under the Natural Gas Act
pursuant to the court's equitable jurisdiction to grant preliminary injunctions under
Fed. R. Civ. P. 65(a).  Northern Border concluded that there was no authority to
grant immediate access through use of a preliminary injunction.

The producer-defendants in this case argue against the holding in Sage for
several reasons: (1) unlike quick take provisions in other federal statutes, the
Natural Gas Act contains no authority for immediate possession prior to the
completion of a condemnation; (2) Fed. R. Civ. P. 71.1 contains no provision for a
quick take and the drafters of the rule specifically considered whether to insert
such a provision; and (3) eminent domain statutes are to be strictly construed in
favor of the property owner and against the condemning authority.  (Doc. 362, at
1-2.)

Each of the above arguments were presented to the court in Sage and were

---

[11]  A detailed discussion of both cases and the issue of immediate possession in
cases under the Natural Gas Act is set out in J. Behnke and H. Dondis, *The Sage
Approach to Immediate Entry by Private Entities Exercising Federal Eminent Domain
Authority under the Natural Gas Act and the Federal Power Act,* 27 ENERGY L. J. 499
(2006).

found insufficient to preclude a court from granting immediate access through the means of a preliminary injunction.  361 F.3d at 824-26.  Importantly, these arguments were also raised in the Petition for Writ of Certiorari in Goforth which sought certiorari based on a conflict between Sage and Northern Border Pipeline.  See 2004 WL 1843952 (2004).  Even before the decision in Sage, one of the judges in this District had noted that

> It is apparently well settled "that the district court does have the equitable power to grant immediate entry and possession where such relief is essential to the pipeline construction schedule." *Gas Pipeline Co. v. New England Power,* 6 F.Supp.2d 102, 104 (D. Mass. 1998).

Humphries v. Williams Natural Gas Co., 48 F.Supp.2d 1276, 1280 (D. Kan. 1999).[12]  After the holding in Sage, it appears that numerous district courts have concluded that a plaintiff can obtain immediate possession in such cases.  *See e.g.,* Rockies Express Pipeline, LLC v. 4.895 Acres of Land, No. 2:08-cv-554, 2008 WL 4758688, at * 4 (S.D. Ohio, Oct. 27, 2008); Gulf Crossing Pipeline Co., LLC v. 7.50 Acres of Land, No. 4:08-cf-178, 2008 WL 2774534, at * 5 n. 1 (E.D. Tex., Jul. 8, 2008) (report and recommendation collecting over a dozen cases supporting immediate possession).  Finally, in a related case involving the Cunningham

---

[12]  In fact, Humphries is cited in Sage as one of several district courts that has approved immediate access pursuant to a preliminary injunction process.  361 F.3d at 827.

27

Storage Field, this court specifically noted that courts have granted immediate possession of the property where circumstances warrant, citing specifically the holding in <u>Sage</u>.  <u>Northern Natural Gas Co. v. L.D. Drilling, Inc., et. al.,</u> 759 F. Supp. 2d 1282, 1303 (D. Kan. 2010).

After reviewing the above authorities, the court believes that the Tenth Circuit would follow the reasoning in <u>Sage</u>, and accordingly recommends that the court hold that a private party seeking to condemn property under the provisions of the Natural Gas Act may legally obtain immediate entry and possession of the subject property prior to completion of the condemnation proceedings if it can meet the strict requirements for entry of a preliminary injunction under Fed. R. Civ. P. 65(a).

B.      <u>Requirements for a Preliminary Injunction for Immediate Access.</u>

The court in <u>Sage</u> concluded that a gas company seeking immediate access prior to completion of the condemnation proceeding must satisfy the strict requirements for a preliminary injunction.  361 F.3d at 825.  The court also determined that the district court's injunction mandated affirmative relief (immediate possession) and thus did not preserve the *status quo*; therefore, the court was required to conduct a more searching review to determine whether the circumstances are such that "the exigencies of the situation demand such relief."

28

361 F.3d at 828, 830.

In the related case concerning Northern's Cunningham Storage Field, this

court outlined the four requirements for entry of a preliminary injunction:

> When seeking a preliminary injunction, the moving party
> must demonstrate: (1) a likelihood of success on the
> merits; (2) a likelihood that the movant will suffer
> irreparable harm in the absence of preliminary relief; (3)
> that the balance of equities tips in the movant's favor;
> and (4) that the injunction is in the public interest. *Little
> v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010) [citations
> omitted].

Northern Natural Gas Co. v. L.D. Drilling, Inc., et. al., 759 F. Supp. 2d at 1297-

98.  In that case, the court granted Northern's motion for a preliminary injunction

shutting in twenty-five wells operated by L.D. Drilling, Val Energy and Nash Oil

& Gas, which are located in the Expansion Area of the Cunningham Storage Field

and were producing gas from the Viola/Simpson formations.[13]  In granting the

preliminary injunction, the court also noted that since the requested relief would

require the defendants to take affirmative action by shutting in their wells, the

requested injunction would alter the *status quo* and would qualify as a disfavored

mandatory injunction.  759 F.3d at 1298.

---

[13]  The defendant-producers have taken an appeal of this preliminary injunction
which is pending in the Tenth Circuit Court of Appeals, Case No's 11-3024 & 11-3026.
Oral argument was scheduled on November 14, 2011.

In the Tenth Circuit, there are three types of specifically disfavored preliminary injunctions: (1) preliminary injunctions that alter the *status quo*; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the moving party all the relief that it could recover at the conclusion of a full trial on the merits.  SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1098-99 (10th Cir. 1991).  If a party seeks a preliminary injunction that falls into one of these three categories, the moving party must satisfy "a heightened burden," and "[a]ny preliminary injunction fitting within one of the disfavored categories must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course."  O Centro Espirita Beneficientse v. Ashcroft, 389 F.3d 973, 975 (10th Cir. 2004).  Therefore, "[a]ny party seeking such a disfavored preliminary injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms . . . ."  389 F.3d at 975-76.

In this case it is clear that the request for immediate possession seeks a mandatory injunction which does not preserve the *status quo* and is therefore a disfavored preliminary injunction.  As such, the court must determine whether Northern has met its heightened burden of making a strong showing of both likelihood of success and balance of the harms.

30

1.      Likelihood of success.

It appears that in federal condemnation cases under the Natural Gas Act, the requirement to prove likelihood of success is essentially met when the court has entered an order finding that the condemning party has a right to condemn the subject property.  *See* <u>Sage</u>, 361 F.3d at 829-30 (success on the merits is apparent when the condemning party has an order confirming its right to condemn the property.)   Therefore this factor favors the entry of a preliminary injunction.

2.      Irreparable harm to the moving party.

Northern argues that it will suffer irreparable harm if a preliminary injunction allowing immediate access is not granted because it will not be able to meet its obligations to protect the Cunningham Storage Field as required by the FERC's June 2, 2010 Order.  Northern points out that it originally proposed a containment plan that would first stop third-party production of gas in areas adjacent to the storage field and then would monitor any future migration from the field.  Any implementation of a water injection program would only be commenced if future monitoring determined that pressures did not return to pre-migration levels in a "reasonable" period of time.  Brush Exhibit 1 (June 2, 2010 Order), at 28.  The FERC, however, determined that the integrity of the storage field "is substantially at risk" and did not approve Northern's proposed

containment plan.  Brush Exhibit 1, at 27, 29.  Instead, the FERC  directed

Northern to design and implement "a more robust, aggressive, and proactive plan"

that will prevent migration of storage gas beyond the newly authorized expansion

area.  Brush Exhibit 1, at 29.  To accomplish this

> the Commission will require Northern to file within two
> months of the date of this order a comprehensive and
> specific containment and management plan detailing
> how it will effectively slow and reverse flow of gas out
> of the field.  The plan should be designed to go into
> effect within six months of the date of this order.

Brush Exhibit 1, at 29, 32.

Northern subsequently proposed its Storage Gas Containment Plan as part

of its Third Quarterly Report to the FERC dated April 25, 2011.  Brush Exhibit 9.

By Order of April 29, 2011, FERC staff determined that the Third Quarterly

Report and the proposed actions "are in general conformance and compliance with

the requirements of the June 2, 2010 Order."  Brush Exhibit 13.

It is clear that the FERC is strongly urging Northern to act quickly to design

and implement a containment plan.  This is demonstrated by the requirement that

the plan "be designed to go into effect within six months."   In this case, unlike

Sage,[14] the FERC certificate did not set any actual deadline for completion of

---

[14]  In Sage, the FERC order required the company "to complete construction and
have the pipeline in operation by January 1, 2005."  361 F.3d at 829.

construction of the project;  however, FERC clearly urged Northern to act on the

containment plan as quickly as possible since it had concluded that the storage

field is substantially at risk without implementation of a water injection plan.

Northern's time line for the construction project shows completion and

operation of the waterflood project to begin sometime between approximately

December of 2012 and April of 2013.  Brush Exhibit 6A.  This time line indicates

that it could take as much as approximately three years from the time Northern

obtains access to the Extension Area before the water injection system is installed

and operable.  Brush Exhibit 6A (*cf.* Step 1 to Step 3).  Any delay in allowing

Northern access to the Expansion Area will automatically further delay the

completion of the entire water injection system.

There are several elements to the containment plan which are interrelated

and Northern is severely limited in what it can do to advance the completion of the

project until it obtains full access to the Expansion Area.[15]  One of the major

surface owners has agreed that Northern can have immediate access to its

properties so that Northern can commence work on electrical lines and pipelines

---

[15]  It appears that the only activities which Northern can now take without a grant of immediate access from the Court is to proceed with permitting and drilling of water wells which are located on real property which is owned by Northern.  It is doing that now.

necessary for implementation of the water injection system.  However, the Court

does not believe that it can recommend piecemeal immediate access to only part of

the subject property, *i.e.,* the surface, while denying immediate access to other

portions of the property, *i.e.,* the wells that are to be converted to observation

wells.  As is the case with many construction projects, the water injection project

is dependent on a critical path approach, and completion of parts of the project are

dependent on work done on other parts.  The FERC's concerns about the

substantial risk to the storage field absent implementation of a robust containment

plan supports a finding that any further delay in commencement of work on the

water injection system would result in irreparable harm to the field and to

Northern.

Northern also argues that any delay in construction of the water injection

system has the possibility of allowing third-party gas producers to acquire leases

on land adjacent to the storage field and expansion area, and to drill wells that

could lead to increased migration of gas from the field.  Northern argues that if

additional wells are drilled and migration increases, it could also increase the

pathways for gas to escape from the field and possibly undermine the efficiency of

the plans for the design of the water injection system.  Northern cites two things to

support this argument: (1) approximately 2,800 acres of the Viola/Simpson

34

formation are currently leased along the north and east boundaries of the expansion area; and (2) eight months after shut in of the wells located in the expansion area, the Section 28 Area Wells continue to demonstrate a steady increase in production.  (Doc. 387, at 4.)

When questioned about the possibility of new wells being drilled near the expansion area, Northern's geologist, Mr. Cook, admitted that there had been no filed intents to drill any wells within the last three months, and that it had been some time -- years -- since the last wells had been drilled in Section 28.  Transcript (Oct. 5-6, 2011), at 223.  Northern's contract petroleum landman testified that she searched the records for leases within one mile North and one mile East of the expansion area and found approximately ten leases of which only three or four had been filed since January 2011.  Transcript (Oct. 5-6, 2011), at 239-40.  These leases were apparently held by only a couple of companies.  Only one well had been drilled in the area and there was no production so it was plugged and abandoned.  Transcript (Oct. 5-6, 2011), at 240.

As to production from the eight Section 28 area wells, in the related case No. 08-1405-WEB, Northern filed a motion to amend its complaint to remove any claims pertaining to the Section 28 area wells because their experts had determined that as of September 2010, those wells were producing all native gas

rather than storage gas.  Case No. 08-1405-WEB, Doc. 391, at 3, 5.  While

Northern admits that the Section 28 area wells were producing only native gas, it

was concerning about the possibility that Section 28 area wells might produce

storage gas now or in the future.  However, Northern's petroleum engineer,

Randall Brush, acknowledged in his affidavit in the related case that this was a

"potential" possibility, that the wells "could" produce storage gas in the future, but

importantly, this would only be determined or known through future monitoring.

Case No. 08-1405-WEB, Brush Affidavit, Doc. 413-1.

Even though it appears that other drilling by third parties near the

Expansion Area and production of storage gas by the Section 28 wells are only

"possibilities" which are not presently substantiated, this does not mean that there

is no irreparable harm if implementation of the containment plan is further delayed

pending completion of this condemnation action.  Considering the FERC's finding

of substantial risk to the storage field if the more robust containment plan is not

timely implemented, the Court finds that the storage field, and thus Northern, will

be irreparably harmed if immediate access is not granted.  This favors a grant of a

preliminary injunction.

3.    Balance of the equities.

Harm to the owner of property sought to be condemned which arises

36

because of an order of immediate possession has been characterized as merely a

timing argument since once it is determined that the condemning party has the

legal right to condemn the property, the loss of the property by the landowner is

inevitable and is merely one of timing.  *See* <u>Sage</u>, 361 F.3d at 829.  Defendants,

however, dispute this characterization, pointing out that (1) Northern might

abandon the condemnation if the ultimate award of just compensation were so

high that Northern believed the costs to be excessive; or (2) Northern might not be

able to pay a high just compensation finding due to its financial condition;   (Doc.

362, at 5-6.)[16]  The court in <u>Sage</u> addressed both of these possibilities, noting that

if the condemnation were abandoned or if the condemning party were unable to

pay, the landowners still had protection because title to the property had not

passed to the condemning party and as such, the condemning party would be liable

to the landowners if they abandoned the project because they would then be a

trespasser and would be liable as such.  <u>Sage</u>, 361 F.3d at 825-26.  Also, the

_____

[16]  The producing defendants also argue that the water injection project proposed
by Northern might ruin those properties for production and if Northern were to later
abandon the project, the damage would already be inflicted.  However, this is contrary to
defendants' arguments during the hearing that the installation of the water injection
project is not even scheduled to be completed until 2013 at at the earliest, and well into
2014 at the latest.  *See* Brush Exhibit 6A.  There is no reason to believe that the
condemnation cannot be completed and full compensation paid before any water injection
occurs, therefore the likelihood of physical damage to the property from any water
injection is *de minimis* at best.

condemning authority would be liable to the landowner for the time it occupied the land and for any damages resulting from their possession.  Sage, 361 F.3d at 826.  This fact, along with the protection that can be given by a requirement for deposits and/or bonds if immediate possession is granted, indicates that sufficient safeguards can be put in place to protect the landowners from harm.

Defendant gas producers also claim that granting immediate access would deprive them of the opportunity to explore zones above the Viola/Simpson for production of oil or natural gas.  L.D. Drilling has taken steps to test higher formations in the Zink 1-A well with some success.  However, again any potential harm to the gas producers can be addressed by the nature and amount of any deposit and/or bond required as part of any preliminary injunction.[17]

After consideration of defendants' claims, the court finds that the relative harm to defendants if immediate access is granted is not as serious as the harm to

---

[17] Defendants argue that Northern's action of withdrawing its request for immediate access to the Zink 1-A well is proof that Northern does not need to act as quickly as it claims to install the water injection program.  Northern did argue in objecting to L.D. Drilling's testing of the Lansing Kansas City formation that the Zink 1-A was a very important part of its containment plan.  Thus it is somewhat incongruous to now withdraw the request for immediate access to that well.  However, that is only one of the nine wells to be converted to observation wells and any delay in obtaining possession of that one well alone does not appear to be the deciding factor in how quickly Northern can complete installation of the water injection program.  Also, Northern states that it needs to ascertain if the completion in the upper zone has damaged the well for use as an observation well in the lower Viola formation.

38

Northern if the construction and implementation of the water injection program is delayed until final determination of just compensation at the conclusion of the condemnation action.  This factor favors entry of a preliminary injunction.

    4.    <u>The public interest.</u>

    There can be little question but that protection of the Cunningham Storage Field from the loss of storage gas through migration is in the public interest.  This is clear from the FERC Order of June 2, 2010, where FERC concludes that the integrity of the storage field is substantially at risk and directs Northern to design and implement a robust plan that will prevent further migration.  This factor also favors entry of a preliminary injunction.

    After consideration of the four elements required to issue a preliminary injunction under Rule 65(a), and keeping in mind that the request for immediate access seeks a mandatory injunction which is disfavored, the Court finds that Northern has made the strong showing required for issuance of a disfavored preliminary injunction.  Accordingly, the undersigned recommends that the Court find that Northern has met the requirements for an injunction granting it immediate access to the Expansion Area, conditioned upon the requirement that Northern make such deposits and post such bonds as the Court determines are reasonably necessary to protect the interests of the Defendants

C.      Determination of a reasonable bond and/or deposit.

Northern's response to Defendants' post-hearing memorandum outlines the respective positions of the parties about the amounts of any deposit and/or bond that should be required if Northern is granted immediate possession of the subject property prior to a final determination of just compensation in this case. *See* Doc. 387-1. Northern proposed to make a deposit of $771,700 which could all be drawn down by the defendants prior to completion of the case, and to also post a bond in the amount of $7,498,870. The producer-defendants propose that Northern be required to deposit the sum of $39,562,500, all of which could be immediately drawn down. As previously noted, two defendants -- the Huff Landowner Group and Five Star Energy -- do not object to the bond and deposit suggested by Northern.[18] The differences between the parties' proposals centers

---

[18]   The Huff Group states its opinion that Northern is financially capable of satisfying any award of just compensation above the amount of the bond and deposits proposed by Northern. The Court, however, is unable to make any specific finding concerning Northern's financial capability. No financial statements have been offered into evidence concerning Northern's financial condition or net worth. The only evidence in the record on this issue is Shaner Ex. 5A which is a recent Standard and Poors "A" credit rating for Northern, and Shaner's general testimony that after review of both Standard and Poors and Moody's reports for several periods, he concluded that Northern had "a reasonably good credit rating." Transcript (Oct. 5-6, 2011), at 270. The Court notes that the Standard and Poors definition of an "A" rating is "[s]trong capacity to meet financial commitments, but somewhat susceptible to adverse economic conditions and changes in circumstances." *See  http://www.standardandpoors.com/ratings/definitions-and-faqs/en/us,* last accessed on 11-14-2011.

on the values placed on two elements: (1) the eight wells to be converted to observation wells; and (2) the gas volumes in the Expansion Area.

>    1.    Eight wells to be converted to observation wells

Northern contends that the subject wells are worth only salvage value of $20,000, so it proposes to make a deposit of that amount for each of the eight wells, which totals $160,000.  This amount could be drawn down immediately by the defendants.  Northern acknowledges that defendants' position is that the each well would cost $400,000 to drill and complete in the Viola/Simpson formations, but since it disagrees with this valuation, it proposes to post a bond for the $380,000 difference in excess of the salvage value should the defendants' position be sustained by the fact finder.  This bond amount would total $3,040,000.

Defendants, relying on Rockies Express Pipeline, LLC v. 4.895 Acres of Land, No. 2:08-cv-554, 2008 WL 4758688 (S.D. Ohio, Oct. 27, 2008) argue that the full amount of $400,000 it would cost to drill replacement wells should be deposited with the court, plus a 25% "additional surety" which is "to account for additional value attributable to production from other formations, the time value of money, etc."  (Doc. 362, at 7.)  For the eight wells, this totals $4,000,000.

The court in Rockies Express granted plaintiff the right of immediate access conditioned upon plaintiff's deposit into court of an amount equal to the last

41

appraisal made for each property.  2008 WL 4758688 at * 5.  The court also

directed that

> the landowner could immediately access all or any
> portion of the deposited funds, with the understanding
> that such withdrawal is at the landowner's peril and that
> if the ultimate compensation award is less than the
> amount withdrawn, the landowner will be liable for the
> return of the excess with appropriate interest.

*Id.*  In noting the difference between a deposit and posting a bond, the court stated

that

> The posting of such a bond would not afford as swift
> compliance with the expediency provision of the Federal
> Rules of Civil Procedure 71.1(j)(2) as the elective pre-
> trial or hearing distribution ordered today by the Court.

*Id.*  In addition, the court required plaintiff to post a bond equal to 25% of the last

appraisal of the properties which was to protect the interests of the landowners as

to any damages that might be awarded in excess of the deposited funds.   In this

case defendants' proposal varies from the rationale in Rockies Express by having a

25% "premium" be a part of the required deposit rather than covered by a bond.

     As to the issue concerning the eight wells, the court finds the approach in

Rockies Express to be more appropriate than the proposals by either plaintiff or

defendants.  The court finds for purposes of setting a bond and/or deposit that the

testimony of L.D. Davis is persuasive and the cost of a replacement well would be

approximately $400,000.  Transcript (Oct. 5-6, 2011), at 396.  In fact, Northern's

expert witness, Mr. Cook, arrived at the same estimated cost to drill a similar

replacement well.  Transcript (Oct. 5-6, 2011), at 162.  If one of the defendant

producers sought to explore for hydrocarbons in the Expansion Area in other

zones -- either up-hole or down-hole from the Viola and Simpson formations --

they would be required to fund the cost of drilling any replacement well at the time

it was drilled.  The cost to drill such a replacement well significantly exceeds the

cost to perforate other zones in an existing well, and, as a practical matter, that

additional cost may well cause a producer to delay any further exploration

activities in other zones until it finally receives payment of just compensation at

the completion of these condemnation proceedings.  However, it is undisputed that

the producers have the right to explore in zones other than the Viola and Simpson

and Northern is not seeking to prevent such exploration.  Therefore, in order to

provide a reasonable security for allowing immediate possession of these eight

wells, a bond would not provide defendants with the same degree of security as

would a deposit which could be drawn down in order to fund further exploration.

Accordingly, the undersigned recommends that Northern be required to deposit

the sum of $3,200,000 (8 wells x $400,000).

    In Rockies Express, the court also required the condemnor to post a bond as

additional security to landowners should an award of just compensation exceed the

amount deposited.  However, unlike Rockies Express, in this case the defendants

themselves have presented evidence as to the cost of drilling any replacement

wells.  Therefore the court does not find that any additional security should be

required in the form of a bond.  The deposit required in this case can be drawn

down by the appropriate defendants in full or in part, but if the ultimate award of

just compensation is less than the amounts drawn down, each defendant who drew

down funds shall be liable for the return of the excess together with appropriate

interest.

2.   Gas volumes in the Expansion Area

By its very nature, any attempt to calculate gas volumes underlying the

Expansion Area is subject to the most uncertainty.  This is demonstrated by the

wide discrepancy in testimony of  the experts for the respective parties.

Northern's expert calculates a volume of 1.045 Bcf of gas and values it at a total

of $4,478,870; defendants' expert calculates the value of gas in the Expansion

Area as $35,562,000.  Also, statements made by Northern in applications in the

FERC proceedings concerning migration of 17-18 Bcf of gas during fill-up of the

storage field have led to spirited disagreements between the parties.  While

Northern's expert analysis appears to be more detailed in its volumetric

44

calculations, in part due to the fact that Northern has had more time to study and

analyze data concerning the field, it is also true that in the past Northern's prior

experts have apparently been mistaken in their analysis of the field and the causes

of gas migration.  The court is also uncertain whether Northern's volumetric

analysis takes into account any communication that exists between the Viola and

Simpson formations.  These uncertainties support a finding that reasonable

security for the value of gas beneath the Expansion Area should be in the form of a

bond rather than a cash deposit that can be drawn down.

Aside from the question of the volume of gas beneath the Expansion Area is

the issue of who owns that gas, a legal question that is now before the Kansas

Supreme Court.  This uncertainty gives rise to concerns about who would be

entitled to draw down any deposit of funds related to the value of the gas if a

deposit were required instead of a bond.  This uncertainty further supports the

argument that posting a bond related to the value of gas would be more

appropriate than requiring a cash deposit.

After considering the testimony of the expert witnesses and the arguments

of counsel, and due to the uncertainties in ascertaining gas volumes in

underground formations, the court finds that a reasonable bond related to gas

volumes located beneath the Expansion Area would be in the amount of

$6,700,000. This is approximately 150% of the amount derived from Northern's volumetric analysis by Randall Brush.

### 3. Other components of a bond and/or deposit

In addition to the above findings concerning the amounts of any bond and/or deposit related to the eight wells and the gas volumes beneath the Expansion Area, Northern's proposed security also included three other components: (a) Northern's use of the Viola formation throughout the Expansion Area -- deposit of $538,000; (b) Property rights and interests to install, construct and maintain the three new injection wells and one new observation well -- deposit of $16,800; and (c) Property, rights, and interests to install flow lines, electrical lines and telecommunications lines -- deposit of $56,900. (Doc. 387-1.) Since defendants did not specifically dispute these particular components or provide any suggested values, the court finds that these proposed deposits constitute reasonable security for the items described and should be added to the amounts discussed by the court under subparagraphs (1) and (2) above.[19]

---

[19]  The Court is recommending these amounts only for purposes of setting a reasonable bond or deposit. There are disagreements with some of the calculations, including Mr. Shaner's appraisal of Northern's use of the Viola formation for storage and his refusal to apply the income approach in his appraisal. Nothing in this Report and Recommendation shall prevent any party from presenting contrary evidence and arguments concerning these valuations at the time of trial.

46

**IT IS THEREFORE RECOMMENDED** that the Court enter an order confirming that Northern has the authority to condemn all of the property described in its Amended Complaint (Doc. 188.);

**IT IS FURTHER RECOMMENDED** that the Court enter an order holding that it has the legal authority to grant Northern the right of immediate possession of the property to be condemned in this case pursuant to Fed. R. Civ. P. 65(a) and the reasoning of the court in E. Tenn. Natural Gas Co. v. Sage, 361 F.3d 808, *rehearing* denied 369 F.3d 357 (4th Cir. 2004), *cert denied sub nom.* Goforth v. E. Tenn. Natural Gas Co., 543 U.S. 978 (2004) and Joyce v. E. Tenn. Natural Gas Co., 543 U.S. 978 (2004);

**IT IS FURTHER RECOMMENDED** that the Court find that Northern has made the strong showing required for issuance of a disfavored preliminary injunction and therefore the motion for immediate possession should be granted and a preliminary injunction should be entered allowing Northern immediate access to the Expansion Area;

**IT IS FURTHER RECOMMENDED** that the preliminary injunction be conditioned upon Northern's providing the following reasonable security:

A.     Posting of a bond with appropriate sureties          $7,700,000

and

B.      Deposit into the registry of the Court of the following amounts:

| | | |
|---|---|---|
| 1. | Wells (8) to be converted to observation | $3,200,000 |
| 2. | Use of the Viola formation throughout the Expansion Area | $ 538,000 |
| 3. | Rights and interests to install, construct and maintain the three new injection wells and one new observation well | $ 16,800 |
| 4. | Property, rights, and interests to install flow lines, electrical lines and tele-communications lines | $ 56,900 |
| | Total Deposit | $3,811,700 |

**IT IS FURTHER RECOMMENDED** that the required deposit can be drawn down by the appropriate defendants in full or in part, but if the ultimate award of just compensation is less than the amounts drawn down, each defendant who drew down funds shall be liable for the return of the excess together with appropriate interest.  As to the draw down of any funds concerning the eight wells to be converted to observation wells, any request to draw down the funds shall be accompanied by the consent of any landowners, royalty owners, working interest owners and lienholders who have an interest in the tract upon which the well is located.

A copy of this Report and Recommendation shall be served on all parties electronically via the Court's CMECF system.  Pursuant to 28 U.S.C. §636(b)(1), Fed. R. Civ. P. 72, and D. Kan. Rule 72.1.4, any party shall have fourteen days after service of a copy of these proposed findings and recommendations to serve and file with the U.S. District Judge assigned to the case, any written objections to the findings of fact, conclusions of law, or recommendations of the magistrate judge.  A party's failure to file such written, specific objections within the fourteen-day period will bar appellate review of the proposed findings of fact, conclusions of law, and the recommended disposition.

Dated at Wichita, Kansas this 16th day of November, 2011.

s/ Donald W. Bostwick
DONALD W. BOSTWICK
U.S. MAGISTRATE JUDGE