## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF KANSAS

NORTHERN NATURAL GAS COMPANY,      )
                                   )
                    Plaintiff,     )      CIVIL ACTION
                                   )
v.                                 )      No.  10-1232-MLB
                                   )
                                   )
Approximately 9117.53 acres in Pratt, )
Kingman, and Reno Counties, Kansas,   )
and as further described herein;      )
                                   )
Tract No. 1062710 containing 80.00 )
acres more or less, located in Kingman )
County, Kansas, and as further     )
described herein; et al.,          )
                                   )
                    Defendants.    )
_____)

### MEMORANDUM AND ORDER

On November 16, 2011, Magistrate Judge Donald Bostwick issued a Report and Recommendation regarding Northern's Motion for a Temporary Restraining Order.  That same day he also filed a Report and Recommendation addressing Northern's Motion for Preliminary Injunction and for Supplementary Confirmation of Condemnation Authority.  (See Docs. 414 & 415, addressing Docs. 403 & 202). The parties filed various objections to the Reports. Docs. 426, 427, 428.  Following Judge Brown's death, the case was transferred to the undersigned judge.  Accordingly, the matter is now before the court on the parties' objections to Judge Bostwick's reports and recommendations.

Judge Bostwick's first Report recommended that the court grant Northern's motion to temporarily restrain L.D. Drilling, Inc. from re-completing the Brown A1 well. The second Report recommended that the court confirm Northern's supplemental condemnation authority request and grant its motion for preliminary injunction to allow it immediate

access to, and possession of, the property to be condemned (including the Brown A1 well and seven other wells Northern seeks to condemn), subject to several conditions. Those recommended conditions include the posting of a bond in the amount of $6.7 million and the deposit of just over $3.8 million in funds into the court's registry, with the latter funds subject to being drawn down by defendants affected by Northern's immediate access.[1] If an amount drawn down should exceed the ultimate award of just compensation at the end of the case, the affected defendant would be liable for return of the excess plus interest. With regard to the eight wells that Northern seeks to convert to observation wells, Judge Bostwick recommended an additional requirement that any draw-down of funds be accompanied by the consent of any landowners, royalty owners, working interest owners or lienholders who have an interest in the tract upon which the well is located.

## I. SUMMARY OF OBJECTIONS

a. <u>Northern</u>. Northern objects to the recommendation for a $3.2 million deposit to secure access to defendants' eight wells, arguing that a bond would be sufficient security and asserting that neither case law nor Rule 65 requires a deposit. Alternatively, Northern argues it should be allowed to post a $1.2 million bond as security

---

[1] The total cash deposit recommended by Judge Bostwick was $3,811,700. The following represent the component parts of that total: $3.2 million would relate to the eight wells to be converted to observation wells [$400,000 per well] ; $538,000 would be security for Northern's use of the Viola formation throughout the Expansion Area; $16,800 would be for the rights and interests to install three new injection wells and an observation well; and $56,900 would be for the property, rights and interest to install flow line, electrical lines, and communication lines.

for access to Nash's wells, instead of a cash deposit, due to concerns about Nash Oil & Gas, Inc.'s ability to repay any excess draw-down. Northern also requests clarification as to whether the conditions require defendants to apply any withdrawn funds toward the actual cost of drilling a new well, and whether and to what it extent the conditions require defendants to provide evidence of the landowners' consent to a withdrawal.

    b. <u>L.D. Drilling, Inc., Nash Oil & Gas, Inc., et al</u>.[2]  These defendants first object to Judge Bostwick's recommendation that the court has the power to grant a preliminary injunction allowing Northern immediate access to the property. They point out that the Natural Gas Act contains no "quick take" provision for immediate taking of property, in contrast to other condemnation statutes where Congress specifically provided such authority. Defendants assert the court should follow the reasoning of <u>Northern Border Pipeline Co. v. 86.72 Acres of Land</u>, 144 F.3d 469 (7th Cir. 1998) and <u>Transwestern Pipeline Co., LLC v. 17.19 Acres of Property Located in Maricopa County</u>, 550 F.3d 770 (9th Cir. 2008) which hold that, in the absence of an order of condemnation, a federal district court has no authority to grant a preliminary injunction for immediate access because the condemnor has no substantive right to immediate possession of the property.  Defendants reject the reasoning of <u>East Tennessee Natural Gas Co. v. Sage</u>, 361 F.3d 808 (4th Cir. 2004), which holds that a district court has the inherent equitable power to grant this type of

---

[2] These defendants include L.D. Drilling and Nash Oil and Gas and their respective holders of working interests and overriding royalty interests. *See* Doc. 428 at 1.

injunctive relief.

As a fall-back position, defendants assert that even if the court concludes it has such authority, Northern has failed to show that it will suffer irreparable harm without an injunction. Defendants point out that no gas production has occurred in the Expansion Area for nearly a year, notwithstanding Northern's claim that third-party production is the cause of storage gas migration.

Defendants additionally raise an objection to Northern's authority to condemn the well bores. They argue that even if the wells are covered by Northern's Blanket Certificate of authority, the NGA limits condemnation to properties that are "necessary" to the proper operation of the facility. They say the well bores are not necessary because Northern can obtain or drill other well bores to achieve its purposes.

As to the $3.2 million deposit of funds pertaining to the eight wells sought by Northern, defendants contend that the funds are based on the cost of drilling replacement wells and that defendants alone – and not the landowners – own the eight wells and will bear any well replacement costs. For that reason, they argue they should not be required to obtain the consent of landowners or royalty owners before drawing down deposits that are intended to cover the costs of wells.

Defendants also object to Judge Bostwick's recommendation that L.D. Drilling be temporarily restrained from recompleting the Brown A1 well pending a ruling by the court on Northern's motion for immediate access. They argue Judge Bostwick impermissibly relied on an ex parte affidavit to find a likelihood of harm to the Brown A1 well, and that he erred in concluding that damage to the well bore

-4-

will constitute irreparable harm to Northern because the well bores are not "necessary" to operate Northern's facility.

## II. STANDARDS OF REVIEW

The foregoing motions were referred to Judge Bostwick pursuant to 28 U.S.C. § 636(b)(1)(B). On such a referral, the court makes a de novo determination of those portions of the report, findings or recommendations as to which objection is made. The court may accept, reject, or modify the findings or recommendations, and it may receive further evidence or recommit the matter to the Magistrate. Id.

The standards for issuing a temporary restraining order or a preliminary injunction are well established. When seeking a TRO or a preliminary injunction, the moving party must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest. See Little v. Jones, 607 F.3d 1245, 1251 (10th Cir. 2010). In addition, the movant must establish "a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint." Id. (citing Devose v. Herrington, 42 F.3d 470, 471 (8th Cir. 1994)). Certain types of injunctions are disfavored, including mandatory injunctions to compel the nonmoving party to take action and injunctions that disrupt the status quo. See Little, 607 F.3d at 1251; Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC, 562 F.3d 1067, 1070 (10th Cir. 2009). Northern's request for immediate access to and possession of defendants' wells and other property falls within the disfavored category. Before a court may grant such relief, the movant must make

a heightened showing of the four factors. <u>O Centro Espirita</u> <u>Beneficiente Uniao Do Vegetal v. Ashcroft</u>, 389 F.3d 973, 975-6 (10th Cir. 2004) (<u>en banc</u>). The court must more closely scrutinize the request to assure that the exigencies of the case support the granting of relief that is extraordinary even in the normal course. <u>Id</u>. at 975.

## III. DISCUSSION

A. <u>Motion to Confirm Supplemental Authority to Condemn</u>. In March 2011, the court confirmed Northern's authority to condemn the property listed in the initial complaint, including the right, title and exclusive possession of the Viola and Simpson formations in the Expansion Area approved by FERC (Doc. 183). Northern later amended the complaint to include property interests to be taken to implement a proposed water injection program (<u>see</u> Docs. 202, 183.)[3] The latter interests include the right to install, acquire and operate various wells, including specified existing wells to be converted to observation wells; installing electrical and telecommunication lines; the right to inject water into the Viola formation; and the right of ingress and egress across the Expansion Area to facilities that are part of Northern's containment plan.

Defendants contend some or all of these property rights are not "necessary" within the meaning of 15 U.S.C. § 717f(h), and that Northern does not have authority to condemn them because Northern can use newly-drilled wells or well bores other than the ones specified (Doc. 428 at 12-13). The court agrees with Judge Bostwick, however,

---

[3] The Amended Complaint also added tracts 123611 and 3152711 as part of the property to be taken. These tracts were not included in the initial complaint.

-6-

that this amounts to an impermissible collateral attack on the FERC Certificate and FERC's approval of the water injection program submitted by Northern. Cf. Brief of L.D. Drilling, Inc. (Doc. 305 at 13) ("We have reviewed Northern's submission to FERC and Northern did NOT provide any evidence or analysis regarding the issues previously identified. For example, Northern stated that the locations of these wells are suitable, but Northern did not discuss whether drilling wells nearby would also be suitable."). It is undisputed that FERC directed Northern to submit a containment plan that would effectively slow and reverse storage gas migration out of the Cunningham storage field, that Northern's filings under that order included a plan for conversion of specified third-party wells into observation wells, and that FERC issued a delegated order confirming that Northern's proposed actions are in compliance with the June 2, 2010 FERC Order. In that determination, FERC declared that "Northern's proposed construction activities ... can be undertaken pursuant to section 157.203(a) of Northern's blanket certificate authority."[4] No appeal was taken from FERC's orders relating to the containment plan and, as Judge Bostwick noted, collateral attacks on FERC orders cannot be entertained in the district court. See Doc. 415 at 22; Williams Natural Gas Co. v. City of Oklahoma City, 890 F.2d 255, 264 (10th Cir. 1989) (the eminent

---

[4] A Blanket Certificate was issued in September of 1982 authorizing Northern to conduct routine activities as permitted by 18 C.F.R. § 157.203(b). Additional certificates were issued in 2008 and 2010 authorizing expansion of the storage field by 1,760 acres and creation of a buffer zone of 12,320 acres. Northern filed a containment plan in a quarterly report in April of 2011, and on April 29, 2011, FERC issued a Delegated Order under 18 C.F.R. 375.308(y)(1) finding Northern's proposed actions to be in compliance with FERC's June 2, 2010 order.

domain authority granted district courts under the NGA does not provide challengers with an additional forum to attack the substance and validity of a FERC order). The court agrees with Judge Bostwick's analysis and finds that Northern's request to confirm its supplemental confirmation authority should be granted.

B. Motion for Immediate Access. Northern seeks a preliminary injunction granting it immediate possession of, and access to, the property interests to be taken in order to implement its containment plan for the Cunningham Storage Field. The threshold question is whether the court has the power to even consider Northern's request for a preliminary injunction under the facts of this case.

There are two conflicting lines of case law regarding a district court's authority to grant a preliminary injunction for immediate access to property that is the subject of a condemnation proceeding. Judge Bostwick gave a concise summary of these decisions in his Report and the court has reviewed the decisions as well. Although there is no Tenth Circuit authority on the question, the court concludes the better view is that the district court has the equitable power to grant an injunction in an appropriate case.

In East Tennessee Natural Gas Co. v. Sage, 361 F.3d 808 (4th Cir. 2004),[5] a district court granted a gas company a preliminary injunction for immediate possession of properties needed for a pipeline project. In upholding this injunction, the Fourth Circuit recognized that the NGA, like most condemnation statutes, contains no

---

[5] Rehearing and rehearing en banc denied, 369 F.3d 357 (4th Cir., May 14, 2004), and cert. denied sub nom. Goforth v. East Tennessee Natural Gas Co., 543 U.S. 978 (Nov. 8, 2004).

so-called "quick-take" provision,[6] but simply provides that the holder of a certificate may acquire property "by the exercise of eminent domain in the district court." <u>Id</u>. (citing 15 U.S.C. § 717f(h)). <u>Sage</u> pointed out that despite the absence of such express authority, nothing in the NGA precludes a preliminary injunction for immediate possession. Similarly, neither Rule 71.1 nor its predecessor (Rule 71A) contains any language prohibiting a condemnor from pursuing any available procedure to obtain immediate possession, including an application for preliminary injunction under Rule 65. <u>Sage</u>, 361 F.3d at 823. On the contrary, the rules of civil procedure generally apply to condemnation proceedings except as otherwise provided in Rule 71.1. <u>See</u> Fed.R.Civ.P. 71.1(a). <u>Sage</u> noted that the committee which drafted Rule 71A decided against including procedures for immediate possession because "the procedure ... being followed [to allow immediate possession] seems to be giving no trouble, and to draft a rule to fit all the statutes on the subject might create confusion." <u>Sage</u>, 361 F.3d at 823 (<u>quoting Fed.R.Civ.P. 71A advisory committee supplementary report</u>, 11 F.R.D. 222, 228 (Mar. 1951)). <u>Sage</u> accordingly rejected an argument that a district court lacks authority to enter an injunction for immediate possession: "Congress has never given any indication

---

[6] The Fourth Circuit noted there are two basic types of condemnation: a "straight condemnation," where just compensation is determined and final judgment entered before the condemnor takes possession, and a "quick take" method, where the condemnor takes possession at the outset of the proceeding. *Sage* pointed out that under the latter method, which it said was typically available only to the United States under the Declaration of Taking Act, the Government must deposit the estimated value of the property with the court, and the persons entitled to compensation have that sum available, whereupon title to the property vests in the United States even though just compensation is not finally determined until later in the proceeding. <u>Sage</u>, 361 F.3d at 822.

that it disapproves of this procedure. Indeed, because Congress has not acted to restrict the availability of Rule 65(a)'s equitable (injunctive) remedy in an NGA condemnation, we conclude that the rule applies." Sage, 361 F.3d at 824. See also id. (citing Mitchell v. Robert De Mario Jewelry, Inc., 361 U.S. 288, 291 (1960) ("Equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command.")). In the Fourth Circuit's view, then, a district court has inherent equitable power to grant immediate entry to the condemnor to prevent irreparable harm. Sage, 361 F.3d at 826.

Nevertheless, Sage observed that equitable powers may not be used to create new substantive rights.  But when a substantive right exists, an equitable remedy may be fashioned to give effect to the right. Sage, 361 F.3d at 823. Once a condemnor's right to take the property has been confirmed by a court, the condemnor has a substantive right to obtain the property, and it is proper to consider the condemnor's  request for equitable relief in the form of a preliminary injunction for immediate possession. To obtain such relief, the condemnor must still meet the strict requirements for a preliminary injunction, including a showing that it will suffer irreparable harm without the injunction. Id. at 825.

Sage recognized that the Constitution does not bar taking immediate possession before just compensation is paid. Rather, the Constitution mandates that "the owner is entitled to reasonable, certain, and adequate provision for obtaining compensation before his occupancy is disturbed." Id. at 824 (citing Cherokee Nation v. S. Kan. Ry. Co., 135 U.S. 641, 659 (1890)). Because title to the property does not pass until the end of the case (unlike a true "quick-take"

procedure), the condemnor becomes a trespasser if it fails to pay the final compensation award in a reasonable time. Id. at 825-26. Likewise, if the condemnor abandons the project before final judgment, it will be liable to the landowner for the occupation and for any resulting damages. Id. at 826. Sage noted that landowners were protected by the availability of condemnation procedures under then-Rule 71A, by the condemnor's deposit of an amount of cash equal to the appraised value of the interests condemned, and by the solvency of the condemnor and its ability to make up any difference between the deposit and the ultimate determination of just compensation. Sage, 361 F.3d at 824.

Defendants reject Sage and instead rely on Northern Border Pipeline Co. and Transwestern Pipeline Co., supra. They complain that Judge Bostwick did not "analyze the comparative merit" of Sage and Northern Border but rather based his recommendation by counting the number of decisions which follow Sage's reasoning as opposed to Northern Border (Doc. 428 at 3-7). Clearly this is an unwarranted and unfair characterization of Judge Bostwick's thorough Report.

Defendants' reliance on Northern Border is unimpressive. Northern Border is sketchy about the facts before the district court. But as explained in both Sage (361 F.3d at 827) and Transwestern Pipeline (550 F.3d at 777) the critical defect in Northern Border's application for a preliminary order of possession was its failure to first obtain an order confirming its right to condemn the property. Defendants acknowledge that Northern has such an order (Doc. 183) but counter that Transwestern explains that ". . . a confirmation order cannot provide a substantive right that the underlying FERC

certificate does not, because the order simply confirms the existence of authority that is granted by the certificate. . . ." (citing the district court's opinion, 544 F. Supp. 2d at 948).  If the district court's opinion says that, this court has missed it.  It's more instructive to consider what the Ninth Circuit said on appeal:

> Here, Transwestern's substantive right to condemn the affected parcels accrues only through the issuance of an order of condemnation by the district court. To obtain such an order, Transwestern must, at minimum, meet the requirements of § 717f(h), which include showing: "(1) that it holds a FERC certificate authorizing the relevant project, (2) that the land to be taken is necessary to the project; and (3) that the company and the landowners have failed to agree on a price for the taking.... In addition to showing an inability to agree on a price with the landowner, [Transwestern] must also establish that it engaged in good faith negotiations with the landowner." Nat'l Fuel Gas Supply Corp. v. 138 Acres of Land, 84 F.Supp.2d 405, 416 (W.D.N.Y. 2000) (citations omitted).[7]

> Most courts presented with the issue agree that a plaintiff gas company must secure an order of condemnation before taking possession. In Northern Border, the Seventh Circuit held that the gas company could not obtain a preliminary injunction without first showing a "substantive claim to immediate possession." Northern Border Pipeline Co. v. 86.72 Acres of Land, 144 F.3d 469, 472 (7th Cir. 1998). In East Tennessee Natural Gas Co. v. Sage, 361 F.3d 808, 825 (4th Cir. 2004), the Fourth Circuit found that the district court's grant of immediate possession was appropriate only where an order of condemnation had first issued. In construing the holding of Northern Border, the Sage court agreed that without first accruing its substantive right of possession through an order of condemnation, the gas company could not invoke the court's equitable powers. Id. at 828. Sage also cited Northern Border Pipeline Co. v. 64.111 Acres of Land, 125 F.Supp.2d

---

[7]    The Memorandum and Order of March 15, 2011 (Doc. 183) discusses the matter of good faith negotiation. Judge Brown concluded that the NGA does not condition Northern's authority to proceed with condemnation upon "good faith negotiation."  This is not to say, however, that negotiations are not an acceptable part of the condemnation process.  Indeed, Northern has negotiated with at least some of the landowners.  As Judge Brown correctly and sensibly observed, if compensation cannot be negotiated, it will be determined as part of the action.

299, 301 (N.D.Ill. 2000) and <u>Guardian Pipeline, L.L.C. v.</u> <u>950.80 Acres of Land</u>, 210 F.Supp.2d 976, 979 (N.D.Ill. 2002), cases interpreting the Seventh Circuit's <u>Northern Border</u> decision and which granted possession to gas companies only following judgments of condemnation.

Transwestern relies upon <u>Northwest Pipeline</u>, because there the district court relied heavily on the court's equitable powers to grant a preliminary injunction under the NGA. <u>Northwest Pipeline Corp. v. The 20' x 1,430' Pipeline Right of Way</u>, 197 F.Supp.2d 1241, 1246 (E.D.Wash. 2002). Transwestern argues that the <u>Northwest Pipeline</u> decision cannot be reconciled with the district court's decision in this case. But its reliance is misplaced. The court in <u>Northwest Pipeline</u> granted the gas company possession only after first deciding the gas company's summary judgment motion, issuing an order of condemnation, and requiring the gas company to deposit the estimated fair market value of the condemnation. <u>Id.</u> Using the court's equitable powers after issuing an order of condemnation and ensuring the preliminary injunction standard is met was proper. The <u>Northwest Pipeline</u> decision is also consistent with the district court's actions here, as Transwestern did not file any summary judgment motion before seeking immediate possession.

Given the limited statutory authority afforded by the NGA, an order of condemnation must be issued before the substantive right of taking accrues. This approach strikes the correct balance of requiring the gas company to satisfy all elements of the statute, but does not require it to wait for the full determination of just compensation for each parcel before the district court uses its equitable powers to grant possession. Rather, once the order is issued, the district court can require Transwestern to deposit the full estimated amount of the taking and engage in the standard preliminary injunction analysis, as it did in <u>Northwest Pipeline</u>.

<u>Transwestern Pipeline</u>, 550 F.3d at 776-7 (footnote omitted).

<u>Northern Border</u> was decided in 1998. More contemporary authority endorses the <u>Sage</u> approach, including a prior decision in this district. <u>See Sage</u>, 361 F.3d at 827 (listing cases); <u>Humphries v. Williams Natural Gas Co.</u>, 48 F.Supp.2d 1276, 1280 (D. Kan. 1999) (noting "the fact that it is apparently well settled 'that the district court does have the equitable power to grant immediate entry

and possession where such relief is essential to the pipeline construction schedule.'"). See also J. Behnke and H. Dondis, The Sage Approach to Immediate Entry by Private Entities Exercising Federal Eminent Domain Authority under the Natural Gas Act and the Federal Power Act, 27 Energy L.J. 499 (2006) ("the Sage approach to immediate entry currently represents the most developed stage of judicial thought and action concerning immediate entry and federal eminent domain law."); Perryville Gas Storage LLC v. 40 Acres of Land, 2011 WL 4943318(W.D. La., Oct, 17, 2011) ("Federal courts across the country have recognized that a district court has the equitable authority to grant immediate entry and possession to a natural gas company in a condemnation action brought under the Natural Gas Act.").

After considering defendants' arguments, the court agrees with Judge Bostwick's recommendation that the court should follow the reasoning of Sage. The court finds that it has the authority to consider Northern's motion for a preliminary injunction for immediate access. Should the motion be granted, the court will not be creating a substantive right but rather will be granting preliminary relief that may – and likely will – be available to Northern at the end of the case under the NGA. The rules of civil procedure provide a mechanism for obtaining preliminary relief, and Northern's confirmed right to condemn the property provides Northern with an interest in the property that the court, upon proper showing, has the authority to protect from irreparable harm. Without such authority, the owner of any single property subject to condemnation could effectively thwart the condemnation process by using the property in a way that destroys its usefulness to the condemnor, and the public interest

-14-

underlying the condemnation could be irreparably harmed.

Having concluded that the court has authority to grant a preliminary injunction for immediate access, upon the proper showing, the court turns to whether an injunction is warranted in this case. As Judge Bostwick noted, Northern's request would alter the status quo and is a disfavored mandatory injunction subject to a higher level of scrutiny. Doc. 415 at 29.

1. *Likelihood of Success on the Merits*. Judge Bostwick concluded that in an action under the NGA, the court's entry of an order confirming the condemnor's right to condemn the property shows that the condemning party is likely to prevail on the merits. Doc. 415 at 31. Defendants do not challenge that particular conclusion and the court agrees that Northern is likely to prevail on its claim for condemnation of the named property given its authority under the NGA and the FERC Certificate, as recognized by the court's prior order and by the discussion above. See *Sage*, 361 F.3d at 829-30.

2. *Irreparable Harm to the Moving Party*. FERC rejected Northern's initial proposal for a "wait and see" approach to whether water injection is necessary to stop storage gas migration into the Expansion Area. FERC found the integrity of the storage field is "substantially at risk" and insisted that Northern develop a more robust plan to reverse the storage gas migration, adding that the plan should go into effect within six months of FERC's June 2, 2010 order. In response, Northern submitted a containment plan calling for (among other things) installation of facilities for a water injection program, including the acquisition and conversion of existing well bores of defendants for conversion to observation wells. FERC

determined that Northern's proposal is in compliance with the June 2 order. As Judge Bostwick noted – and as the record shows – "FERC clearly urged Northern to act on the containment plan as quickly as possible since it had concluded that the storage field is substantially at risk without implementation of a water injection plan." Doc. 415 at 33.

Northern's containment plan will take several years to fully implement. See Doc. 203-5, Brush Affidavit p. 6; Doc. 203-6 at 10. The estimated total time to achieve complete stabilization of the field is between 41 to 69 months from July 2010. It's now March 2012. The plan calls for potential injection of large volumes of water – up to 6,000,000 barrels – which itself will likely require a significant period of time. Implementation of the plan's latter steps are obviously dependent upon Northern gaining access and completing the initial stages – a "critical path approach," as Judge Bostwick noted. As a result, "[a]ny delay in allowing Northern access to the Expansion Area will automatically further delay the completion of the entire water injection system." Doc. 415 at 33. Compounding the problem is the risk that if defendants retain the well bores now sought by Northern and use fracking techniques to explore other zones, the well bores may be damaged and rendered unusable for Northern's purposes, despite the fact that Northern has been granted authority to condemn the wells for a legitimate public purpose.

FERC said the viability of the Cunningham Storage Field is at risk because of storage gas migration to the Expansion Area, and that Northern's containment plan – including water injection – is necessary

to remedy that situation and preserve the integrity of the field.[8] The evidence submitted by Northern in this proceeding supports that conclusion. Under the circumstances the court agrees that Northern has shown a threat of irreparable harm if the preliminary injunction is not granted.[9] Like Sage, this project, which has yet to begin, will suffer even more delay without a preliminary injunction and Northern may be unable to reestablish stability of the Cunningham Storage Field. Northern is already unable to come anywhere close to meeting FERC's time line for installation of a water injection program, and the viability of the storage field will be threatened. Unlike the cases relied upon by defendants, there is a real threat of irreparable harm present that renders inadequate the ordinary legal remedy of allowing the condemnor to gain possession only after just compensation is fully determined and paid. Cf. National Fuel Gas Supply Corp. v. 138 Acres of Land, 84 F.Supp.2d 405, 416 (W.D.N.Y. 2000) (counsel for condemnor conceded that neither condemnor nor its customers would face irreparable injury without an injunction).

    3. *The balance of equities*.   Defendants argue they would be harmed by the injunction because Northern could later decide to abandon the condemnation. Defendants cite Kirby Forest Industries,

----

[8] Defendants say Northern previously represented that stopping third-party production in the Expansion Area alone would stop the gas migration, and that because production has now ceased Northern faces no threat of irreparable harm. But the evidence does not show that the migration has been eliminated, and the containment plan approved by FERC clearly contemplates that water injection may be necessary to re-establish stability of the storage field.

[9] Defendants say that "Northern's own brief admitted, Northern will not suffer irreparable harm if it is denied a quick take." (Doc. 428 at 8).  Defendants fail to cite the applicable pages of Northern's "own brief" and the court is unaware of any such fatal admission.

Inc. v. United States, 467 U.S. 1 (1983) which involved what the
Supreme Court called a "straight condemnation procedure prescribed in
40 U.S.C. § 257" which, after entry of judgment following a trial
before a court or special commission determining the just compensation
due, gives the government the option to buy the property.  Defendants
cite the court's statement that "If the Government decides not to
exercise its option, it can move for dismissal of the condemnation
action." (Doc. 428 at 12).  Defendants overlook Rule 71.1(i)(1)(A)
which provides:

> By the Plaintiff. If no compensation hearing on a piece of
> property has begun, and if the plaintiff has not acquired
> title or a lesser interest or taken possession, the
> plaintiff may, without a court order, dismiss the action as
> to that property by filing a notice of dismissal briefly
> describing the property.

(Emphasis supplied).

Here, the result of a preliminary injunction will permit Northern to
take "possession," therefore precluding Northern from unilaterally and
without court authorization "back[ing] out of [a] taking if the amount
of just compensation is eventually set too high." (Doc. 428 at 12).
Defendants cite no evidence that Northern will "back out" or even
might "back out."   Arguments based on speculation are never
persuasive.

    Defendants next contend they will suffer a loss of production
opportunities prior to completion of the condemnation proceeding. But
as Judge Bostwick (and Sage) pointed out, defendants, as landowners,
are protected because they retain title to the property and can
proceed against Northern for trespass if Northern abandons the
condemnation – including damages for Northern's occupation of the

-18-

property. Security against any harm from lost production can be addressed through the amount of deposit or bond required for the injunction (see Doc. 415 at 38). Defendants' suggestion that the particular wells at issue are so uniquely situated that substitute wells cannot allow them to adequately explore other zones likewise appears highly speculative (see Doc. 305 at 3) ("Drilling a new well might miss the hydrocarbons found at the pinpoint locations of the current wells."). At any rate, defendants will be entitled in the course of condemnation to just compensation for any property rights taken by Northern. These potential harms to defendants, which appear compensable, are substantially outweighed by the danger of irreparable harm to Northern from being unable to restore the integrity of the storage field in a timely fashion.

4. *Whether the Injunction is in the Public Interest*. As the court has noted before, both federal and state law recognize that the public interest is furthered by establishing and maintaining natural gas storage fields. That public interest is the basis for granting natural gas companies the authority to condemn and take private property for use in a gas storage facility. The public interest in maintaining storage fields will be furthered by a preliminary injunction allowing Northern to obtain immediate access to and possession of the defendant property and to proceed with implementation of the containment plan, including conversion of defendants' wells to observation wells. FERC's finding that the viability of the storage field is at risk is supported by evidence presented in this proceeding, and it provides strong support for the extraordinary remedy of allowing Northern to access and take possession of wells and property to which defendants

-19-

retain title, provided it is for the purpose of implementing the containment plan approved by FERC and which FERC has directed Northern to promptly engage. Sage, 361 F.3d at 826 ("As the Supreme Court has said, courts of equity may go to greater lengths to give 'relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.'" (quoting Va. Ry. Co. v. Sys. Fed'n. No. 40, 300 U.S. 515, 552 (1937))); Rockies Exp. Pipeline, LLC. v. 4.895 Acres of Land, 2008 WL 4758688 (S.D. Ohio, Oct, 27, 2008)("issuance of an injunction ... would in fact serve the public interest in that it would aid in ensuring that the FERC-approved pipeline deadline is not delayed beyond the already adjusted target date.").

After weighing the facts relevant to Northern's motion and giving full consideration to defendants' positions, the court agrees with Judge Bostwick's view that Northern has made a sufficient showing to warrant the issuance of the disfavored preliminary injunction it seeks. The court also agrees that the injunction should be conditioned upon Northern providing the deposits and bonds discussed hereafter to provide adequate security to protect the interests of defendants.  The court concludes that granting immediate access and possession of the property to Northern will not violate defendants' rights under the Takings Clause of the Fifth Amendment. "[T]he Takings Clause does not prohibit the taking of private property for public use, but rather requires compensation when a taking occurs. [cite omitted] Such compensation does not have to be contemporaneous with the taking, so long as there is an adequate provision for obtaining compensation that exists at the time of the taking." Alto Eldorado Parternership v.

County of Santa Fe, 634 F.3d 1170, 1174 (10th Cir. 2011) (citing Williamson County Req'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 194 (1985)).   In this instance, the condemnation procedures provided by Rule 71.1, the security in the form of cash deposits subject to withdrawal and/or the posting of bonds by Northern, as well as the fact of Northern's good credit rating, all provide defendants with a reasonable, certain and adequate provision for obtaining just compensation.

Security.  The court may issue a preliminary injunction only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. See Fed.R.Civ.P. 65(c).   After reviewing the recommendations of Judge Bostwick concerning the posting of security, as well as the parties' objections and comments, the court concludes that the following represent the reasonable bonds and deposits that should be required as security for issuance of the preliminary injunction.

1. Eight wells to be converted to observation wells.  Northern proposed that its estimated salvage value of these wells – $20,000 each, or a total of $160,000  – be deposited with the court, with defendants able to draw upon the deposits. Northern acknowledged that defendants' cost to drill replacement wells, if they chose to do so, would be in the neighborhood of $400,000 for each well, so Northern proposed to put up a bond for the $380,000 difference, representing a total bond of $3,040,000 for the eight wells, in addition to the cash deposit. Defendants, on the other hand, argued for a deposit of $400,000 for each well plus an additional 25% to cover interest and

lost production from other zones. Judge Bostwick ultimately recommended that the court require a deposit of $400,000 for each well (a total of $3.2 million for the eight wells), which could be drawn down by the appropriate defendants.

Defendants have a right to explore zones other than the Simpson and Viola. They can do so with their current well bores at a cost substantially below the cost of drilling a new well, but Northern's immediate possession of these wells will obviously preclude that activity. Moreover, practical considerations may preclude further exploration by defendants until just compensation is received. See Doc. 415 at 43. Under these circumstances, the court finds – with one exception noted below – that Northern should be required to deposit $400,000 per well, with the deposit subject to withdrawal by the appropriate defendant. The deposit can be drawn down by the appropriate defendant(s) in full or in part, but if the ultimate award of just compensation is less than the amount withdrawn, the defendant which drew down such funds will be liable for any excess, plus interest.

Northern raises a specific objection concerning the three Nash wells (the Trinkle 1, Holland 1-26, and J.C. 1) that are subject to the motion for immediate access. It argues that Nash Oil & Gas is financially unsound and Northern should therefore be allowed to provide a bond as security for these wells instead of a cash deposit. Otherwise, Northern argues, it will be unlikely to recoup any money drawn by Nash in excess of the Commission's ultimate award of just compensation (Doc. 426 at 4-5). Nash does not really dispute that it has incurred financial difficulty, but blames Northern's litigation

tactics and says there will likely be more than enough money awarded to the producer defendants from the gas reserves in the Expansion Area Viola to protect Northern from loss (Doc. 441 at 3-4).

After considering the matter, the court agrees with Northern that in view of Nash's financial difficulties, security for the three Nash wells should be primarily in the form of a bond rather than a deposit. While it is possible, as Nash argues, that it could receive an award for gas reserves in the Expansion Area that would protect Northern from any potential loss on its deposit, that argument is based on speculation about the outcome of the Kansas Supreme Court case and about the amount of reserves for which Nash may receive compensation.

Given the parties' financial circumstances, the court concludes that the following represents reasonable security for Northern's immediate possession of the three Nash wells: Northern shall be required to make a deposit of $20,000 for each of the three wells and to post a bond in the amount of $380,000 for each well. This represents a total deposit of $60,000 for the three Nash wells plus a bond for $1,140,000. The deposit portion will be subject to withdrawal by Nash under the same terms and conditions as the deposits pertaining to all of the other defendants' wells.

Northern also asks for clarification whether Judge Bostwick recommended that the ability of producer defendants to draw on the deposits be conditioned upon a showing that the draw is for the purpose of drilling a replacement well in the Expansion Area. Doc. 426 at 5-6. Judge Bostwick included no such condition in his recommendation and the court will impose no such requirement. The deposits may be used by the owners for any purpose they see fit. The

court will adopt Judge Bostwick's recommendation that any request to draw down deposits for the eight wells be accompanied by the consent of any landowners, royalty owners, working interest owners and lienholders who have an interest in the tract where the well is located. Although defendant producers argue this condition is unwarranted, the court concludes it is appropriate and necessary to protect the interests of all parties who may be affected by the condemnation and to avoid subsequent disputes arising from withdrawal of the deposits.

Northern additionally seeks "clarification as to the Court's intentions regarding the intended relationship between the costs to drill these new 'replacement' wells and the calculation of any just compensation to which the producer Defendants may be entitled." Doc. 426 at 6. Northern's apparent concern is whether the court is endorsing "the substitute facilities doctrine," which Northern says is not a permissible method of determining just compensation under Kansas law. Id. at 6-7. Judge Bostwick made no recommendations concerning the standards for just compensation, nor did he make any findings about the amount of compensation likely to be due defendants for the taking of their wells. These issues simply are not ripe and the court will issue no advisory opinions. Judge Bostwick properly limited his recommendations as to the amount of security he considered sufficient to compensate defendants should it be found that they are wrongfully restrained or enjoined. He considered all of the available evidence, including the fact that defendants have a right to explore other zones in the Expansion Area, that defendants' initial attempt to explore other zones met with at least some success, and that

Northern's possession of the wells in question may effectively inhibit defendants' ability to explore further.  Judge Bostwick acknowledged defendants' argument that Northern might abandon the project before completion of the condemnation proceedings, which would result in an award of damages to defendants. His recommended solution, using the cost of a replacement well as a measure of the security necessary to protect defendants from harm is not erroneous, but sensible. The court has likewise considered all of these factors and concludes that the appropriate amount of security for the extraordinary and drastic remedy sought by Northern are the amounts set forth by Judge Bostwick, as modified by the court's ruling above.

2. Gas Volumes in the Expansion Area/ Other Components of a Bond or Deposit. Judge Bostwick noted the wide variance between plaintiff and defendants' estimates of the value of the Viola gas underlying the Expansion Area ($4.4 million versus $35.5 million). He also noted the parties' legal dispute concerning ownership of the gas.  He took these uncertainties into account in finding that the posting of a bond for the value of the gas would be more appropriate than a cash deposit. None of the parties have objected to that conclusion – or to the recommendation for a $6.7 million bond – and the court concludes that Judge Bostwick's recommendations are appropriate and should be adopted. The court likewise adopts Judge Bostwick's recommendations that Northern be required to deposit the following amounts, which will be subject to withdrawal, as security for Northern taking immediate possession of these additional items of property: (a) use of the Viola formation throughout the Expansion Area – $538,000; (b) rights and interests to install, construct and maintain 3 new injection wells and

-25-

1 new observation well – $16,800; and (c) property, rights and interests to install flow lines, electrical lines, and telecommunication lines – $56,900.

C. <u>Northern Motion to Restrain L.D. Drilling from Recompletion of the Brown A1 Well</u>. After L.D. Drilling filed notice of its intent to recomplete the Brown A1 well (also referred to in the briefs as the Brown 1A) in the Mississippi formation, Northern moved to restrain L.D. from reentering and reworking the well pending a ruling on Northern's motion for immediate possession. Judge Bostwick recommended that the motion for a TRO be granted. L.D. Drilling and other defendants with an interest in the Brown A1 now challenge Judge Bostwick's finding that there is a significant likelihood of damage to the well bore if the recompletion is allowed. They contend Judge Bostwick impermissibly accepted an ex parte affidavit of Northern's expert in making this finding. Even if damage to the well bore could occur, defendants argue this would not constitute irreparable harm to Northern and would not justify an injunction. Defendants also reiterate their contention that Northern is not authorized to condemn the well bore under the NGA because it is not "necessary" for use in the storage facility. Finally, as discussed above, defendants contend Northern should not be allowed to take immediate possession of this or any of their wells.

The motion for a TRO regarding the Brown A1 well may become moot if Northern posts the security discussed above and obtains possession of the well. For now, however, the controversy remains at issue and the court will rule on the objection. Judge Bostwick afforded the parties an evidentiary hearing on this motion and the court is

unpersuaded by defendants' argument that it was improper for him to rely on Mr. Cook's affidavit. Northern submitted materials (including the affidavit) in connection with its motion, and defendants apparently made no contemporaneous objection to Judge Bostwick's consideration of, or reliance on, these materials. The court also notes that Mr. Davis and Mr. Shoemaker both testified at the hearing that they examined the materials relied upon by Northern and they each addressed opinions expressed by Cook in his affidavit. Davis disputed Cook's view that the well bore would likely be damaged for Northern's purposes if the well were fracked above the Viola formation. Davis conceded, however, that the procedure could warp the casing and that he had never fracked a well using anywhere near the 200,000 pounds of sand contemplated for the Brown A1.

The court concludes from the evidence presented that recompletion of the Brown A1 in the manner described by defendants will, in all likelihood, damage the well bore and render it unsuitable for use as an observation well by Northern. As Judge Bostwick observed, this fracture treatment is four times larger than any overseen by Davis previously and "there is no indication that this size of fracture is safe where the well bore needs to be maintained and preserved" for use in an observation well (Doc. 414 at 5-6). The court further concludes that Northern will suffer irreparable harm from being unable to use the well bore to comply with FERC's orders and to implement the containment plan approved by FERC. By contrast, defendant will suffer little if any harm from the delay caused by the TRO. Moreover, the order preventing any reworking of the well will preserve the status quo. Finally, the TRO furthers the public interest by preserving an

item of property that has been lawfully named in a condemnation action as necessary to help stabilize a natural gas storage field. The court concludes that a bond in the amount of $10,000, as recommended by Judge Bostwick, represents reasonable security for the foregoing order.

## IV. CONCLUSION

A. Northern's Motion for Temporary Restraining Order (Doc. 403) is GRANTED in part and DENIED in part. The motion is granted with respect to defendant L.D. Drilling Inc. and the Brown A1 well; it is denied with respect to any other defendants and any other wells, as no threat of imminent harm to any wells other than the Brown A1 has been shown. Defendant L.D. Drilling, Inc. is hereby ordered to refrain from re-entering and recompleting the Brown A1 well. The foregoing order shall remain in effect until Northern has had a reasonable opportunity to post security pertaining to its Motion for Immediate Access and to take possession of the Brown A1 well. Northern shall post a bond pursuant to Fed.R.Civ.P. 65(c) in the amount of $10,000, without any requirement for any sureties, as security for any costs or damages incurred by L.D. Drilling, Inc. should it be determined that it has been wrongfully restrained under the foregoing order. Defendant L.D. Drilling's objections to Judge Bostwick's Report and Recommendation (Doc. 414) concerning the above motion are denied; the court adopts the Recommendation in its entirety.

B. Northern's Supplemental Motion to Confirm Condemnation Authority and to Grant Preliminary Access to Implement Water Injection Program (Doc. 202) is GRANTED to the following extent. The court determines and confirms that Northern has been granted lawful

authority by the Natural Gas Act and the Federal Energy Regulatory
Commission to acquire by condemnation all of the property described
in its Amended Complaint (Doc. 188), including:  the "Interests to Be
Taken Located on the Property to Be Taken" and the "Interests to Be
Taken to Implement Water Injection Program Located on the Property to
Be Taken to Implement Water Injection Program." See Doc. 188 at ¶¶62-
63 & Exhs. I, J.

The court finds that Northern has made the strong showing
required for issuance of a disfavored preliminary injunction, and that
it is entitled to immediate possession of the Interests to Be Taken
and the Interests to Be Taken to Implement Water Injection Program,
and to immediate access to the Property to Be Taken and the Property
to Be Taken to Implement Water Injection Program. This order is
conditioned upon Northern first providing the following reasonable
security to protect defendants' continuing interests in the subject
property:

A. Posting of a bond with appropriate sureties

    1. Gas in Expansion Area          $6,700,000

    2. Nash wells (3)            $1,140,000

B. Deposit into Court's Registry:

    1. Wells (8) to be converted to observation $2,060,000[10]

    2. Use of the Viola formation throughout
       the Expansion Area         $  538,000

    3. Rights and interests to install, construct
       and maintain the three new injection wells
       and one new observation well    $   16,800

---

[10] As noted previously, this figure includes a deposit of $60,000
for the Nash wells (3), and $2,000,000 for the remaining five wells.

        4.  Property, rights and interests to install
            flow lines, electrical lines and
            telecommunication lines                    $    56,900

                    Total Deposit              $2,671,700

        The required deposits may be drawn down by the appropriate

defendants in full or in part.  Any request to draw down funds shall

be accompanied by consent of any landowners, royalty owners, working

interest owners and lienholders who have an interest in the tract upon

which the well is located. Any defendant seeking to draw down funds

may file a motion with the court asking for an order authorizing the

disbursement. The motion shall be accompanied by proof of any consent

required by this order. Any response or objection to the motion shall

be filed within 10 days.

        If the ultimate award of just compensation is less than the

amounts drawn down, each defendant which drew down funds shall be

liable for the return of the excess together with appropriate

interest.  This order of preliminary injunction shall remain in effect

until just compensation is determined and paid and final judgment is

entered in the case, or until the court orders otherwise.

        As a further condition to the issuance of this injunction, the

court orders that Northern, at least 15 days prior to entering or

taking possession of any property affected by this order, give written

notice to the affected landowner describing the nature and duration

of the activity Northern intends to conduct upon said property.

        A motion for reconsideration of this order pursuant to this

court's Rule 7.3 is not encouraged.  The standards governing motions

to reconsider are well established.  A motion to reconsider is

appropriate where the court has obviously misapprehended a party's

position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence.  Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate. Comeau v. Rupp, 810 F. Supp. 1172 (D. Kan. 1992).  Any such motion shall not exceed five pages.  The response to any motion for reconsideration shall not exceed five pages.  No reply shall be filed.

IT IS SO ORDERED.

Dated this  13th   day of March 2012, at Wichita, Kansas.


s/Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE