IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS


NORTHERN NATURAL GAS COMPANY,    )
                                 )
                Plaintiff,       )    **CIVIL ACTION**
                                 )
v.                               )    No.  10-1232-DWB-MLB
                                 )
APPROXIMATELY 9117 ACRES IN PRATT, )
KINGMAN, AND RENO COUNTIES,      )
KANSAS, AND AS FURTHER DESCRIBED )
HEREIN;                          )
                                 )
TRACT NO. 1062710                )
CONTAINING 80.00 ACRES MORE OR   )
LESS, LOCATED IN KINGMAN COUNTY, )
KANSAS, AND AS FURTHER DESCRIBED )
HEREIN; ET AL.,                  )
                                 )
                Defendants.      )
_____)


<u>**MEMORANDUM AND ORDER**</u>

This condemnation matter is before the court on Northern's Motion for Partial Summary Judgment (Doc. 532). The motion seeks a determination of the "date of taking" of the defendant property. The defendants have filed a number of responses and other briefs addressing the issue. (Docs. 529, 530, 534, 535, 536, 548, 579, 580, 581). Northern has filed a reply. (Doc. 590).

**I. Background**

Northern's motion argues that the date of taking was – with one exception – March 30, 2012, when Northern perfected a right to take physical possession of the defendant property by posting security and providing notice to landowners. (Doc. 532 at 1).[1]

_____

[1] The one exception is the Zink 1A (or A1) well, which was not included in the injunction giving Northern immediate possession of the property being condemned. Northern argues the date of taking of this

Some of the defendants argue any determination of a date of taking is premature or is otherwise inappropriate for summary judgment. Alternatively, they suggest a multitude of possible dates, including:

- the date Northern actually took possession of surface property and, for property not yet actually possessed, the date title will pass to Northern (Mereis group - Doc. 529);

- the date producing wells were shut in (Dec. 15, 2010) as a result of the injunction obtained by Northern in Case No. 08-1405 (Pratt Well Service group - Doc. 530);

- the date the complaint was filed in this action (July 16, 2010) (Five Star - Doc. 535);

- for producing Viola leases, the last date of production before the wells were shut in, and for other properties the date "as of which Northern's action reduced the value of those properties or, if the value has not been reduced, the date of Northern's possession or the first day of trial." (L.D. group Producer-Defendants - Docs. 536, 580);[2]

- for property Northern has not yet entered, the date of trial, and for property Northern has already entered or used, the date of Northern's actual entry onto the land or its use of the subsurface (Huff Group - Docs. 534 & 579); and

_____

well will be the date just compensation is ultimately paid.

[2] Producer-defendants specifically identify several alternate dates of taking: (1) June 2, 2010, the date of the FERC order; (2) sometime between July 2010 and February 2011, when the producers were forced to shut in their wells; and (3) no later than December 22, 2010, the date of Judge Brown's order enjoining further production from the subject formations. (Doc. 580 at 22-24).

- for productive leases, the date wells were shut in by order of the court; for surface interests being used by Northern, the date of the court order allowing Northern a right of entry; for subsurface formations used by Northern the date Northern penetrated those formations; and for non-productive leases or surface property not yet used by Northern, the date of the June 2, 2010 FERC Order (Hudson Group - Doc. 548).

## II. Uncontroverted Facts

Northern operates the Cunningham Storage Field, an underground natural gas facility within the meaning of the Natural Gas Act, 15 U.S.C. § 717a. The storage field was constructed and is operated pursuant to one or more Certificates of Public Convenience and Necessity granted by the Federal Energy Regulatory Commission (FERC). As of March 16, 2007, the field was certificated to occupy a total of 26,240 acres, or 41 square miles.

In 2004, Northern filed the first of several lawsuits against the present producer-defendants. In that case, Northern sued for conversion based on a claim that Nash Oil & Gas's first two Viola wells in the area were producing storage gas. The district court granted summary judgment to Nash on statute of limitations grounds and, alternatively, on collateral estoppel grounds. The Tenth Circuit affirmed based on the statute of limitations without reaching the collateral estoppel issue. Northern Nat. Gas Co. v. Nash Oil & Gas, Inc., 526 F.3d 626 (10th Cir. 2008).

In March of 2007, Northern asked FERC to expand the storage field boundaries by 4,800 acres, citing storage gas migration. FERC

allowed Northern to expand the field by 1,780 acres in October 2008.

In December of 2008, Northern filed a complaint against oil and gas producers operating wells in the general vicinity (i.e., within 2-6 miles) of the storage field. In that "damage case" <u>Northern Nat. Gas Co. v. L.D. Drilling, Inc., et al.</u>, 08-1405 (U. S. Dist. Ct., D. Kan.)), Northern claimed three defendant producers (Nash Oil & Gas, VAL Energy, and L.D. Drilling) were causing storage gas to migrate from the storage field and were converting it. Northern also claimed unjust enrichment, nuisance, and civil conspiracy, among other things. (Case 08-1405, Doc. 1). The defendants counterclaimed against Northern. The defendant producers continued to operate and produce gas after the complaint was filed.

In December of 2009, Northern filed an action in Pratt County (Kansas) District Court against two gas purchasers – ONEOK and Lumen – claiming they were indirectly converting Northern storage gas by purchasing it from Nash, VAL, and L.D. Drilling. Some of the producers were brought in to the case as third-party defendants. On April 15, 2010, Judge Schmisseur of the Pratt County District Court granted summary judgment for the producers, finding that Northern lost title to its migrating storage gas once it went beyond the "adjoining property." The ruling was based on K.S.A. § 55-1210, which provides in part that if storage gas migrates from an underground storage field to adjoining property that has not been condemned or otherwise purchased, the injector shall not lose title if it can prove the gas was originally injected into the storage field. The court concluded that the statute, by implication, retains the common law rule of capture if storage gas migrates beyond the adjoining property, with

that term construed by the Kansas courts to mean a one-mile section of land next to any section containing a storage field.[3] Because the producers' wells were two or more miles from the then-certified boundaries of the Cunningham storage field, the court concluded Northern lost title to any storage gas produced by the defendants and hence there was no conversion.

On June 2, 2010, FERC granted Northern's application for an additional Certificate of Public Convenience and Necessity. This certificate authorized Northern to expand the buffer zone of the storage field by 12,320 acres, via condemnation, to include the area where the defendant producers were operating. On July 16, 2010, Northern initiated the instant case by filing a complaint for condemnation of the property. (Doc. 1). The interests to be taken pertain primarily to the Viola and Simpson formations underlying the identified property.

Meanwhile, after Northern obtained the FERC certificate, it asked the Pratt County district judge to reconsider his summary judgment ruling. He declined to do so, although he said the circumstances could be different with respect to storage gas migrating after June 2, 2010, the date of the FERC certificate. But because the producers' gas proceeds were being held in suspense as a result of the litigation, he found Northern would not be harmed while the matter was

---

[3] See Williams Nat. Gas Co. v. Supra Energy, Inc., 261 Kan. 624, 931 P.2d 7 (1997). Williams found the right in §55-1210(c)(2) to test wells on adjoining property was not unconstitutionally vague. It said the trial court's conclusion that a one-mile section of land was adjoining property "conforms to our holding in State, ex rel., v. Bunton, 141 Kan. 103, Syl. ¶1, 40 P.2d 326 (1935), where 'adjoining' had its 'usual and ordinary meaning, that of being contiguous or touching.'"

appealed. Northern appealed the summary judgment ruling and the case was transferred to the Kansas Supreme Court.

In December of 2010, U.S. District Judge Wesley Brown granted a preliminary injunction in the 2008 damage case. (08-1405, Doc. 420). He found Northern was likely to prevail on its nuisance claim, which alleged that production from defendants' wells in the expansion area constituted an unreasonable interference with Northern's use and enjoyment of the storage field. The preliminary injunction, which took effect on February 24, 2011, required the defendant producers to cease further production of natural gas from 25 specified Viola wells in the expansion area. (08-1405, Doc. 420 at 28-39). The three producers involved in the damage case (Nash, VAL, and L.D. Drilling) shut in their subject wells on or before the required date. Nash had already shut in its wells in July 2010 because it was not receiving any revenue from them. The gas proceeds had been held in suspense since October 2010 as a result of the Pratt County litigation. Some of the producers appealed Judge Brown's ruling and the Tenth Circuit subsequently upheld the issuance of the preliminary injunction. Northern Nat. Gas Co. v. L.D. Drilling, Inc., 697 F.3d 1259 (10th Cir. 2012).

On March 15, 2011, Judge Brown entered an order in this case confirming Northern's authority to condemn the property listed in the complaint. (Doc. 183). Northern amended its complaint on June 15, 2011, adding certain interests to be taken to implement a water injection program. It then filed a supplemental motion to confirm its condemnation authority. It also moved for an order granting "immediate possession of the Interests To Be Taken and the Interests To Be Taken

to Implement Water Injection Program" and for preliminary access to the property to be taken. (Doc. 203).

On March 13, 2012, the undersigned judge adopted Judge Bostwick's Report and Recommendation to grant the foregoing motions. The court's order provided that upon the posting of appropriate security and notice, Northern was granted the right of immediate possession of the interests to be taken and immediate access to the property to be taken. (Doc. 464). Northern posted the required security on March 26, 2012, (Doc. 470), and gave notice to interest owners on March 30, 2012.

In September of 2011, while Northern's motion for immediate access was pending, L.D. Drilling gave notice of its intent to recomplete the Zink 1A well uphole in the Lansing-Kansas City formation and to plug off the Viola and Simpson formations. (Doc. 340). Northern immediately sought a temporary restraining order to prevent the recompletion. (Doc. 341). Finding no showing of irreparable harm, Judge Brown denied the motion for TRO and, shortly thereafter, L.D. Drilling completed the Zink 1A in the Kansas City Lansing (Swope Layer). (Doc. 353). Oil was produced and first sold from the recompleted well on October 3, 2011. L.D. Drilling has continued to produce oil from the Swope Layer and as of June 6, 2013, has produced a cumulative total of 2,677 barrels of oil from the Zink 1A. (Doc. 675-1). After this well was recompleted, Northern withdrew its request for immediate possession of the Zink 1A well.

On March 15, 2013, the Kansas Supreme Court affirmed Judge Schmisseur's ruling that there was no conversion of the storage gas and remanded for further proceedings to resolve any issues relating

to the period after the June 2, 2010 FERC certificate. <u>Northern Natural Gas Co. v. ONEOK Field Svcs. Co.</u>, 296 P.3d 1106 (Kan. 2013).

## III. Summary Judgment Standard

The rules applicable to summary judgment are well-known and are only briefly outlined here. Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if sufficient evidence exists so that a rational trier of fact could resolve the issue either way and an issue is "material" if under the substantive law it is essential to the proper disposition of the claim. <u>Adamson v. Multi Community Diversified Svcs., Inc.</u>, 514 F.3d 1136, 1145 (10th Cir. 2008). Rule 56 permits a party to move for summary judgment with respect to a claim or defense or a part of a claim or defense. Fed. R. Civ. P. 56(a).

## IV. Discussion

<u>Overview of takings and dates of taking</u>.

The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. This means the taking of private property for public use, by or under the authority of the federal Government,[4] gives rise to a claim for just compensation. It does not prevent the

---

[4]Northern's complaint for condemnation is based on eminent domain authority granted by the Natural Gas Act, 15 U.S.C. § 717(h).

Government from interfering with property rights but mandates that it pay compensation when it does so. It is designed to keep the Government from "forcing some people alone from to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 537 (2005). In most cases "just compensation" means the fair market value of the property on the date it is appropriated. Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 10 (1984). The owner is "entitled to receive 'what a willing buyer would pay in cash to a willing seller' at the time of the taking."[5]

Identification of the date of taking is thus essential in determining the amount of compensation to which the owner is entitled. Kirby Forest, 467 U.S. at 11. The date of taking ordinarily fixes the date for valuation of the property and imposes an obligation on the Government to pay interest on that value until just compensation is ultimately paid to the property owner.[6] United States v. Dow, 357 U.S. 17, 22 (1958). If disbursement is delayed, the owner is entitled to interest "sufficient to ensure that he is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation." Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 10 (1984) [cite omitted]. Moreover, if there is a delay between the date of valuation and the date the property is actually

---

[5] Other measures are used when fair market value is too difficult to find or when its application would result in manifest injustice to the owner or public. Kirby Forest, 467 U.S. at 10, n.15.

[6] The date of taking is also significant because the owner as of that date, rather than the owner at an earlier or later time, is the one entitled to compensation. Dow, 357 U.S. at 20-21.

taken, the property owner may seek a modification of the award to ensure that just compensation is paid. Kirby Forest, 467 U.S. at 17.

There are two principal statutory methods by which the United States takes private property. See Kirby Forest, 467 U.S. at 3-5.[7] First, in a "straight condemnation," it files a complaint identifying the property to be taken, followed by a trial to determine the amount of compensation due the owner. A judgment determining just compensation gives the Government an option to buy the property at the determined price. If it exercises the option, it tenders payment to the owner, and at that point title and the right to possession vest in the United States. If it decides not to exercise the option, it can move for dismissal of the action. The date of taking in a straight condemnation is the date on which the United States tenders payment to the landowner. Kirby Forest, 467 U.S. at 11.

The second principal method of appropriating property is under a statute authorizing the Government to file a declaration of taking within a condemnation proceeding. When this "quick take" method is invoked, it requires the Government to deposit the estimated value of the property into court, with the funds then available to the property owner. Title and the right of possession vest immediately in the United States. See 40 U.S.C. § 3114. The exact value of the land is later determined at trial, with the owner awarded any difference between the adjudicated value and the amount already received, plus

---

[7] Two lesser-used methods also exist. One is a direct Congressional exercise of the power of eminent domain. In the other, the United States physically enters the property without court authority and ousts the owner, giving the owner a right to bring an adverse condemnation action. Kirby Forest, 467 U.S. at 4-5.

interest. <u>Kirby Forest</u>, 467 U.S. at 4-5.

This action by Northern is a straight condemnation proceeding pursuant to the Natural Gas Act, 15 U.S.C. § 717(h). The NGA does not include a quick-take provision authorizing a non-governmental condemnor to immediately take property by filing a declaration of taking. But courts have allowed non-governmental condemnors to seek injunctive relief for immediate possession of the property if they can show that a threat of irreparable harm and other circumstances warrant such relief. <u>See</u> <u>E. Tennessee Natural Gas Co. v. Sage</u>, 361 F.3d 808 (4th Cir.), <u>rehearing denied</u>, 369 F.3d 357 (4th Cir.), <u>cert. denied sub nom</u>. <u>Goforth v. E. Tenn. Natural Gas Co.</u>, 543 U.S. 978 (2004). The court did so here, relying on <u>Sage</u> and its progeny in issuing a preliminary injunction that gave Northern immediate possession of the property. As such, the circumstances of this case do not fall squarely within the takings discussed by the Supreme Court in the context of straight condemnations and quick-take proceedings. Those decisions nevertheless provide some guidance on the date of taking.

In cases where the Government is not in possession of the property when it files a declaration of taking, it is the filing of the declaration that constitutes the taking of the property. <u>Dow</u>, 357 U.S. at 23. But where the Government has already entered into possession when it files a declaration, the (earlier) date of possession controls: "The usual rule is that if the United States has entered into possession of the property prior to the acquisition of title, it is the former event which constitutes the act of taking." <u>Dow</u>, 357 U.S. at 22-24. In <u>Dow</u> the Court noted that the Government's entry into physical possession provides a readily ascertainable time

-11-

for the taking. Moreover, the possibility that the Government might abandon the condemnation after acquiring possession does not undermine reliance upon the date of possession, because in that event the taking would simply be considered temporary in nature rather than permanent.

Aside from a physical taking of property in condemnation, a governmental taking can also occur through laws or regulations that place some significant restriction upon the owner's use of his property. "The general rule ... is that while property may be regulated to a certain extent, if that regulation goes too far it will be recognized as a taking." Penn. Coal Co. v. Mahon, 260 U.S. 393, 415 (1922).

In Kirby Forest the owner of several forested tracts argued that a taking occurred upon the filing of the condemnation complaint (with a lis pendens notice) because the filing effectively prevented the owner from selling the land or making any profitable use of it. The Government was authorized by Congress in that case to obtain the property in a straight condemnation but was also authorized to resort to a "quick-take" if necessary to prevent damage to the property. In response to petitioner's argument the Supreme Court commented:

> If petitioner's depiction of the impairment of its beneficial interests during the pendency of the condemnation suit were accurate, we would find its constitutional argument compelling. We have frequently recognized that a radical curtailment of a landowner's freedom to make use of or ability to derive income from his land may give rise to a taking within the meaning of the Fifth Amendment, even if the Government has not physically intruded upon the premises or acquired a legal interest in the property. Thus, we have acknowledged that a taking would be effected by a zoning ordinance that deprived "an owner of economically viable use of his land." [cite omitted]. And we have suggested that, under some circumstances, a land-use regulation that severely interfered with an owner's "distinct investment-backed

expectations" might precipitate a taking. <u>Penn Central</u>
<u>Transportation Co. v. New York City</u>, 438 U.S. 104, 124, 98
S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). The principle that
underlies this doctrine is that, while most burdens
consequent upon government action undertaken in the public
interest must be borne by individual landowners as
concomitants of " 'the advantage of living and doing
business in a civilized community,' " ... some are so
substantial and unforeseeable, and can so easily be
identified and redistributed, that "justice and fairness"
require that they be borne by the public as a whole.
[footnote omitted]. These considerations are as applicable
to the problem of determining when in a condemnation
proceeding the taking occurs as they are to the problem of
ascertaining whether a taking has been effected by a
putative exercise of the police power.

<u>Kirby Forest</u>, 467 U.S. at 13-14. But the Court in <u>Kirby</u> declined to

find an interference with petitioner's property interest severe enough

to constitute a taking, pointing out that even after the complaint was

filed petitioner remained free to sell the property or to harvest the

trees. The fact that the Government would almost surely have resorted

to a "quick take" to prevent this from happening weakened rather than

strengthened petitioner's argument, because it showed that petitioner

still retained those rights after the complaint was filed.

In <u>Lucas v. South Carolina Coastal Council</u>, 505 U.S. 1003 (1992),

the Court said whether a regulation rises to the level of a taking is

usually a case-by-case determination, but two types of action

categorically qualify as takings: first, regulations that compel the

owner to suffer a physical invasion of his property; and second,

regulations that deny <u>all</u> economically beneficial or productive use

of land. <u>Lucas</u>, 505 U.S. at 1015. The latter category is further

limited by an exception for restrictions that "inhere in the title

itself, in the restrictions that background principles of the State's

law of property and nuisance already place upon land ownership."

Lucas, 505 U.S. at 1028-29. In other words, a law or decree is not a taking if it does no more "than duplicate the result that could have been achieved in the courts – by adjacent landowners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally,..."[8] This standard looks to "common, shared understandings of permissible limitations derived from a State's legal traditions." Palazzolo v. Rhode Island, 533 U.S. 606, 630 (2001).

Where a claimed regulatory taking does not compel physical intrusion or deny all beneficial use – and is therefore not a categorical taking under Lucas – the court must weigh the relevant circumstances (i.e. "the Penn Central factors") to determine if a taking of property occurred. See Palazzolo v. Rhode Island, 533 U.S. 606, 617 (2001). Relevant factors under include: (1) economic impact of the regulation on the property owner; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. See Warren v. United States, 107 Fed.Cl. 533, 568 (2012); Alto Eldorado Partnership v. County of Santa Fe, 634 F.3d 1170, 1175 (10th Cir. 2011). In making this determination, the court looks at "the parcel

---

[8] This was a refinement of early cases stating that harmful or noxious uses of property can be prohibited without any requirement of compensation, but that regulations conferring a public benefit require compensation. Lucas, 505 U.S. at 1022. Lucas noted this was a difficult if not impossible distinction to make, with the difference largely being one of whose perspective – landowner or government – was used in making the determination. Lucas therefore rejected a taking standard that merely asks whether the regulation prevents a harmful use of private property.

as a whole," as opposed to a discrete segment of the property. Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 329 (2002).

The claim by some defendants that a taking occurred when Judge Brown enjoined further gas production from the expansion area implicates not only the Lucas nuisance exception discussed above, but also an unsettled question of law: namely, whether and under what circumstances a judicial order impairing property rights can be considered a governmental taking. See Stop the Beach Renourishment, Inc. v. Florida Dept. of Environmental Protection, 130 S.Ct. 2592 (2010)(no majority for the proposition that judicial decisions affecting property rights can be deemed a governmental taking).
Application to defendant property.

Order Giving Northern a Right of Possession. By virtue of the court's March 2012 order (Doc. 464), Northern obtained a right of access to, and exclusive possession and use of, the property interests that are to be taken in condemnation. This right was conditioned upon the posting of appropriate security and the giving of notice to affected landowners. These conditions were first satisfied, and Northern thus perfected its right to possession of the property, on March 30, 2012. The nature of the rights granted Northern is such that they will likely continue as long as Northern uses the property for a certified storage operation. Under these circumstances, the court concludes that the defendant property was in fact taken by Northern, under color of governmental authority, at least as of March 30, 2012.

This granting to Northern of the foregoing exclusive rights destroyed any remaining rights of the property owners to possess, use,

or dispose of the property, and essentially amounted to a physical taking. See Nollan v. Cal. Coastal Comm'n., 483 U.S. 825, 831 (1987) (a permanent physical occupation occurs "where individuals are given a permanent and continuous right to pass to and fro...."). See also Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982) ("To the extent that the government permanently occupies physical property, it effectively destroys" the owner's right to possess, use and dispose of it). The right to exclude others is "one of the most essential sticks in the bundle of rights that are commonly called property." Loretto, 458 U.S. 419, 433 (1982). That right was clearly taken from the property owners and given to Northern by virtue of the order. Similarly, the right to beneficial use of the property was precluded by Northern's acquisition of the exclusive right to use it. Regardless of whether legal title to the property remained in the owners after the order, the transfer of the foregoing rights from the owners to Northern constituted a taking of the defendant property.

The Huff group contends Northern "must demonstrate actual, physical presence and occupancy" of the property in order to show a taking. It argues this requires a tract-by-tract examination of when Northern physically entered onto or made use of each property, something Northern has not demonstrated in its motion. (Doc. 579 at 7-9). But that approach fails to fully consider the rights taken from defendants and granted to Northern by virtue of the injunction. Permanently depriving the owners of the principal characteristics of ownership – i.e., the right to exclusive possession, the right to all beneficial uses of the properties, and the right to sell them – is sufficient, under the circumstances of this case, to constitute a

taking of the property. Cf. United States v. General Motors Corp., 323
U.S. 373, 359-60 (1945) ("Governmental action short of acquisition of
title or occupancy has been held, if its effects are so complete as
to deprive the owner of all or most of his interest in the subject
matter, to amount to a taking."); Texas Gas Transmission, LLC v. 18.08
Acres, 2012 WL 6057991 (N. D Miss., Dec. 6, 1012) (date of taking was
the date condemnor was granted access to the property).

Having determined that a taking occurred at least as of March 30,
2012, the court turns to the various earlier dates suggested by the
defendants, to determine whether a taking occurred before Northern
obtained the right to possession of the property.

Issuance of FERC certificate. The earliest point at which any
party contends a taking occurred was the issuance of the FERC
certificate on June 2, 2010. The Hudson Group, for example, contends
this event "took away the Defendants' rights to have their [non-
producing] property leased to produce." Doc. 548 at 1. But the Hudson
Group does not explain this theory or show any factual basis for it.
The issuance of the FERC certificate itself imposed no legal barrier
to leasing the property. The court can only speculate the Hudson Group
is claiming that the practical effect of the certificate was to
discourage potential mineral exploration and to make it impossible to
lease the property. But such a theory is not supported by any factual
basis or any supporting case law. Certainly no facts are cited to
suggest that issuance of the certificate by itself destroyed all
economic value of the property.

The producer-defendants (L.D. Drilling, et al) similarly argue
that a taking "occurred as early as" the date of the FERC order. (Doc.

-17-

580 at 22). But again L.D. Drilling et al. do not clearly explain how issuance of the FERC certificate alone took their property. They point not to the certificate but to Judge Brown's later (December 2010) preliminary injunction order, in which he said it "appears clear" that under Kansas law the issuance of the certificate meant Northern retains title to any storage gas thereafter migrating to the expansion area. (Doc. 580 at 23). (<u>See</u> Case 08-1405, Order of 12/22/2010, Doc. 420 at 31) (<u>citing</u>, <u>inter alia</u>, <u>Union Gas System, Inc. v. Carnahan</u>, 245 Kan. 80, 774 P.2d 962 (1989) (upon issuance of a commission certificate "the gas was no longer ferae naturae and subject to the rule of capture.")).[9] Even if a judicial ruling of this sort can constitute a taking of property for public use, this particular ruling did not do so. The preliminary injunction shut in order did not rule on the merits of any claim for title to the storage gas and did not constitute a final judgment on the title question. This point is emphasized by the Tenth Circuit's opinion reviewing the injunction, which specifically noted that any question about title to gas migrating after the FERC certificate was not material to the injunction. <u>Northern Nat. Gas Co. v. L.D. Drilling</u>, 697 F.3d 1259, 1270, n.5 (10th Cir. 2012). Defendants identify no evidence to support a finding that their property was taken by issuance of the June 2, 2010 FERC certificate.

<u>Filing of the condemnation complaint</u>. The next event cited by a

---

[9] In a subsequent order Judge Brown conceded it was unclear what effect the adoption of K.S.A. § 55-1210 had on the <u>Union Gas</u> rule. (Doc. 445 at 3). That issue has now been remanded to the state district court for determination. <u>Northern</u>, 296 P.3d at 1128 (remanding to district court to resolve any claims regarding matters after issuance of June 2, 2010 FERC order).

defendant as a date of taking is Northern's filing of the condemnation complaint. <u>Kirby Forest</u> found the filing of a condemnation complaint was insufficient to constitute a taking. Like the filing in <u>Kirby</u>, Northern's complaint "did not abridge [the defendants'] right to sell the land if it wished." <u>Kirby Forest</u>, 467 U.S. at 15. The filing of the complaint in itself gave Northern no authorization to restrict or interfere with defendants' use of their property. And although it is "certainly possible ... that the initiation of condemnation proceedings, publicized by the filing of a notice of lis pendens, reduced the price that the land would have fetched, ... impairment of the market value of real property incident to otherwise legitimate government action ordinarily does not result in a taking. [citations omitted] At least in the absence of an interference with an owner's legal right to dispose of his land, even a substantial reduction of the attractiveness of the property to potential purchasers does not entitle the owner to compensation under the Fifth Amendment." <u>Kirby Forest</u>, 467 U.S. at 15.

Defendant Five Star nevertheless argues the filing of the complaint "deprived [it] of all economically beneficial or productive use of its leases." (Doc. 535 at 2). Specifically, it contends the pendency of the complaint prevented it from obtaining a clear title opinion and, consequently, prevented it from drilling a well or developing its leases. But the affidavit cited in support of this argument does not address the extent of Five Star's property interest, nor does it consider that Northern's complaint only seeks use of the Viola and Simpson formations, not the remainder of any mineral interest. <u>Cf</u>. <u>Penn Central</u>, 438 U.S. at 130-31 ("'Taking'

jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole....”). No facts are cited to suggest Five Star could not drill or lease the remainder of its interests, nor are any facts cited to show the degree of impairment of its overall property interest. Additionally, as <u>Kirby</u> noted, the condemnor's ability to abandon the proceeding – an ability Northern retained after the complaint was filed but before it obtained possession of the property – “would be difficult to understand if a taking were effectuated any time prior to tendering payment” (or before obtaining actual possession of the property). <u>See</u> <u>also</u> <u>Danforth v. United States</u>, 308 U.S. 271, 184 (1939) (“Unless a taking has occurred previously in actuality or by a statutory provision, ... we are of the view that the taking in a condemnation suit under this statute takes place upon payment of the money award by the condemnor. * * * Until taking, the condemnor may discontinue or abandon his effort.”).

Finally, the likelihood after the complaint was filed that any attempt by Five Star or other defendants to develop their leases would have prompted Northern to try to halt development or to obtain immediate possession does not mean the filing of the complaint constituted a taking. On the contrary, it reinforces the fact that defendants retained the right to possession and use of the property after the complaint was filed. <u>Kirby</u>, 467 U.S. at 12–13 (“the [quick-

take] option of peremptorily appropriating land prior to final judgment, thereby permitting immediate occupancy and improvement of the property[,] * * * would have been superfluous if, as petitioner contends, a taking occurred upon the filing of the complaint in a [straight-condemnation] suit."); <u>Guardian Pipeline, L.L.C. v. 950.80 Acres of Land</u>, 486 F.Supp.2d 741 (N.D. Ill. 2007) (filing of condemnation complaint did not amount to taking). In sum, the court concludes there is no genuine issue of fact as to whether a taking of defendants' property occurred upon the filing of the condemnation complaint. The filing of the complaint was not a taking of the property.

    <u>Shut in of producing wells in the expansion area</u>. L.D. Drilling and other producers contend "the date of taking is the date on which the Producer Defendants were deprived of the ability to produce natural gas from their Viola properties." (Doc. 580 at 17). They say there can be no dispute that they "acquired their interests in the Viola properties for the sole purpose of producing and selling natural gas from them," as well as an absence of evidence that their interests "ever had the slightest value independent of their capabilities for producing natural gas." As such, they maintain a taking occurred "when Northern's action deprived them of the ability to produce natural gas from their Viola properties...." (Doc. 580 at 19). They assert both a total regulatory taking theory and a partial taking under the <u>Penn Central</u> factors. (Doc. 580 at 19).

    A categorical taking is precluded, however, because it is clear that even after the shut in injunction the producers retained a right to produce minerals from formations other than the Viola. As Northern

points out, defendants seek to minimize the significance of this fact by repeatedly referring to the taking of their "Viola properties," although they make no showing that their property interests were limited to the Viola formation. This focus on "a discrete segment of the property" is inconsistent with the requirement that the parcel be viewed as a whole in assessing whether a taking occurred. Tahoe-Sierra Preservation Council, 535 U.S. at 329. And the claim that the producers were deprived of all economically beneficial use of their property when Viola production was shut down is belied by the fact that they still had a right to sell or develop their leases and to take minerals from other formations, as L.D. Drilling did with its Zink 1A well and, presumably, as defendants could have done with other wells or leases, provided use of the wells to be condemned would not be irreparably harmed by any such recompletion. The uncontroverted facts here refute any claim that a categorical taking occurred when defendants were forced to cease production from the Viola formation.

The court therefore turns to the Penn Central factors and the particular circumstances under which defendants were forced to stop production. There can be no question that the producers' investment-backed expectations for use of their leasehold or mineral interests were significantly impacted by the court's order to halt production. The primary (if not sole) beneficial use of a mineral lease is the removal and sale of the minerals covered by the lease. Taking away that use would deprive the mineral right holder of the primary benefit of the lease. The producers were (at least temporarily) deprived of their investment expectations upon issuance of the preliminary injunction. The injunction also clearly had a negative economic impact

on the producers, although the impact is not really quantified in their response.

The extent to which the producers' expectations of continued gas production were reasonable under Kansas law presents a more difficult question. It turns in part on the question identified in <u>Lucas</u>: did the restriction on gas production "inhere in [defendants'] title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership"? <u>Lucas</u>, 505 U.S. at 1029.[10]

If the preliminary injunction did "no more than duplicate the result that could have been achieved in the courts – by adjacent landowners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally," then the injunction only enforced a pre-existing limit on defendants' use of their property, and any claim that the order took away a previously-held property right is undermined. <u>Cf</u>. <u>Lucas</u>, 505 U.S. at 1029. <u>See</u> <u>also</u> <u>Keystone Bituminous Coal Assn. v. DeBenedictis</u>, 480 U.S. 470, 490-91 (1987) ("Long ago it was recognized that all property in this country is held under the implied obligation that the owner's use of it shall

_____

[10] Although <u>Lucas</u> dealt with a categorical taking, as a matter of logic the same inquiry would be germane in the <u>Penn Central</u> taking analysis. <u>Palazzolo</u>, 533 U.S. at 634 (degree of interference with investment-backed expectations is one factor to consider). <u>See</u> <u>also</u> <u>Resource Investments, Inc. v. United States</u>, 85 Fed.Cl. 447 (Fed. Cl. 2009); <u>Appolo Fuels, Inc. v. United States</u>, 381 F.3d 1338, 1347 (Fed. Cir. 2004) ("under the <u>Penn Central</u> analytic framework, the government may defend against liability by claiming that the regulated activity constituted a state law nuisance"); <u>Lucas</u>, 505 U.S. at 1032 (if background principles of nuisance law prohibit the use then "the State can fairly claim that, in proscribing all such beneficial uses, the [governmental action] is taking nothing.").

not be injurious to the community, and the Takings Clause did not transform that principle to one that requires compensation whenever the State asserts its power to enforce it.") and id. at 491, n.20 ("[s]ince no individual has a right to use his property so as to create a nuisance or otherwise harm others, the State has not 'taken' anything when it asserts its power to enjoin the nuisance-like activity.").

The L.D. Drilling Group argues the Lucas nuisance exception does not apply because these producer-defendants "had the legal right to produce any and all gas underlying their Viola properties from the day it acquired those properties, as the Pratt County District Court expressly held." (Doc. 580 at 21-22).

It is true that by virtue of the Pratt County judgment and the March 2013 Kansas Supreme Court decision, defendants can claim at least a qualified title to much (if not all) of the gas underlying their leases – native and storage – and the rule of capture means their previous and continuing production did not amount to conversion of the gas. But defendants' suggestion that this necessarily means they had an unlimited and unfettered right to continue producing storage gas – even if their production resulted in massive drainage from the storage field, caused damage to the reservoir, or otherwise interfered with Northern's ability to use or operate the field – is not reflected in background principles of Kansas property law.

The right to produce gas pursuant to the law of capture is not unlimited under Kansas law. Kansas recognizes that production rights can be limited by correlative rights of others in a common reservoir:

> The "correlative rights doctrine" recognizes that a person operating a well properly located on his land can significantly affect the rights of other property owners in the same reservoir. Society and the common law have historically placed limits upon a landowner's use of property to prevent injury to neighbors and the general public. The rule of capture encouraged independent action in an effort to exploit the oil and gas resource for maximum individual gain without regard for the best interests of the reservoir community. The landowner's rights under the rule of capture have been restrained to protect other interests in the oil and gas resource. Reciprocal rights and duties between landowners overlying a common reservoir are the essence of the correlative rights doctrine.

Kansas Oil and Gas Handbook, Pierce, David E., §3.03 at 3-4 (Kan. Bar Assn. 1986).

The Kansas legislature long ago adopted correlative rights with respect to gas production from common sources of supply:

> In the absence of any statutory regulation, the common-law rule of capture applies to a common pool. At common law, the owner of a tract of land acquired title to the oil and gas which the owner produced from wells drilled thereon even though it could have been proved that part of such oil or gas migrated from adjoining lands. The rule promotes excessive drilling and production, resulting in economic waste and damage to reservoirs. Kansas enacted the Natural Gas Conservation Act in 1935 to prevent such waste and to protect the rights of adjoining owners. G.S.1935, 55-701 et seq.
>
> The statutes governing the production and conservation of natural gas in Kansas empower the KCC [Kansas Corporation Commission] to prevent waste, avoid uncompensated drainage, and assure orderly development and production of natural gas in Kansas. Along with the prevention of waste, the KCC is directed to prevent the unfair or inequitable taking of natural gas from a common source of supply. This concept of equitable recovery of a common pool is known as correlative rights. Correlative rights means that each owner or producer in a common source of supply is privileged to produce that source only in a manner or amount that will not (a) injure the

> reservoir to the detriment of others, (b) take an
> undue proportion of the obtainable oil or gas, or
> (c) cause undue drainage between developed
> leases. K.A.R. 82-3-101(17) (1992).

Mobil Exploration & Producing U.S. Inc. v. State Corp. Comm. of State of Kansas, 258 Kan. 796, 908 P.2d 1276, 1282-83 (1995). See also Northwest Central Pipeline Corp. v. State Corp. Com'n. Of Kansas, 489 U.S. 493, 498 (1989) ("The common-law rule of capture, whereby gas was owned by whoever produced it from the common pool, left unchecked these twin problems of perceived inequities between owners of rights in the pool and of waste resulting from strong economic disincentives to conserve resources. [] In response, producing States like Kansas have abandoned the rule of capture in favor of assigning more equitable correlative rights among gas producers and of directly regulating production so as to prevent waste.").

As compared to laws governing native gas production, Kansas law pertaining specifically to storage gas has developed more recently, as described in Northern Nat. Gas v. Nash Oil & Gas, 296 P.3d 1106. In 1951, Kansas adopted the Underground Storage of Natural Gas Act to promote underground gas storage. Among other things, the Act adopted procedures for natural gas public utilities to establish KCC-certified underground storage areas and, if necessary, to acquire property by eminent domain for use in storage facilities. But the Act "was silent regarding its impact, if any, on the rule of capture as to injected storage gas." Northern, 296 P.3d at 1116.

In two subsequent cases the Kansas Supreme Court "extended the rule of capture to determine ownership of previously injected storage gas." Northern Nat. Gas, 296 P.3d at 1116. In the second of these

cases, <u>Union Gas System, Inc. v. Carnahan</u>, 245 Kan. 80, 774 P.2d 962 (1989), the court held that the rule of capture applied up to the point at which a public utility obtained a KCC permit to condemn the property, but not thereafter. As a result, the storage operator could not recover for any storage gas previously produced by the adjoining landowner, but the injector did retain title to its migrating storage gas after it obtained the certificate. <u>Union Gas</u>, 245 Kan. at 88-89. <u>See also Reese Exploration, Inc. v. Williams Nat. Gas Co.</u>, 983 F.2d 1514, 1523, n.9 (10th Cir. 1993) (noting <u>Union Gas</u> holding "that a public utility is exempt from the rule of capture only after it received certification from the Corporation Commission.").[11]

In 1993 the Kansas legislature adopted K.S.A. § 55-1210, which provided that natural gas previously captured and injected into underground storage shall at all times be the property of the injector. It further prohibited any person from "interfer[ing] with or exercis[ing] control" over gas injected into a storage field. It seemed to do away with the rule of capture as applied to storage gas by providing that the injector shall not lose title to storage gas that migrates to "adjoining property or to a stratum, or portion thereof, which has not been condemned," provided the injector can prove by a preponderance that the gas was originally injected into

---

[11] The <u>Union Gas</u> court also rejected the landowner's argument in condemnation that it should be compensated for "for the value of injected as well as native gas under the property." The court noted "[t]he legislature has specified ... only that <u>native</u> gas be considered." <u>Union Gas</u>, 245 Kan. at 89 (<u>citing</u> K.S.A. §§ 55-1201(c), 55-1204(a)(2), and 55-1205)). Northern has now filed a motion for partial summary judgment claiming that the Kansas Underground Storage of Natural Gas Act and common law provide that Northern is only obligated to compensate defendants for recoverable oil and native gas within the Expansion Area. (Doc. 677).

storage.[12] But within this language the Kansas Supreme Court has discerned a legislative intent to limit the injector's title to a one-mile section next to a storage field, and beyond that to revert to the pre-existing rule of capture.[13] This clearly precludes any claim for conversion under Kansas law for producing storage gas that migrates several miles away from the boundary of a certified storage field because an injector cannot claim title to such gas.

But while these rulings clarify the question of title to migrating storage gas, they do not address the extent to which Kansas law protects correlative rights of producers and storage operators in a common reservoir. The KCC is statutorily empowered to address correlative rights by determining a prorated "allowable" production from a common pool. But allowables are geared toward giving developed leases a fair opportunity to produce all of the gas in a reservoir, not toward accommodating the interests of storage operators in injecting and keeping gas in storage. Cf. Colorado Interstate Gas Co. v. State Corp. Commission, 192 Kan. 1, 386 P.2d 266 (1964) ("The

---

[12] The Kansas Supreme Court and the Tenth Circuit both suggested as much in subsequent decisions. See Hayes Sight & Sound, Inc. v. ONEOK, Inc., 281 Kan. 1287, 136 P.3d 428 (2006) ("Subsection (c) applies when stored gas has migrated to property not controlled by the gas injector"; applying subsection (c)(3) when storage gas migrated eight miles from the storage field); Northern Nat. Gas Co. v. Nash Oil & Gas, Inc., 526 F.3d 626, 632 (10th Cir. 2008)("In 1993 ... the Kansas legislature abolished the rule of capture with respect to migrated gas without limit to where the gas migrates. [] Now, an injector of natural gas ... does not lose property rights to injected gas when such gas migrates beyond the boundaries of the injector's storage facilities.").

[13] The court found K.S.A. § 55-1210 "abolished the rule of capture as to [injected] natural gas which migrates horizontally within a stratum to adjoining property or vertically to a different stratum, but preserved that rule as to natural gas which migrates beyond those boundaries." 296 P.3d at 1111.

Commission could not be required to shut in an entire gas field to protect correlative rights where some of the producers desired to cease production and hold a gas field for a reserve."). It is unclear whether the KCC has authority to act when uncompensated drainage or interference with a certified storage field is claimed – and in particular a storage field certified and subject to regulation by FERC.[14] Judge Brown noted as much when he refused to stay his shut in order. (Doc. 445 at 10). The parties have not cited Kansas law clearly establishing KCC's jurisdiction to decide such issues. But even assuming it does have jurisdiction – and that the KCC has the power to determine defendants' "fair share" of production from such a common pool – the recognition of a long-standing state police power to halt or limit production to prevent unfair drainage undermines rather than supports defendants' claim of an entitlement to continue producing gas even if it drains the storage field, damages the underground reservoir, and interferes with Northern's ability to use the field. Cf. Bennett v. State Corporation Commission, 157 Kan. 589, 142 P.2d 810 (1943) ("The right of the state in the exercise of its police powers to protect the correlative rights of producers from a common pool is well established."); State Corporation Commission v. Wall, 113 F.2d 877, 881 (10th Cir. 1940) ("the state has the power to regulate the production of oil and gas for the purpose of preventing waste and protecting the correlative rights of owners producing oil or gas from

---

[14] Cf. Schneidewind v. ANR Pipeline, 485 U.S. 293 (1988) ("The NGA confers upon FERC exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale"; "transportation" of gas in interstate commerce includes underground gas storage facilities).

a common pool.").

Against this background, Judge Brown found Northern had shown a likelihood of prevailing on a nuisance claim, which alleged that the defendants were unreasonably interfering with Northern's use and enjoyment of the storage field. As the Tenth Circuit's review of that order makes clear, the ruling was not dependent upon who held title to any storage gas being produced by defendants. The Tenth Circuit therefore rejected defendants' contention that the Pratt County judgment precluded a finding that defendants' production unreasonably interfered with the storage field. Northern Nat. Gas, 697 F.3d at 1271-72 ("The state case addressed whether Northern had still had title to the natural gas that migrated several miles away from the Field. Here, on the other hand, the issue is whether Defendants' production from their wells in the expansion area unreasonably interfered with Northern's storing its natural gas in the Field."). The Tenth Circuit likewise rejected defendants' argument that their authorization from KCC to operate the wells precluded a nuisance claim. The circuit pointed out that under Kansas law, "the fact that a business is carried on lawfully and in accordance with ordinary methods does not relieve one from liability if the use is unreasonable and as such constitutes a nuisance." Northern Nat. Gas, 697 F.3d at 1271. The court noted that whether a lawful use is a nuisance "depends upon a number of circumstances – locality and surroundings, the number of people living there, the prior use, whether it is continual or occasional, and the extent of the nuisance and injury caused to the neighbor from the use."

The foregoing review indicates there was no established property

right under Kansas law to continue gas production regardless of its effect on Northern's storage field. In these circumstances the Kansas common law of nuisance could conceivably limit a producer's right to take gas from a common pool. Cf. Restatement (Second) of Torts §858 (grantee of riparian rights who withdraws ground water from land is generally not subject to liability for interference with use of water by another, but may be liable if the withdrawal causes harm to neighboring land by reducing artesian pressure or if the withdrawal exceeds the grantor's reasonable share of the supply).

Defendants accurately point out that Northern's nuisance claim depends upon a number of facts yet to be finally determined, including whether defendants were in fact producing storage gas from the Cunningham Storage Field. But the background principles of Kansas law noted above undermine their argument that a temporary halting of their production, pending a resolution of the nuisance claim, constituted a taking of their property for a public purpose.

Finally, the nature of the governmental action at issue weighs against a finding that defendants' property was taken by the shut in order. The injunction was issued upon a state law claim for nuisance in a lawsuit between private parties claiming damages against one another. The court's injunction was only preliminary; it did not constitute a final adjudication of the parties' rights. The federal rules of civil procedure authorize preliminary injunctions when necessary to prevent irreparable harm pending a final determination of the parties' claims. When such temporary injunctions are issued, the rules require the movant to post security for costs and damages sustained by any party wrongfully restrained. Fed. R. Civ. P. 65(c).

These procedures were followed here. After assessing the limitations on the use of private property arising from Kansas nuisance law, Judge Brown issued a preliminary restraint to prevent irreparable harm until the claim could be determined. He required a $2 million bond as security for the injunction. (Case 08-1405, Doc. 420 at 40). The same procedural rule that authorized the preliminary restraint also authorized a remedy for defendants in the event the restraint turns out to have been wrongfully issued: Rule 65(c) "creates a cause of action for the 'costs and damages' incurred by the enjoined party should it later be determined that that party was 'wrongfully enjoined or restrained,...'" <u>Atomic Oil Co. of Okla. v. Bardahl Oil Co</u>., 419 F.2d 1097, 1101 (10th Cir. 1969). Defendants cite no authority for the proposition that such a preliminary restraint pending litigation – one supported by a remedy for damages caused by a wrongful restraint – constitutes a governmental taking of property.

There is obviously a connection between the damage claims in Case No. 08-1405 and the instant condemnation action. The two actions involve the same property and overlap in many respects. But the preliminary injunction in the damage case was not a governmental taking of defendants' property. It was a preliminary and temporary restraint on defendant's use of the property. It was authorized by the federal rules of civil procedure and is at least facially consistent with background principles of Kansas property and nuisance law. That does not mean that Northern's nuisance claim is valid. The claim has yet to be determined, and if Northern fails to prove it, the defendant producers can seek a remedy in Case 08-1405. As Judge Brown noted in granting the preliminary injunction:

Northern's current motion for preliminary injunction does not seek immediate possession of the wells or property; it seeks an order prohibiting the defendants from continuing their production during this litigation. Based on the evidence that the current production constitutes an unreasonable interference with the storage field, the court concludes that preliminary injunctive relief is appropriate. * * * But, should it later be determined that the injunction improperly denied the defendants a right to do what they had a legal right to do, the defendants could then seek to obtain damages for being wrongfully enjoined. See e.g., <u>Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 910 F.2d 1049, 1054 (2d Cir. 1990) (a party is wrongfully enjoined "if it ultimately found that the enjoined party at all times had the right to do the enjoined act.").

(Case 08-1405, Doc. 420 at 37.). <u>See also</u> <u>State of Kansas ex rel. Stephan v. Adams</u>, 705 F.2d 1267, 1269-70 (10th Cir. 1983); <u>Atomic Oil Co. of Okla. v. Bardahl Oil Co.</u>, 419 F.2d 1097, 1102 (10th Cir. 1969) (determination on the merits that no injunction was warranted necessarily determines that the temporary injunction previously granted was improper). Considering all of the circumstances set forth by the parties here and in their briefs, the court concludes that the taking of defendants' property did not occur upon issuance of the preliminary injunction shut in order, but on March 30, 2012, when Northern was granted a right of access to and possession of the property.

One final point about the nature of the property being condemned confirms this conclusion. The focal point of this condemnation proceeding – and in fact the reason for any condemnation at all – is the fact that the Viola and Simpson formations underlie and extend throughout the Expansion Area. They underlie all of the tracts in the complaint, all of the wells being condemned for use in Northern's

water injection program, and all of the surface areas being taken for related uses such as installation of pipelines or electrical lines. In assessing the date of taking, it makes sense to look to the point at which Northern obtained exclusive possession and use of these underground formations as a whole. That event more than any other marks the point at which the property interests were taken from defendants and acquired by Northern. And it is more logical to consider that single date as the taking than to declare a multitude of different takings as of the various dates that defendants ceased production from different wells or on which Northern set foot on or installed equipment on particular tracts of land. As the Supreme Court noted in <u>United States v. Dow</u>, 357 U.S. 17, 24 (1958), "it would certainly be bizarre to hold that there were two different 'takings' of the same property, with some incidents of the taking determined as of one date and some as of the other."

## V. Conclusion

Northern's Motion for Partial Summary Judgment (Doc. 532) is GRANTED. The court determines that the date of taking of the defendant property (except for the Zink 1A well) was March 30, 2012, when Northern perfected a right to possession of the property. As for the Zink 1A well, the date of taking will be the date compensation is paid for that property.

A motion for reconsideration of this order pursuant to this court's Rule 7.3 is not encouraged. Any such motion shall not exceed three pages and shall strictly comply with the standards enunciated by this court in <u>Comeau v. Rupp</u>. The response to any motion for reconsideration shall not exceed three pages. No reply shall be filed.

IT IS SO ORDERED.

Dated this 2nd day of July 2013, at Wichita, Kansas.

                                        s/Monti Belot
                                        Monti L. Belot
                                        UNITED STATES DISTRICT JUDGE