**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| NORTHERN NATURAL GAS COMPANY, ) | | |
| ) | | |
| Plaintiff, ) | **CIVIL ACTION** | |
| ) | | |
| v. ) | No. 10-1232 | |
| ) | | |
| APPROXIMATELY 9117 ACRES IN PRATT, ) | | |
| KINGMAN, AND RENO COUNTIES, ) | | |
| KANSAS, AND AS FURTHER DESCRIBED ) | | |
| HEREIN; ) | | |
| ) | | |
| TRACT NO. 1062710 ) | | |
| CONTAINING 80.00 ACRES MORE OR ) | | |
| LESS, LOCATED IN KINGMAN COUNTY, ) | | |
| KANSAS, AND AS FURTHER DESCRIBED ) | | |
| HEREIN; ET AL.,, ) | | |
| ) | | |
| Defendant. ) | | |
| ) | | |

**MEMORANDUM AND ORDER**

Before the court are the following:

Northern's Motion in Limine to Exclude 2010 Simulation and Memorandum in Support (Docs. 734, 735); Defendants' Responses (Docs. 741, 742, 746, 748); and Northern's Reply (Doc. 754));

Northern's Motion in Limine on Use of Trans Pac Litigation Materials and Memorandum in Support (Docs. 736, 737); Defendants' Responses (Docs. 749, 751, 752, 753); and Northern's Reply (Doc. 757); and

Defendant L.D. Drilling's Motion in Limine and Motion for leave to File <u>Daubert</u> Motion (Doc. 738); Northern's Response (Doc. 744); and Defendant's Reply (Doc. 755).

**I. Northern Motion in Limine to Exclude 2010 Simulation.**

Northern worked on a computerized gas migration model, referred to as "the 2010 simulation," intending to use it in Northern's 2009

FERC application.[1] Northern created the model by inputting data into a leased software program called "Eclipse." Northern says the model was never completed and was abandoned in 2010. It now moves for an order prohibiting use of the 2010 simulation at trial, citing the following reasons: the simulation is not based on facts similar to known conditions (i.e., it does not include data for the known fracture porosity of the 2010 Extension Area); it uses incomplete and inaccurate facts (including what Northern says are artificially assumed concentrations of native gas to simulate migration pathways in the Extension Area); it did not generate results consistent with known conditions (such as rapid gas movement through observed fractures in the upper Viola formation); and it does not comply with standard reservoir engineering practices. Additionally Northern argues the simulation does not "fit" the relevant scientific issues, in part because it was abandoned in May 2010 and does not incorporate significant data acquired thereafter.[2]

---

[1] Northern used a model referred to as the 2007 Simulation in a prior FERC application. The 2007 Simulation is not at issue here.

[2] Northern says it eventually concluded that the 2010 simulation was not necessary because an accumulation of other data – including production data on defendants' wells – demonstrated the nature and scope of gas migration in the 2010 Extension Area. It says attempts to work on the model were stopped "after it became apparent that the fractured nature of the upper Viola reservoir into which nearly 30 third-party operator wells had been completed could not be properly accounted for in the model without significant revisions to the entire model." (Doc. 735-1 at 5). Unable to simulate the flow from a fractured portion of the formation, Northern says it resorted to inputting various assumptions into the model, including "arbitrarily assign[ing] native gas accumulations" in and around the northern part of the Extension Area. Northern says that although the data did not support or reflect such gas accumulations, it used the assumption to artificially create gas-permeable pathways and thereby simulate the flow of the fractured portion of the Viola.

Defendants, meanwhile, contend Northern is attempting to exclude the 2010 simulation because its results contradicted Northern's experts and Northern's prior representations. Defendants argue the model shows that storage gas migrated to the Extension Area before defendants began producing in that area and then leveled off after defendants began producing, all contrary to Northern's current theory of migration. Defendants argue the 2010 simulation is admissible at least to impeach Northern witness Randal Brush, who worked on the simulation. Defendants further assert that their own experts may rely on the 2010 simulation pursuant to Rule 703 of the Federal Rules of Evidence. They note that if experts would reasonably rely upon such data in forming an opinion, the data itself need not be admissible for the expert's opinion to be admitted. Finally, defendants argue Northern's motion is premature because defendants' experts have not yet explained how they will use the model.

The 2010 simulation is potentially relevant for impeachment purposes. To the extent Northern's experts offer opinions at trial that differ from results (preliminary or otherwise) obtained under the 2010 simulation, defendants may be entitled to ask the witnesses why there is a difference and why Northern abandoned the model. The witnesses can offer the explanations cited above – e.g., incomplete data, invalid assumptions, or results at variance from known conditions. But ultimately it will be up to the Commission to consider whether results from the 2010 simulation are relevant and whether they contradict Northern's current position or otherwise undermine the credibility of its witnesses. The Commission may find that results from the model are so unreliable or limited as to say virtually

nothing about the witnesses' current opinions, or it may conclude that the results cast substantial doubt on the witnesses' present testimony. The Commission is better suited than the court to assess the significance of how various assumptions or limited data effect the reliability of a gas migration model. It rests within the sound discretion of the Commission to decide how much evidence relating to the 2010 simulation is relevant and what weight, if any, it should be given.

As for whether defendants may offer evidence of the 2010 simulation through their own experts, the court concludes for the reasons discussed infra in Section III that any challenge to the scientific reliability of any expert opinion based on the 2010 simulation should be raised in the first instance before the Commission.

**II. Northern's Motion to Exclude Trans Pac Litigation Materials.**

To a substantial degree, this motion duplicates the points and authorities raised and responded to in the motion to exclude the 2010 simulation. It may be that this sort of excess briefing impresses the clients; it does not impress the court.

Northern seeks an order prohibiting use of materials from the Trans Pac litigation[3] as substantive evidence at trial. Although conceding that expert reports and testimony from the Trans Pac case may be properly used to impeach its experts at trial, Northern argues such material cannot be introduced as substantive evidence because it is hearsay. It argues the experts who authored the reports in Trans

---

[3] Northern Nat. Gas Co. v. Trans Pacific Oil, Case No. 02-1418 (D. Kan.).

Pac are not "unavailable" within the meaning of Federal Rule of Evidence 804 because defendants made no effort to depose them or obtain their presence at trial. Additionally, it contends the prior statements of these experts cannot be attributed to Northern under Rule 801(d)(2). Finally, it argues the Trans Pac expert opinions are now unreliable – because they do not take into account the past eight years of accumulated data about the storage field – and that their admission would result in unfair prejudice.[4]

Both sides agree the Trans Pac material can be properly used for impeachment purposes. In light of this, the parties' extensive dispute about whether the materials can also be used as substantive evidence seems to the court to be an expensive academic exercise without much significance. Be that as it may, the court will not prohibit the Commission from considering these materials as evidence. Defendants have made a preliminary showing that the Netherland, Sewell expert opinions from the Trans Pac case qualify as non-hearsay under Fed. R. Evid. 801(d)(2). That rule allows a statement to be offered against a party if it is one that the party "manifested that it ... believed to be true." Northern's prior use of these expert opinions in the Trans Pac trial satisfies that standard.

Having said that, it is (again) entirely within the Commission's discretion to determine how much of this evidence is relevant and what weight to give it. It is not clear from the briefs how much bearing the Trans Pac materials have on the migration questions before the

---

[4] Northern concedes that the Commission, being composed of experienced professionals, is unlikely to be confused or misled by this evidence, but argues the introduction of such evidence would be a waste of time for the parties and the Commission.

Commission. The Trans Pac opinions are obviously dated and were made without benefit of a significant amount of subsequent data, including new production and testing data from the Extension Area. As Northern points out, there is no way to know whether the experts who gave the opinions in Trans Pac would have the same opinions today. But whether the Trans Pac opinions are indicative of opportunistic theory-shifting by Northern, as defendants repeatedly claim, or instead represent a prior theory that was superseded by changed circumstances and information, as Northern maintains, are questions the Commission is fully qualified to consider and address.[5] The Commission may consider the Trans Pac materials to the extent and for the purposes it considers appropriate. If it concludes the materials are not relevant it may disallow them. Even if it finds them relevant, it may limit or disallow them if it concludes the presentation of such materials would be a waste of time that outweighs the probative value of the materials. See Fed. R. Evid. 403.

**III. L.D. Drilling's Motion in Limine and Motion for Leave to file Daubert Motion.**

A. "Bad intent" Evidence. L.D. Drilling moves to exclude any evidence or argument before the Commission "as to the producers' motives, intent, knowledge and reasonableness," arguing (among other things) that such issues are not relevant to the valuation question

---

[5] Given that a jury in Trans Pac rejected Northern's theory of storage gas migration to the Park wells, the presence of any storage gas in the Extension Area would have to be explained by some other theory. Defendants can argue to the Commission that Northern's theory shifting weighs against its experts' credibility, but the mere fact that a prior theory was disproved does not mean Northern's current theory is false. Cf. Aesop's Fables, "The Boy Who Cried Wolf."

-6-

the Commission must determine. Northern states in response that it "will not offer ... evidence in this proceeding that the producer-defendants' actions were unreasonable, or that the producer-defendants had bad motives or intentions, or knew that their actions would draw storage gas away from Northern's Cunningham Storage Field." Doc. 744 at 2. But Northern does intend to offer evidence that defendants' production of gas and water in the Extension Area caused storage gas migration. Northern argues such causation evidence is relevant and proper to explain the physical process by which storage gas migrated to the Extension Area and the resulting quantity of storage gas that can be found there.

L.D. Drilling points out that under Northern Nat. Gas Co. v. ONEOK Field Servs. Co., 296 Kan. 906 (2013), the cause of any storage gas migration is irrelevant to who holds title to the gas, and it contends any evidence of causation could have no purpose but to impugn the producers:

> Why, then, would Northern want to make to the commissioners the irrelevant point that the storage gas that migrated to the producers' extension area wells did so because of the producers' acts, as opposed, say, to Northern's acts or happenstance? Exactly, and only, because Northern's evidence of causation *implies* the producers' bad intent.

Doc. 755 at 4.

This attempt to exclude all evidence of the cause of storage gas migration borders on the frivolous. In assessing the value of the various tracts, the Commission will have the difficult task of estimating how much storage gas is in the Extension Area and, at least in some cases, when that migration occurred. L.D. Drilling does not

-7-

explain how the Commission could possibly do so without taking into account the cause of the migration. It is patently obvious that the mechanism by which any storage gas migration occurred has a bearing on how much gas went to the Extension Area and when it did so. The amount of storage gas in the Extension Area is a function of the mechanism that brought it there. L.D. Drilling has shown no grounds for excluding such evidence of causation.

B. <u>Request for Leave to File Daubert Motions</u>. At the September 4, 2013, status hearing, the court informed the parties of its views regarding the value of <u>Daubert</u> motions in this type of case. First, although the court rather than the Commission would have undertaken any challenges to the underlying qualifications of a witness to offer an expert opinion, there have been no such challenges. Second, with respect to more substantive <u>Daubert</u> matters – such as claims that an expert's opinion lacked an adequate factual basis or was not the product of reliable methods – the court strongly suggested that the Commission was uniquely qualified to consider such questions. For that reason, the court observed that it would be a waste of time to consider pre-trial <u>Daubert</u> motions, and that such issues should be resolved by the Commission in the first instance.

At the hearing, only counsel for L.D. Drilling protested this procedure, arguing that it could violate <u>constitutional</u> protections.[6]

---

[6] Jim Goering, one of L.D. Drilling's counsel, stated: "I believe <u>Daubert</u> is a constitutional issue...." When the court asked Mr. Goering "What constitutional issue are you thinking about...?", he did not specifically identify one. The court told Mr. Goering that if the court's ruling regarding <u>Daubert</u> motions "[v]iolates L.D.'s constitutional rights, then I guess you could file a motion directed to the constitutional issue as opposed to the <u>Daubert</u> issue...." Doc. 727 at Pp. 75-76.

As a result the court reluctantly set a deadline for briefing and for requesting leave to file <u>Daubert</u> motions. L.D. Drilling's resulting 35-page prolix motion and reply say not one word about a constitutional issue, much less cite a case raising a <u>Daubert</u> hearing to a constitutional right. Instead, L.D. Drilling attacks the credibility of Northern's experts (likening them to "compurgators"[7]) and argues that in fairness L.D. Drilling should be able to file <u>Daubert</u> motions after Northern's experts have been deposed. The reply also chides Northern for citing "no authority whatsoever for its argument that the commissioners' expertise and sophistication relieve this Court of the gatekeeping duties that <u>Daubert</u> imposes" and for failing to show that "the commissioners have special expertise with respect to the particular scientific principles and methodologies that L.D. Drilling will challenge as insufficient." (Doc. 755 at 6-7).

The Commission appointed to hear this matter – whose members were reviewed and approved by the parties – includes two lawyers with

---

[7] The court, having not run across a "compurgator" before, had to look the term up in Black's Law Dictionary. In case anyone reading this order has even the remotest interest in the definition, it is "one of several neighbors of a person accused of a crime, or charged as a defendant in a civil action, who appeared and swore that they believed him on his oath." The application of the term to this case escapes the court.

Defendants, who vociferously complain about having been called "cattle rustlers" and "gas stealers" by Northern, have themselves repeatedly accused Northern of bad faith and of knowingly advancing unfounded positions. When it comes to hurling epithets, both sides have at times employed "the Chicago way," meaning (as explained by Sean Connery in "The Untouchables"): "He pulls a knife, you pull a gun. He sends one of yours to the hospital, you send one of his to the morgue."

Once again – and for the last time – the court admonishes counsel that it is neither impressed nor swayed by these sorts of tactics. Nor will be the commissioners, each of whom is a professional. The only concrete result of these tactics has been to delay the ultimate resolution of the case.

-9-

extensive experience in oil and gas law (one of whom has a degree in petroleum engineering); a certified appraiser (37 years experience) who specializes in commercial real estate; a petroleum reservoir engineer (38 years experience) whose work involves evaluating oil and gas reserves; and an experienced petroleum engineer with a special expertise in reservoir analysis. The court is not informed about what "particular principles and scientific methodologies" L.D. Drilling expects to challenge, but it is unmistakably clear to the court that the Commission is supremely qualified to identify and weed out any expert opinions that are not reliable, helpful, or adequately supported.

A commission appointed under Rule 71.1 has the powers of a master under Rule 53(c). Fed. R. Civ. P. 71.1(h)(2)(D). Those powers include the authority to "regulate all proceedings"; to "take all appropriate measures to perform the assigned duties fairly and efficiently"; and to "exercise the court's power to compel, take, and record evidence." Fed. R. Civ. P. 53(c). This has traditionally included the power to rule upon the admissibility of evidence unless the order of reference provides otherwise. See 9C Fed. Prac. & Proc. Civ. §2609, Arthur Miller (3rd ed).

L.D. Drilling cites no authority to show that the court cannot refer Daubert-type challenges to the Commission in the first instance, with appropriate instructions. Other courts have taken a similar approach. See Guardian Pipeline, L.L.C. v. 950.80 Acres of Land, 486 F.Supp.2d 741, 749 (N.D. Ill. 2007) (affirming Commission's finding that witness' testimony was reliable under Daubert); U.S. ex rel. Tennessee Valley Authority v. An Easement and right-of-way over a

Total of 8.62 Acres of Land, more or less, in Rutherford County, Tennessee, 2010 WL 3491216, 8 (M.D. Tenn. 2010) (Commission disposing of Daubert challenge: "If the Commission is to be treated as an entity more akin to a magistrate, special master, or referee than a jury, as the Commission believes, then the Commission would not see the need to be protected from potentially confusing or misleading science, and be sufficiently competent to not need a 'gatekeeper' function."). Any due process concerns here are more than satisfied by the opportunity to challenge expert opinions before the Commission and, if necessary, to seek review of the Commission's report under Fed. R. Civ. P. 53(f). To make it perfectly clear, this court will not hold Daubert hearings.

**IV. Conclusion.**

Northern's Motion in Limine to Exclude 2010 Simulation (Doc. 734) is DENIED;

Northern's Motion in Limine to Limit Trans Pac Materials (Doc. 736) is DENIED; and

L.D. Drilling's Motion in Limine and For Leave to File Daubert Motion (Doc. 738) is DENIED.

A motion for reconsideration of this order is not encouraged. The standards governing motions to reconsider are well established. Comeau v. Rupp, 810 F.Supp. 1172 (D. Kan. 1992). Any such motion shall not exceed three pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp. The response to any motion for reconsideration shall not exceed three pages. No reply shall be filed.

IT IS SO ORDERED.

Dated this 27th day of December 2013, at Wichita, Kansas.

s/Monti Belot

Monti L. Belot

UNITED STATES DISTRICT JUDGE