IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS


NORTHERN NATURAL GAS COMPANY,   )
                                    )
                Plaintiff,    )    **CIVIL ACTION**
                                    )
v.                             )    No.  10-1232-MLB-DWB
                                    )
APPROXIMATELY 9117 ACRES IN PRATT, )
KINGMAN, AND RENO COUNTIES,     )
KANSAS, AND AS FURTHER DESCRIBED  )
HEREIN;                           )
                                    )
TRACT NO. 1062710              )
CONTAINING 80.00 ACRES MORE OR   )
LESS, LOCATED IN KINGMAN COUNTY,  )
KANSAS, AND AS FURTHER DESCRIBED  )
HEREIN; ET AL.,              )
                                    )
                Defendants.   )
_____)

## MEMORANDUM AND ORDER

This matter is before the court on:

Northern's Second Motion for Partial Summary Judgment (Docs. 677, 678);

Producer-Defendants[1] Response and Cross-Motion for Partial Summary Judgment (Docs. 699, 700) and joinder by other defendants (Docs. 701, 702);

Northern's combined Response and Reply (Doc. 715); and

Defendants' Reply (Docs. 731, 732).

## I. Background.

Northern brought this condemnation action pursuant to the Natural Gas Act, 15 U.S.C. § 717f(h), to acquire additional acreage for use in its underground natural gas storage field near Cunningham, Kansas.

---

[1]L.D. Drilling, Inc., Nash Oil & Gas Co., Val Energy, Inc., and Five-Star Energy, Inc. Doc. 699 at 1.

Since the late 1970's, Northern has operated an underground natural gas storage facility in south-central Kansas known as the Cunningham Storage Field. The facility uses a large natural underground reservoir that was substantially depleted following decades of native gas production from the reservoir. Pursuant to authority granted by the Federal Energy Regulatory Commission (FERC), Northern's operation involves transporting natural gas produced elsewhere to the field and injecting it into the reservoir. The gas can then be withdrawn in periods of high demand and transported to out-of-state markets. Such injected "storage gas" may have a different chemical composition than the "native" gas naturally found in the area. See K.S.A. § 55-1201(c) ("'native gas' shall mean gas which has not been previously withdrawn from the earth"; "storage gas" is not defined by Kansas statute).

Northern's original certificate from FERC allowed it to acquire and store gas in an underground area covering more than 26,000 acres. Northern began to suspect at least by the 1990's that its storage gas was migrating out of the field and was being produced by nearby gas well operators. After litigating (and losing) several lawsuits, Northern returned to FERC and sought authority to acquire additional acreage for use as a buffer zone for the storage field. In 2008 it was granted a certificate to condemn an additional 1,760 acres. In 2010 it was granted a certificate to condemn an additional 12,320 acres. This latter "2010 Extension Area" is the subject of the instant

condemnation.[2] Northern obtained voluntary storage lease rights in about 30% of the 2010 Extension Area; it is proceeding with condemnation of rights in the remainder of the Extension Area.

The motions before the court deal with storage gas that migrated into the 2010 Extension Area as of March 30, 2012, the "date of taking" of that area by Northern.[3] Specifically, the motions seek a determination of whether Northern must pay just compensation for the taking of migrated storage gas in the 2010 Extension Area. There is no dispute that the defendant landowners (or their assignees) are entitled to just compensation for any economically recoverable native gas that was under their property on the date of taking.

Northern argues the Kansas Underground Gas Storage Act, K.S.A. § 55-1201 et seq. (hereinafter the "Storage Act"), requires it to pay only for native gas in the 2010 Extension Area. It further contends that under Union Gas System, Inc. v. Carnahan, 245 Kan. 80, 774 P.2d 962 (1989), title to any storage gas in the Extension Area reverted to Northern (or "re-vested") once Northern obtained the 2010 FERC certificate. Northern contends defendants held a fee simple determinable interest in any migrated storage gas, and that their interest terminated under Kansas law once Northern obtained the FERC certificate. Northern thus argues it does not have to pay just compensation for storage gas in the Extension Area.

---

[2] The lone exception appears to be Tract 3152711, a 7.87 acre tract in the 2008 Extension Area that is included in Northern's condemnation complaint.

[3] See Memorandum and Order of July 2, 2013 (Doc. 691) determining the date of taking was March 30, 2012, when the court granted Northern an injunction allowing it to take possession of the entire 2010 Extension Area.

Defendants respond that under Kansas law, including the Supreme Court's ruling in Northern Natural Gas Co. v. ONEOK Field Svcs. Co., 296 Kan. 906, 296 P.3d 1106 (2013), Northern lost title to any storage gas that migrated to the Extension Area. By virtue of the "ownership in place" theory of Kansas oil and gas law, defendants contend any migrated storage gas became their property once it entered the Extension Area. They assert that the FERC certificate had no effect on their title and that Northern must pay just compensation for the taking of their rights in storage gas as of the date of taking.

## II. Uncontroverted Facts.

Northern is a natural gas company as defined by the Natural Gas Act (NGA), 15 U.S.C. § 717. Northern owns and operates the underground natural gas storage field known as the Cunningham Storage Field in Reno, Kingman and Pratt counties, Kansas, pursuant to a series of certificates of public convenience and necessity from FERC.

On October 30, 2008, FERC issued a Certificate of Public Convenience and Necessity authorizing Northern's expansion of the certificated boundaries of the Cunningham Storage Field by approximately 1,760 acres. Through the October 30, 2008, Certificate, FERC authorized "the expansion of Northern's certificated boundary to include, and Northern's acquisition of all property interests in, the Viola and Simpson formations" in the following acreage:

| Section | Township | Range | County |
|---------|----------|-------|--------|
| N ½ of 13 | 27S | 11W | Pratt |
| W ½ of 14 | 27S | 11W | Pratt |
| NE ¼ of 14 | 27S | 11W | Pratt |
| E ½ of 15 | 27S | 11W | Pratt |
| NE ¼ of 22 | 27S | 11W | Pratt |
| NW ¼ of 18 | 27S | 10W | Kingman |

| S ½ of 7 | 27S | 10W | Kingman |
|----------|-----|-----|---------|

This acreage is referred to as the 2008 Extension Area.

On June 2, 2010, FERC issued another Certificate of Public Convenience and Necessity "authorizing expansion of Northern's certificated buffer zone to include the Viola and Simpson Formations" in Pratt, Reno, and Kingman Counties, Kansas by 12,320 acres.

Through the June 2, 2010 Certificate, FERC approved the following acreage:

| Section(s) | Township | Range | County |
|------------|----------|-------|--------|
| 23 - 27 | 26 S | 11 W | Pratt |
| 34 - 36 | 26 S | 11 W | Pratt |
| S ½ of 22 | 26 S | 11 W | Pratt |
| SE ¼ of 33 | 26 S | 11 W | Pratt |
| 1 - 3 | 27 S | 11 W | Pratt |
| 10 - 12 | 27 S | 11 W | Pratt |
| E ½ of 4 | 27 S | 11 W | Pratt |
| E ½ of 9 | 27 S | 11 W | Pratt |
| 30 - 31 | 26 S | 10 W | Reno |
| 6 | 27 S | 10 W | Kingman |
| N ½ of 7 | 27 S | 10 W | Kingman |

This acreage is referred to as the 2010 Extension Area. (Unless indicated otherwise, any reference in this order to the "Extension Area" refers to the 2010 Extension Area.)

Some of the natural gas at issue in these cross-motions for summary judgment is storage gas that migrated more than one section beyond any section containing the pre-condemnation boundaries of the Cunningham Storage Field. The Producer-Defendants (L.D.

Drilling, Nash, Val and Five Star[4]) operate wells in the 2010 Extension Area that are more than a section beyond any section containing the boundaries of the Cunningham Storage Field as those boundaries stood immediately prior to the June 2, 2010 FERC order.

Nothing in the June 2, 2010 FERC Order states that it confers title to any natural gas, or to any other property, upon Northern before Northern pays for the property being condemned, or before the condemnation process has been completed.

The parties agree there may be a significant amount of storage gas located in the 2010 Extension Area.

**III. Summary Judgment Standards.**

The rules pertaining to summary judgment are well-established. Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if sufficient evidence exists so that a rational trier of fact could resolve the issue either way and an issue is "material" if under the substantive law it is essential to the proper disposition of the claim. Adamson v. Multi Community Diversified Svcs., Inc., 514 F.3d 1136, 1145 (10th Cir.2008). When confronted with a fully briefed motion for summary judgment, the court must

_____

[4] At a status conference on February 26, 2014, counsel for Five Star and Northern stated that the claims involving Five Star will likely soon be resolved and it will be dismissed from the case.

ultimately determine "whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). If so, the court cannot grant summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

## IV. Discussion.

The applicable procedures for condemnation under the Natural Gas Act are supplied by Rule 71.1 of the Federal Rules of Civil Procedure. See e.g., East Tennessee Natural Gas Co. v. Sage, 361 F.3d 808, 822 (4th Cir. 2004); Southern Star Central Gas Pipeline, Inc. v. 842 Mineral and Leasehold Acres of Land, No. 08-1313, slip op. at 3 (D. Kan., Mar. 16, 2010) (Rule 71.1 supersedes the NGA's provision endorsing state condemnation procedures).[5] But the substantive law of Kansas determines the extent of the parties' property rights and the standards for determining just compensation. Southern Star, supra; Columbia Gas v. Exclusive Natural Gas, 962 F.2d 1192, 1199 (6th Cir. 1992) (amount of compensation due under § 717f(h) is determined using law of the

---

[5] Although the NGA (15 U.S.C. § 717f(h)) states that the procedure for eminent domain shall conform as nearly as possible to the State procedure where the property is located, that provision is effectively nullified by the Rules Enabling Act's "supersession clause" [28 U.S.C. § 2072(b)] and Rule 71.1. See Guardian Pipeline, L.L.C. v. 295.49 Acres of Land, 2008 WL 1751358, *12 (E.D. Wis. 2008).

state in which the condemned property is located).

The Kansas law pertaining to ownership of stored natural gas has followed a somewhat tortuous path. Unfortunately, the court must once again review that history in order to resolve the title questions that are at the heart of the instant summary judgment motions.

A. Background of Kansas Oil and Gas Law.

As explained by the Kansas Supreme Court, the law of Kansas has long been that native oil and gas in the ground belong to the owner of the land as long as those minerals remain on or in the land or subject to the landowner's control.[6] See Northern Natural Gas Co. v. Martin, Pringle, Oliver, Wallace & Bauer, LLP, 289 Kan. 777, 217 P.3d 966 (2009) and Northern Natural Gas Co. v. ONEOK Field Services Co., 296 Kan. 906, 296 P.3d 1106 (2013), cert. denied, 2013 WL 2903456, 82 U.S.L.W. 3005 (U.S. Oct. 7, 2013). Under this "ownership in place" theory, Kansas landowners own a present estate in oil and gas in the ground. Martin, Pringle, 289 Kan. at 788. But when oil and gas escape and go into other lands, or come under another's control, the title of the former owner is - in the Tenth Circuit's words - "lost." Bezzie v. Hocker, 370 F.2d 533, 536 (10th Cir. 1996) (applying Oklahoma law). In this respect,

---

[6] For purposes of the instant motion it is immaterial whether the oil and gas ownership rights were held by landowners or by someone else (such as a lessee) claiming an interest derived from a landowner.

the interest of a landowner in native gas in the ground is a defeasible interest. Under the rule of capture, such migrating gas becomes the personal property of the first person to produce it.

These ownership principles initially evolved with respect to native gas. Kansas law dealing specifically with previously-captured and re-injected storage gas developed more recently. In 1951, the Kansas legislature enacted the Storage Act to promote the underground storage of natural gas, finding it was in the public interest to build natural gas reserves that allow orderly distribution in periods of peak demand. Among other things, the Storage Act allows natural gas public utilities to condemn subsurface property for use as underground storage facilities if they first obtain a certificate from the Kansas Corporation Commission (KCC). The KCC may issue a certificate after public hearings if it finds the property is suitable and that its use for storage is in the public interest, and after it determines the amount of recoverable oil and native gas, if any, remaining in the formation to be acquired. K.S.A. § 55-1204. In awarding damages for condemnation of such subsurface formations, the Act directs appraisers to take into consideration the amounts of recoverable oil and native gas remaining in the property and to accept the findings of the KCC as prima facie evidence of those amounts. K.S.A. § 55-1205.

Federal law similarly allows for condemnation of underground

formations for natural gas storage. Pursuant to the Natural Gas Act, 15 U.S.C. § 717f, FERC may issue a Certificate of Public Convenience and Necessity allowing an applicant to establish or extend facilities for transportation or sale of natural gas in interstate commerce, including underground gas storage areas, through exercise of the United States' right of eminent domain. Northern's condemnation authority in this case is based on a FERC certificate.

In <u>Anderson v. Beech Aircraft Corp</u>., 237 Kan. 336, 699 P.2d 1023 (1985), Beech Aircraft injected captured natural gas into a common natural reservoir underlying its own property and the neighboring property. It had no permission to use the neighboring property. A lawsuit ensued when a producer on that property began producing storage gas. The Supreme Court held that the rule of capture applied in these circumstances, meaning Beech lost title to the gas when it was injected into the reservoir and produced on the adjoining property. The court emphasized that the Storage Act provided a mechanism for condemning underground storage formations, but Beech was not a natural gas public utility and had not obtained a certificate from the KCC authorizing the storage facility. Apart from an historical perspective, <u>Beech</u> has no application here because Northern has obtained the requisite condemnation authority from FERC.

B. <u>Union Gas</u>.

In *Union Gas System, Inc. v. Carnahan*, 245 Kan. 80, 774 P.2d 962 (1989), a natural gas public utility (Union Gas) had begun in 1952 to inject captured natural gas in the depleted Squirrel formation underlying Montgomery County. It continued to use the formation for storage for more than 30 years without ever obtaining authorization from the KCC. In 1985, shortly after the *Anderson v. Beech* decision, producer Carnahan drilled two gas wells in the Squirrel formation on the neighboring DeTar property. Union Gas filed a damage suit and asked the court to halt the production, but its request was denied. Union Gas then applied for a KCC certificate to condemn the formation under the DeTar property. On January 13, 1986, the KCC granted the application, and Union Gas initiated a condemnation suit. Meanwhile, Carnahan continued his production of gas until August of 1986. The KCC had been unable to determine the ratio of native to storage gas on the evidence before it, but the parties stipulated that Carnahan's production was about 17% native gas and the rest was storage gas. *Union Gas*, 245 Kan. at 93.

In a consolidated appeal of the condemnation and damage suits, the Kansas Supreme Court made a number of rulings. The first issue was whether Union Gas was entitled to recover for any of its storage gas *produced* by Carnahan. The Supreme Court said Union Gas's choice to forego KCC certification and condemnation when it began storage operations in 1952 placed it under the rule of

-11-

Anderson, i.e., the rule of capture. As such, Union Gas was not entitled to recover for any storage gas produced by Carnahan before the KCC certificate was issued. Union Gas, 245 Kan. at 87. But the court held Union Gas was entitled to a set-off for storage gas produced by Carnahan after the KCC certificate was issued. The court reasoned as follows:

> Union acquired no rights to the DeTars' property until April 9, 1987 [the date of taking]. However, the question remains as to its rights to its own gas from January 13, 1986, to April 9, 1987. Since Union established itself as a public utility and was authorized to store its gas underground by the Commission certificate issued on January 13, 1986, it thereafter acquired a changed status. Its operation was given official sanction and its gas was identified. Thereafter it became an exception to the rule of capture expressed in Anderson.
>
> Cross-appellants, relying on the rule of capture, legitimately took advantage of Union's pressurizing the Squirrel horizon under the DeTar land without authority and recovered both previously unrecoverable native gas and Union's injected gas which had migrated onto the DeTars' property. They then sold the gas to Salem and Scissortail, who in turn sold it to Williams, who then sold it to Union for reinjection into the North field. This created a clever circle of purloined production, and a successful one under the rule of capture as stated in Anderson. But all good things must eventually come to an end. This scheme ended when Union received its certificate of authority from the Commission on January 13, 1986. The law abhors a forfeiture. So, as soon as Union's storage operation became authorized and its gas identifiable, the gas was no longer ferae naturae and subject to the rule of capture. The title to Union's captured gas remained in Union. Thus, Union did not forfeit

> its natural gas produced after January 13,
> 1986, even though it acquired no title to the
> DeTars' property until the date of taking,
> April 9, 1987. Consequently, we hold Union is
> entitled to a setoff for the value of its
> injected gas produced by cross-appellants after
> January 13, 1986. The value of its gas is the
> selling price less its share of the cost of
> production, including a reasonable rental for
> the use of the DeTars' land.

Union Gas, 245 Kan. at 88-89. The court went on to reject

Carnahan's argument that he was entitled to just compensation for

the value of the storage gas remaining under the DeTar property.

The court said the Storage Act specified that only _native_ gas was

to be considered. (_Citing_ _inter_ _alia_ K.S.A. § 55-1204(a)(2) and

§55-1205)).[7]

    C. Adoption of K.S.A. § 55-1210.

    Effective July 1, 1993, the Kansas legislature amended the

Storage Act by adding §55-1210. Subsection (a) of that statute

provides in part that all natural gas previously reduced to

possession and injected into underground storage fields or

reservoirs shall at all times be the property of the injector.

Subsection (c) provides in part that with regard to gas that has

migrated to adjoining property which has not been condemned or

---

[7] The court observed that the Kansas Storage Act "was intended to operate _prior_ to the injection and storage of gas by a natural gas public utility." Union Gas, 245 Kan. at 89. This would explain why the statute only requires a determination of how much native gas in is the property and why appraisers are only directed to consider the amount of native gas. Essentially, K.S.A. § 55-1205 contemplates condemnation of an underground area before storage operations begin, meaning there would be no storage gas to be taken into account.

purchased, the injector shall not lose title to such gas if it can prove by a preponderance of evidence that such gas was originally injected into the underground storage.

   D. _Northern v. Martin, Pringle_.

   In 2009, the Kansas Supreme Court addressed a certified question in a suit by Northern against its former attorneys. _Martin, Pringle_, 289 Kan. 777, 217 P.3d 966. The certified question addressed whether Northern lost title to injected storage gas that migrated to adjoining property before the effective date of §55-1210, given that the gas had not been captured or produced by anyone by that date. Northern argued that § 55-1210 "re-vested" it with title to the gas. Pointing to the set-off granted to the injector in _Union Gas_, Northern argued that "title to migrated storage gas previously subject to the Rule of Capture revests in the injector immediately when the Rule of Capture ceases to apply."

   The Supreme Court brushed aside this argument. ("Of course, _Union Gas_ said no such thing."). It said _Union Gas_ "clarified that [a natural gas public] utility has the statutory ability to obtain a certificate for an underground gas storage area and that the failure to use that remedy places the utility squarely under the rule of _Anderson_." _Martin, Pringle_, 289 Kan. at 790-91. The court said because "Northern did not obtain a certificate to condemn the adjacent landowner's property prior to July 1, 1993, the adjoining landowners possessed a right, title, and interest in and to the gas

-14-

which migrated to the adjoining property as of that date." Martin, Pringle, 289 Kan. at 791. The landowners thus "possessed the legal right to produce and keep the injected gas which had migrated onto their property, unless and until Northern obtained a certificate to expand its storage area onto their land and paid them for that privilege through a condemnation action."[8] Although K.S.A. § 55-1210 "abolished that right," according to the court, such a substantive change to vested rights could not be applied retroactively and must be prospective only. Martin, Pringle, 289 Kan. at 791.

    E. Northern v. ONEOK.

The Supreme Court again addressed § 55-1210 in Northern v. ONEOK. That case dealt with claims of conversion of storage gas that migrated beyond the post-October 2008 boundaries of the Cunningham Storage Field, where it was produced and sold by several of the Defendant-Producers. The court said subsections (a) and (b) of § 55-1210 give an injector title to storage gas that remains within its certified storage area. Subsection (c) permits the injector to retain title to storage gas "which migrates horizontally within a stratum to adjoining property or vertically to a different stratum." The term "adjoining property" was

---

[8] In dismissing Northern's "re-vesting" argument out of hand, the Martin, Pringle opinion did not explain how the landowner's vested property interest in Union Gas could be transferred to the injector without any requirement for compensation, nor did it explain what Union Gas meant when it said "the title to Union's captured gas remained in Union" after it obtained a KCC certificate.

construed by the court to mean "any section of land which touches a section containing a storage field." ONEOK, 296 Kan. at 922 (citing Williams Nat. Gas Co. v. Supra Energy, Inc., 261 Kan. 624, 931 P.2d 7 (1997)). The court concluded that "adjoining property" was intended as a geographical limitation on the injector's title to migrating storage gas, meaning that if storage gas migrates beyond the "adjoining property," the injector loses its title and the rule of capture once again applies. The court found that all of the wells at issue in that case were beyond the confines of "adjoining property." Accordingly, the Producer-Defendants rather than Northern had title to any such storage gas and there was no conversion of it.

   F. Viability of Union Gas.

   Union Gas made two rulings of significance here. First, it found that issuance of a KCC certificate meant that storage gas which had migrated into the property to be condemned was no longer subject to the rule of capture. Title to such gas "remained in" the injector as of the date of the certificate. Second, it found that K.S.A. § 55-1205 only requires a condemnor in such circumstances to pay compensation for the native gas in the property being condemned and not for migrated storage gas.

   If Union Gas still represents Kansas law, and if it can be applied constitutionally (see discussion infra at pages 22-23), then it would dictate that Northern's motion be granted because

-16-

under the rule of <u>Union Gas</u>, the FERC certificate of June 2, 2010, would mean title to storage gas in the Extension Area "remained in" Northern as of that date.[9] Northern would only have to compensate defendants based on the recoverable native gas in that area. Not surprisingly, the parties disagree whether <u>Union Gas</u> remains good law.[10]

Defendants claim, among other things, that K.S.A. § 55-1205 does not preclude compensation for storage gas in this case, as it did in <u>Union Gas</u>, because it is a procedural statute and does not apply in this federal action. (Doc. 700 at 9). Section 55-1205 is entitled "Eminent Domain Procedure," and it sets out various

---

[9]    Although the Cunningham Storage Field was initially certificated both by FERC's predecessor and the KCC, the later expansions were certificated only by FERC. The reason for this is not clear in the record, but no party has raised it as an issue and the court assumes for purposes of this motion that a FERC certificate would have the same effect on property rights under Kansas law as a KCC certificate.

[10] Defendants additionally attempt to distinguish <u>Union Gas</u> on its facts. They note that the KCC certificate in <u>Union Gas</u> authorized the injector to store gas under the adjoining property, while Northern's FERC certificate only permits it to use the Extension Area as a buffer zone.  That is a factual difference, but nothing in <u>Union Gas</u> suggests that it is a material one. Both certificates allow the condemnor to obtain exclusive use of the specified area as part of its storage field and both preclude any inconsistent use of the area by the landowner.

Defendants also point out that the FERC certificate did not estimate the amount of recoverable native gas in the property, while the KCC certificate <u>Union Gas</u> had such a finding. But that is true because K.S.A. § 55-1204 requires the KCC to make a finding of the amount of native gas in the property in a condemnation under the Kansas Storage Act. That procedural requirement does not apply in this condemnation under the Natural Gas Act, which is governed by the Federal Rules of Civil Procedure. Northern's failure to follow the state procedure does not affect the property rights at issue or the standard for determining just compensation.

procedural requirements. But insofar as it declares that native gas is compensable in condemnation but storage gas is not – which is how <u>Union Gas</u> interpreted it – it is a substantive rule, not a matter of procedure. To say that one item of property is compensable but another is not is a prime example of a substantive law in condemnation. It cannot be considered merely procedural.[11]

Defendants also contend <u>Union Gas</u> "has been superseded by both statute and by far more recent case law." (Doc. 700 at 4). Section 55-1210 clearly does supersede <u>Union Gas</u> insofar as that case said an adjoining landowner could rely on the rule of capture to produce storage gas. Section 55-1210(c)(1) precludes the rule of capture for storage gas on adjoining property. <u>See</u> <u>Unified School Dist. No. 501, Shawnee County, Kan. v. Baker</u>, 269 Kan. 239, 243, 6 P.3d 848 (2000) ("If the legislature has spoken, the statement supersedes common law"). But <u>Union Gas</u> also decided the two questions noted above relating to condemnation, neither of which were specifically addressed by § 55-1210.

Defendants contend <u>Union Gas</u> was effectively overruled by <u>Martin, Pringle</u> and <u>ONEOK</u> because these subsequent cases reaffirmed

---

[11] Any construction of Kansas law that would allow a condemnor acting under state law to pay only for native gas but would require a federal condemnor in the same circumstances to pay for both native and storage gas would likely be an impermissible burden on interstate commerce. <u>See</u> <u>e.g.</u>, <u>Granholm v. Heald</u>, 544 U.S. 460, 472 (2005) ("Time and again this Court has held that, in all but the narrowest circumstances, state laws violate the Commerce Clause if they mandate 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'").

the "ownership in place" doctrine and recognized that landowners have a present estate in the oil and gas under their property. By contrast, they say, <u>Union Gas</u> did not treat the migrated gas as belonging to any party before it was produced. But neither of these more recent cases expressly overruled <u>Union Gas</u>. In fact, <u>Martin, Pringle</u> seemed to rely on its holding about the significance of a regulatory certificate, and <u>ONEOK</u> was specifically limited to events before issuance of the 2010 FERC certificate, meaning <u>ONEOK</u> did not decide whether that portion of <u>Union Gas</u> remains viable.[12] <u>See</u> <u>ONEOK</u>, 296 Kan. at 937 ("Nash and L.D. had title to any such migrating gas produced by their wells until June 2, 2010, when FERC extended the certificated boundaries of the Field to include Nash's and L.D.'s wells, or brought those wells onto property adjoining the expansion area.").

Northern responds that <u>Union Gas</u> remains good law and that it "recognized a special type of fee simple determinable property interest in favor of the landowners." (Doc. 715 at 11). This "fee simple determinable" argument finds no mention or support in any Kansas case law. And while this novel theory at least makes an attempt to explain <u>Union Gas</u>'s holding that the landowner's property interest in migrated storage gas terminated when a KCC

---

[12] The <u>ONEOK</u> opinion characterized <u>Union Gas</u> as "superseded by statute as stated in <u>Martin, Pringle</u>." <u>ONEOK</u>, 296 Kan. at 920-21. Westlaw's Keycite system characterizes <u>Union Gas</u> as superseded by statute as stated in <u>Martin, Pringle</u> and <u>ONEOK</u>. Lexis' Shepards' system, on the other hand, characterizes <u>Union Gas</u> as superseded by statute as stated in <u>ONEOK</u> but followed by <u>Martin, Pringle</u>.

regulatory certificate was issued, it raises other problems. Most importantly, it ignores the cause-and-effect relationship between authorization to condemn and the termination and transfer of the landowner's property interests. If defendants' vested interests in storage gas terminated because a governmental certificate to condemn their property was issued, with the result that ownership of those interests "remained in" or "re-vested" or in any other fashion went to Northern because it operated a government-certified storage facility, as a practical matter this change of ownership would have to be viewed as a governmental taking of the landowners' property rights.[13] See e.g.,Penn Cent. Transp. Co. of City of New York, 438 U.S. 104, 128 (1978) ("government actions that may be characterized as acquisitions of resources to permit or facilitate uniquely public functions have often been held to constitute 'takings.'"); cf. Palazzolo v. Rhode Island,  533 U.S. 606, 630 (2001) (a regulation that otherwise would be unconstitutional absent compensation is not transformed into a background principle of the state's law by mere virtue of the passage of title). A special type of defeasible interest that terminates when the government decides the property is suitable for public use is but another way of describing a taking of private property for a public

---

[13] Under ONEOK's construction of K.S.A. § 55-1210, an injector's right to retain title to injected storage gas apparently belongs only to the operator of a storage facility certified by the government to be in the public interest. Cf. Williams, 261 Kan. at 630 ("There is nothing unconstitutional about permitting anyone to be considered an injector for purposes of K.S.A. § 55-1210.").

purpose. And as such it would constitutionally require the payment of just compensation.

Faced with the alternatives, the court must agree with defendants that Union Gas cannot be applied as Northern contends – i.e., it cannot relieve Northern of the obligation to pay compensation for migrated storage gas in which defendants held a property interest. ONEOK made clear that in any section not "adjoining" the post-2008 storage field, defendants possessed a vested ownership interest in all of the gas – both native and storage – under their property. Additionally, Martin, Pringle held that any storage gas which migrated out of the storage field before July 1, 1993 was subject to the rule of capture. As a result of Martin, Pringle, then, defendants held title to any storage gas that migrated out of the storage field before July 1, 1993, regardless of whether or not their property "adjoined" the storage field.

ONEOK and Martin, Pringle each relied on the "ownership in place" theory of gas ownership. They characterized the landowner's interest as a "present estate in the oil and gas in the ground" and possession of "a right, title, and interest in and to the gas" in the ground. The landowner's interest included a right to capture the storage gas under their property. Union Gas effectively held that this interest terminated upon issuance of a KCC certificate. Insofar as Union Gas reached that conclusion merely because a

-21-

certificate authorizing condemnation had been issued – while also finding the landowners were entitled to no compensation for any storage gas under their property – such a rule as applied here would violate the Fifth Amendment.[14] Because Kansas law now clearly holds that a landowner's right to such migrated storage gas in the ground is a vested property right, the government cannot take it for a public purpose without paying just compensation.[15] So, for the foregoing reasons, this aspect of <u>Union Gas</u> cannot be lawfully applied and will be treated as having been effectively modified by <u>Martin, Pringle</u> and <u>ONEOK</u>.

An argument can be made that the <u>Union Gas</u> rule poses no constitutional hurdle if it is only applied <u>prospectively</u>. In other words, a rule providing that an injector retains title to any storage gas that migrates into a proposed extension area <u>after</u> the issuance of a regulatory certificate to condemn the area arguably does not deprive the landowner of any vested right. <u>Cf</u>. <u>Martin, Pringle</u>, 289 Kan. at 791; <u>Northern Nat. Gas Co. v. L.D. Drilling</u>,

_____

[14] Defendants also accurately point out that such a taking of their property would be inconsistent with the court's determination that the date of taking was March 30, 2012.

[15] By contrast, <u>Union Gas</u> referred to a landowners' "qualified interest in the gas beneath the ... property" and said the landowners' interest "is perfected only by capture." <u>Union Gas</u>, 774 P.2d at 971. The court notes that even if the landowners' interest was limited to the right to seek to produce the gas, as opposed to a present vested title to it on the date of taking, it still was a valuable property interest deriving its worth from the amount of gas in the ground. The taking of such a right for a public purpose requires the payment of just compensation. <u>Cf</u>. <u>Williams v. City of Wichita</u>, 109 Kan. 317, 374 P.2d 578 (1962) (discussing ownership of water rights).

Inc., 2011 WL 691621, *2, n.2 (D. Kan., Feb. 15, 2011) (discussing prospective operation of Union Gas rule). In fact, this court previously stated that under Kansas law Northern retained title to any storage gas migrating to the Extension Area after the June 2, 2010 FERC certificate. (See e.g., Doc. 187 at 8). Notwithstanding this prior dicta, the court now concludes from its review of Kansas law that even a prospective application of Union Gas has been effectively superseded by K.S.A. § 55-1210 and impliedly modified by Martin, Pringle and ONEOK.

As defendants point out, Union Gas seemingly assumed that the landowners did not have any vested property interest in migrated storage gas under their property because that gas was subject to the rule of capture. See Union Gas, 245 Kan. at 791 ("Cross-appellants' qualified interest in the gas beneath the DeTar property is perfected only by capture."). That premise is untenable after Martin, Pringle and ONEOK, which make clear that under §55-1210, Kansas landowners beyond "adjoining property" hold a present vested interest in any storage gas under their land. ONEOK observed that § 55-1210 was adopted "in response to the common law as it had developed in Union Gas and Anderson," suggesting that the statute was designed to supplant those cases to the extent they were inconsistent with the new statutory rules of ownership.

It is true that § 55-1210 did not expressly address the impact of a regulatory certificate on ownership of migrating storage gas.

-23-

But <u>ONEOK</u>'s conclusion that §55-1210 grants the injector an ownership interest in storage gas only within the confines of a certified storage field, plus the adjoining property, was itself conditioned upon an understanding that the injector's storage rights in that certified area "were acquired" by eminent domain or otherwise. <u>ONEOK</u>, 296 Kan. at 926. In other words, the injector's ownership rights to storage gas are limited to the certified area where the injector has <u>already</u> <u>obtained</u> the necessary storage rights, augmented only to the extent of the "adjoining property." <u>Cf.</u> §55-1210(c) (governing ownership of storage gas that has migrated to adjoining property "<u>which has not been condemned</u> ... or otherwise purchased"). Insofar as <u>Union Gas</u> would allow an injector to claim ownership of storage gas migrating beyond that limited area, into a more distant area where the injector does not yet have storage rights but has only obtained a certificate to condemn the necessary rights, the court concludes that such a rule implicitly conflicts with and is superseded by K.S.A. § 55-1210's scheme for ownership of migrated storage gas, as construed by the Kansas Supreme Court. <u>Cf</u>. <u>City of Haven v. Gregg</u>, 244 Kan. 117, 122-23, 766 P.2d 143 (1988) (when a statute conflicts with the common law, the statute controls). <u>See also</u> <u>Martin, Pringle</u>, 289 Kan. at 791 (the landowners "possessed the legal right to produce and keep the injected gas which had migrated onto their property, unless and until Northern obtained a certificate to expand its storage area

onto their land <u>and paid them for that privilege through a condemnation action</u>.") (emphasis added).

In sum, the court concludes that the issuance of a regulatory certificate from FERC works no instantaneous change of ownership in storage gas under Kansas law. Rather, ownership rights are determined by K.S.A. § 55-1210. And under that statute, an injector's right to retain title to its injected storage gas is limited to the certified area where it has already obtained the necessary storage rights and to the adjoining property.

Northern's reliance on the balance of the Kansas Storage Act, including §§ 55-1204 and 55-1205, does not alter this conclusion. For reasons previously alluded to, § 55-1205 cannot relieve Northern of its obligation to pay just compensation for the taking of defendants' property rights to storage gas. Although § 55-1205 only directs appraisers to consider "the amounts of recoverable oil and <u>native</u> gas" in the property to be acquired, that limited inquiry is due to the fact that this provision "was intended to operate prior to the injection and storage of gas by a natural gas public utility." <u>Union Gas</u>, 245 Kan. at 89. Prior to establishment of a storage field there obviously would be no storage gas to consider. But when a condemnation instead involves the taking of a landowner's rights to capture both native and storage gas, as it does here, the constitution requires the condemnor to pay just compensation for the taking of both.

-25-

The court notes that all of the foregoing pertains only to the question of who had _title_ to storage gas in the Extension Area on the date of taking. Insofar as the ultimate question of just compensation is concerned, the Commission will have to factor in a number of variables, including whether or not such gas was economically recoverable. See _e.g._, _Union Gas_, 245 Kan. at 92-94. The relevant considerations will be covered in the court's ultimate instructions to the Commission.

G. _Northern claim for offset_.

Northern also seeks a ruling that it is entitled to an offset against the condemnation award for: (1) the value of any and all storage gas produced on or after October 30, 2008 from the 2008 Extension Area; and (2) the value of any and all storage gas produced on or after June 2, 2010, from the 2010 Extension Area. (Doc. 678 at 16).

With respect to the 2008 Extension Area, the court has no idea what production Northern is referring to, because no such facts are set forth in the parties' statements of fact, nor is any such production mentioned in the briefs. (As noted previously, the only portion of the 2008 Extension Area involved in this condemnation is a 7.87 acre tract, Tract No. 3152711, in Pratt County). The court will deny the request for summary judgment on this issue as factually unsupported. On this record the court is not even certain that there is a live controversy concerning production from the

2008 Extension Area.

With respect to the 2010 Extension Area, the court will deny Northern's motion for the reasons discussed previously. The court concludes that <u>Union Gas</u> has been superseded or modified insofar as it held that a regulatory certificate gives an injector title to migrating storage gas. The issuance of the 2010 FERC certificate, standing alone, affected no change in ownership of migrating storage gas to the 2010 Extension Area. Northern has shown no entitlement to an offset for production from the 2010 Extension Area after June 2, 2010.

**V. Conclusion.**

Northern's Second Motion for Partial Summary Judgment (Doc. 677) is DENIED. Defendants' Cross-Motions for Partial Summary Judgment (Docs. 699, 700, 701, 702 ) are GRANTED.

With respect to any storage gas that migrated from the Cunningham Storage Field to the 2010 Extension Area prior to the date of taking, the court will instruct the Commission according to the ownership principles set forth in this order.

A motion for reconsideration of this order is not encouraged. Any such motion shall not exceed 5 double-spaced pages and shall strictly comply with the standards enunciated by this court in <u>Comeau v. Rupp</u>, 810 F.Supp. 1172, 1174 (1992). The response to any motion for reconsideration shall not exceed 5 double-spaced pages. No reply shall be filed.

IT IS SO ORDERED.

Dated this _5th_ day of March 2014, at Wichita, Kansas.

s/Monti Belot

Monti L. Belot

UNITED STATES DISTRICT JUDGE