IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

NORTHERN NATURAL GAS COMPANY,       )
                                    )
                Plaintiff,          )       **CIVIL ACTION**
                                    )
v.                                  )       No.  10-1232-MLB-DWB
                                    )
APPROXIMATELY 9117 ACRES IN PRATT,  )
KINGMAN, AND RENO COUNTIES,         )
KANSAS AND AS FURTHER DESCRIBED     )
HEREIN;                             )
                                    )
TRACT NO. 1062710                   )
CONTAINING 80.00 ACRES MORE OR      )
LESS, LOCATED IN KINGMAN COUNTY,    )
KANSAS, AND AS FURTHER DESCRIBED    )
HEREIN; ET AL.,                     )
                                    )
                Defendants.         )
_____)


<u>**MEMORANDUM AND ORDER**</u>

This action to condemn property was brought by Northern Natural Gas Company under the authority of Natural Gas Act, 15 U.S.C. § 717f(h). The action was prompted by evidence that natural gas injected into Northern's underground storage field near Cunningham, Kansas, was migrating out of the storage area and was being produced by wells to the north of the field. Northern obtained authority from the Federal Energy Regulatory Commission (FERC) to acquire certain property rights in this adjacent "2010 Extension Area."

The property to be condemned includes two underground formations (the Simpson and the Viola) underlying some 9,200 acres in the Extension Area. It also includes some surface rights and several well bores, which Northern has taken to implement a water injection plan to reduce gas migration. The court previously granted Northern's

motion for immediate possession of the property being condemned. Doc. 464. The parties claiming interests in the various tracts taken by Northern include, among others, landowners, mineral interest owners, and oil and gas operators who had producing gas wells in the 2010 Extension Area.

Pursuant to Fed. R. Civ. P. 71.1, the court appointed a commission to determine just compensation for the property taken by Northern.[1] Doc. 641. The commission conducted hearings over a six week period with extensive testimony from a number of expert witnesses. Closing arguments were held on June 3-4, 2014, and the commission filed a report of its findings on August 26, 2014. Doc. 888.

The matter is now before the court on the parties' objections to the commission's report and their responses to other parties' objections: Northern (Docs. 918, 929); Nash Oil & Gas (Docs. 915, 928);  L.D. Drilling (Docs. 919, 934);  VAL group (Docs. 917, 930); Pratt Well Service group (Doc. 920); Huff landowner group (Docs. 916, 931); Meireis landowner group (Docs. 921, 932); Hudson landowner group (Docs. 923, 933); and the Miller trust (Doc. 924).

Some of the briefs merely adopt by reference objections made by other parties. The court will discuss herein only the briefs with the original objections.

---

[1] The members of the commission are: Randy B. Miller, PE, a petroleum reservoir engineer with 38 years' experience; Michael D. Herd, an attorney experienced in real estate and oil and gas law; Dwayne McCune (alternate commissioner), an experienced petroleum engineer; and the commission chair, John W. Broomes, an attorney with an undergraduate degree in petroleum engineering who specializes in oil and gas matters.

**Table of Contents**

I. Summary of the report . . . . . . . . . . . . . . . . . -4-

II. Standards . . . . . . . . . . . . . . . . . . . . . . . -5-

III. Objections . . . . . . . . . . . . . . . . . . . . . . -6-
    Northern Natural Gas Co. objections (Doc. 918) . . . . . -6-
        1. Compensation for gas owned by Northern . . . . . -6-
        2. Whether the commission deviated from the instructions by
           assigning the gas reserves to tracts with wells
           . . . . . . . . . . . . . . . . . . . . . . -10-
        3. Whether the commission failed to consider how the
           hydrocarbons impacted fair market value of the tracts
           . . . . . . . . . . . . . . . . . . . . . . -13-
        4. Whether compensation for buffer value is contrary to the
           instructions . . . . . . . . . . . . . . . . -16-
        5. Northern's ownership of Tract 2312610 . . . . . -21-
        6. Northern's asserted ownership of gas located on
           "adjoining property." . . . . . . . . . . . . -22-
    Nash Oil & Gas objections (Doc. 915) . . . . . . . . . . -24-
        1. Whether the commission erred in determining the volume
           of gas in the Extension Area on the date of taking
           . . . . . . . . . . . . . . . . . . . . . . -24-
        2. Whether the commission violated the project enhancement
           rule by failing to award the producers $1 million per
           month in lost gas production . . . . . . . . . -29-
        3. Whether the commission erred in failing to award Vision
           Investments of Pratt, LLC, compensation for lost
           transportation income . . . . . . . . . . . . -30-
    L.D. Drilling, Inc. objections (Doc. 919) . . . . . . . -32-
        1. Whether the commission erred in rejecting the continuous
           migration theory . . . . . . . . . . . . . . . -33-
        2. Whether the commission erred in excluding the Zink A1
           well . . . . . . . . . . . . . . . . . . . . . -39-
    VAL Energy group objections (Doc. 917) . . . . . . . . . -41-
        1. Whether the commission erred in valuation of eight well
           bores taken by Northern . . . . . . . . . . . -41-
    Pratt Well Service (PWS) group objections (Doc. 920) . . -43-
        1. Whether the commission erred by failing to award
           compensation for PWS's loss on its contract with Lumen
           . . . . . . . . . . . . . . . . . . . . . . -43-
    Huff group objections (Doc. 916) . . . . . . . . . . . . -44-
        1. Whether the commission erred in considering Northern
           storage leases as evidence of fair market value of
           buffer acreage . . . . . . . . . . . . . . . -44-
        2. Whether the commission improperly rejected the Brehm
           Field leases . . . . . . . . . . . . . . . . . -47-
        3. Whether the commission erred by finding that all of the
           wells were shut in as a result of the impending
           condemnation . . . . . . . . . . . . . . . . . -50-
    Miller Trust objections (Doc. 924) . . . . . . . . . . . -51-
        1. The Miller Trust objects to the valuation of tract

4012711 . . . . . . . . . . . . . . . . . -51-

IV. <u>Conclusion</u> . . . . . . . . . . . . . . . . . . -52-

**I. <u>Summary of the report</u>.**

The basic findings of the commission were as follows. The evidence showed there was about 4.55 BCF of gas within the Extension Area on the date of taking. The property taken by Northern should be valued based on that total. The recoverable portion of those reserves should be allocated to the wells which, but for the condemnation, would have produced them with the aid of pressure support from the Cunningham storage field. As a result, the gas reserves have been assigned to the Extension Area tracts with existing Viola wells. Because 80% of the 4.55 BCF of gas was recoverable, 3.64 BCF of gas is allocated to those existing Viola wells. Based on historical levels of production, it would have taken 13.76 months to produce 3.64 BCF of gas. Using historical production figures, the commission determined a net present value (discounted at 10%) of each Viola well in the Extension Area using the 13.76 month production period. The result, which totals about $5.95 million, is set forth in Exhibit 3 attached to the commission's report.

The commission also found that the highest and best use of the Extension Area tracts included use of the Viola and Simpson formations as buffer acreage for a gas storage field. The commission found the storage lease potential of the properties added $125 per acre to their overall fair market value. This results in a finding that Northern owes total compensation of just over $1 million for the buffer acreage value of the Extension Area properties taken in condemnation. The

-4-

value for each individual tract is listed in Exhibit 3 attached to the report.

For each of the eight Extension Area wells taken by Northern, the commission found Northern owes compensation for the salvage value of the well equipment. It found the salvage value to be $5,850 for each well, for a total of $46,800.

As for surface takings, the commission concluded that total compensation in the amount of $175,540 is owed, in addition to compensation for surface damages in the amount of $51,000. The commission also awarded $278,190 for the taking of buildings or other structures.

The total compensation found by the commission to be owing by Northern for its taking of the defendant property is $7,310,427.

## II. **Standards**.

Action on the commission's report is governed by Rule 53(f). <u>See</u> Fed. R. Civ. P. 71.1(h)(2)(D). In acting on the report, the court must give the parties notice and an opportunity to be heard. Fed. R. Civ. P. 53(f)(1). The court has given all parties an opportunity to file written objections and written responses to objections of other parties. No party has requested an evidentiary hearing or oral argument. That is not surprising given the extensive hearings already conducted by the commission, which consisted of more than a one-month period of evidentiary hearings followed by two days of oral argument. Under the circumstances the court concludes that further hearings are unnecessary and the objections are ripe on the record now before the court.

The court must decide de novo all objections to conclusions of law made or recommended by the commission. Fed. R. Civ. P. 53(f)(4). Objections to the commission's factual findings will likewise be reviewed de novo inasmuch as the parties have not stipulated otherwise. Fed. R. Civ. P. 53(f)(3). Any commission ruling on a procedural matter is reviewed only for abuse of discretion. Fed. R. Civ. P. 53(f)(5).

The court may receive evidence; it may adopt or affirm, modify, wholly or partly reject or reverse, or resubmit the report to the commission with instructions. Fed. R. Civ. P. 53(f)(1).

**III. Objections.**

**Northern Natural Gas Co. objections** (Doc. 918).

1. <u>Compensation for gas owned by Northern</u>. Northern contends the Commission improperly required it to pay for storage gas that Northern already owned on the date of taking.

In February of 2009, Northern obtained storage leases on about 3,040 acres in the southern part of the 2010 Extension Area. No producing wells were located on this acreage. On June 2, 2010, Northern obtained a FERC certificate authorizing expansion of the Cunningham Storage Field's buffer zone to include the entirety of the 2010 Extension Area, including the afore-mentioned 3,040 acre portion. The 3,040 acre portion, having already been acquired by Northern, was not included in this condemnation proceeding.

The commission found that a total of 0.935 BCF of gas was located in Northern's 3,040 acres on the date of taking. It assigned the value of the recoverable reserves (i.e. 80% of 0.935 BCF) to condemned tracts with producing wells within the Extension Area. Northern

-6-

contends it had title to the gas in the 3,040 acre area and argues the commission's award contradicts Kansas law. According to Northern, Kansas courts have applied the following formula for determining storage gas ownership: "certificate authority + compensation = legally recognized storage area with protected storage gas." Northern argues there is no distinction between its undisputed title to storage gas within the original certified boundaries of its storage field and its ownership of gas in the 3,040 acre portion of the certified Extension Area. Northern asks the court to resubmit the report to the commission with directions to exclude this 0.935 BCF of gas from the condemnation award. (Doc. 918 at 6).

At first glance Northern's argument has some appeal because it seems strange that Northern should have to compensate others for "taking" storage gas located on Northern's own leases. But this is a consequence of the rule of capture, as applied in <u>ONEOK</u>, and its effect upon the fair market value of the nearby gas-producing property that was taken by Northern. Some of the tracts acquired in condemnation had producing wells, and in determining the value of those tracts the commission necessarily had to consider the productive potential of the wells -- exactly what a buyer or seller of those tracts would do. <u>See</u> <u>e.g.</u> <u>United States v. 2,560 Acres of Land, More or Less, Situated in Washington Co., Okla.</u>, 836 F.2d 498, 503 (10th Cir. 1988). The wells' potential depended on a number of variables, including the estimated available reserves, the cost and feasibility of production, the likelihood of others capturing the reserves, and the legal obstacles or other risks to continued production. Under the rule of capture, defendants' wells could lawfully draw in and produce

gas from the 3,040 acre area irrespective of Northern's leases. For reasons explained by the commission, that gas probably would have been produced by defendants' wells were it not for the condemnation. The gas in Northern's 3,040 acre leased area was thus properly considered by the commission as a factor affecting the fair market value of the tracts taken by Northern.

Northern's argument against this outcome is basically a legal one: that the rule of capture ceased to apply on its own acreage once Northern obtained the FERC certificate. In support Northern cites K.S.A. § 55-1210(a), which "gives an injector title to gas injected into its legally recognized storage area." Northern Nat. Gas Co. v. ONEOK Field Svcs. Co., 296 Kan. 906, Syl. ¶ 6, 296 P.3d 1106 (2013). Northern's theory is that the protection of §55-1210(a) applied to the tracts leased by Northern once it acquired the FERC certificate, and (presumably) that the protected area would then grow on a tract-by-tract basis if Northern obtained additional storage leases within the certified Expansion Area. This theory, however, is unsupported by any statutory language or case law. Nor is it a feasible way of determining title to storage gas.

As the court discussed in a prior ruling, the Kansas Storage Act was premised on an assumption that the condemnation of an area for storage would occur prior to commencement of storage operations. Doc. 810 at 13. In a similar vein, Kansas courts seem to construe §55-1210(a) as protecting an injector's title to storage gas only after the injector has obtained storage rights for the certified area. See Doc. 810 at 24 (discussing development of Kansas law). This is suggested by ONEOK's construction of the statute. Section 55-1210(a)

protects an injector's title to gas based upon the certified boundaries of the storage field. The ownership rights applicable to "adjoining property" under §55-1210(c) are likewise tied to the field's certified boundaries. As a practical matter, then, the statutory protection presumes the injector has already obtained storage rights for the area encompassed by the field's certified boundaries. See ONEOK, 296 Kan. at 932 (§55-1210(a) gives injector title to gas in its legally recognized storage area, but not to gas that has migrated outside the injector's certified storage area). The only way of applying this provision, as far as the court can tell, is to look to the boundaries of the field after the injector has acquired all storage rights within the certified area that are required to operate the field, irrespective of whether the rights were acquired by lease or condemnation.

Northern's tract-by-tract alternative is simply not a workable basis for determining storage gas ownership. As a practical matter the geographic protection afforded by §55-1210(a) and 55-1210(c) is tied to the field's boundaries, and it must be understood as commencing only after the injector has acquired all of the storage rights needed to effectively operate the certified area. Northern's "patchwork" alternative would make ownership of storage gas nearly impossible to determine.

Because Northern had storage rights to only about 30% of the Extension Area, the court concludes that §55-1210(a) did not preclude the rule of capture in any part of the 2010 Extension Area -- including the 3,040 acre southern portion. Northern's possession of a FERC certificate did not change that fact. Cf. Northern Nat. Gas Co.

v. ONEOK, Dist. Ct. Case No. 2009 CV 111, Slip Op. at 26 (30th Jud. Dist., Aug. 15, 2014) ("Northern had no ownership interest in any storage gas that was produced from the 2010 buffer zone."); Doc. 810 at 25 ("the issuance of a regulatory certificate from FERC works no instantaneous change of ownership in storage gas under Kansas law."). And because that gas was subject to the rule of capture, the commission did not contradict Kansas law in considering the value of it when assessing the fair market value of the Extension Area well tracts.

2. <u>Whether the commission deviated from the instructions by assigning the gas reserves to tracts with wells</u>. Northern further contends the commission contradicted the court's instructions by assigning the value of all gas reserves to the tracts with producing wells. Northern contends the Commission must allocate all the Extension Area Viola reserves to the particular tracts under which they were located on the date of taking. Doc. 918 at 7-8.

Northern's argument again falters on the nature of the rule of capture. It is true that Kansas considers landowners to have a vested property right in the oil and gas under their land. <u>Mobil Oil Corp. v. Kansas Corp. Comm'n.</u>, 227 Kan. 594, 608 P.3d 1325 (1980). "Petroleum and gas, so long as they remain in the ground, are a part of the realty. They belong to the owner of the land, and are a part of it, so long as they are on it,..." <u>Lanyon Zinc Co. v. Freeman</u>, 68 Kan. 691, 696, 75 P. 995 (1904). But surrounding property owners can capture and produce that gas. <u>Id</u>. at 696 (When [oil and gas] escape, and go into other lands, ... the title of the former owner is gone.").

See also <u>Northern Nat. Gas Co. v. Martin, Pringle, Oliver, Wallace &</u> <u>Bauer, LLP</u>, 289 Kan. 777, 217 P.2d 966 (2009). Because the gas in the Extension Area was subject to being captured by others, the market value of each tract at any given time would reflect the likelihood that the gas reserves would be recovered on that tract. Part of that calculation was whether it was economically feasible to drill a well to capture the reserves. If it was not, then the gas would add nothing to the fair market value of the land where it was located. But it would add to the value of a tract with an existing well that could capture it. <u>See</u> <u>National Fuel Gas Supply Co. v. Cunningham Nat. Gas</u> <u>Corp.</u>, 145 Misc.2d 825, 833, 548 N.Y.S.2d 588 (N.Y. Sup. 1989), <u>modified in part</u>, 174 A.D.2d 991, N.Y.S.2d 152 (1991) (rejecting condemnor's "picket fence argument" that claimant could only recover for gas in place within the boundaries of the surface parcel).

Northern relies on the ownership-in-place doctrine to argue that the gas under each tract had little or no value because it would have been uneconomical for each tract owner to drill a well to capture the gas under that tract. That may be true as far as it goes.[2] But because the rule of capture allowed wells on other tracts to draw in and produce the reserves, those reserves could (and would) affect the market value of property rights appurtenant to those other tracts. Even though tract owners with wells could not claim a vested interest

---

[2] Aside from a lack of evidence that the drilling of new wells would have been economical, the commission noted there was no evidence that any tract owner without a well was preparing to or had any intention of drilling a well, nor was there evidence that any buyer was likely to acquire the tracts and operate them as a unit. Doc. 888 at 56.

in such gas reserves, the fair market value of the well tracts would factor in the amount of reserves those wells were likely to produce. See e.g. Doc. 893 at 793 (testimony of Tom Cook noting that oil and gas leases are sold based on the amount of reserves); National Fuel, supra; Cal-Bay Corp. v. United States, 169 F.2d 15, 18 (9th Cir. 1948) ("An oil and gas lease with a proven discovery of gas in paying quantity but speculative as to its amount ... has its market value determined by arms length bargaining of buyers and sellers on the future income contemplated by each."). Cf. In re EOG Resources, Inc., 46 Kan.App.2d 821, 826, 265 P.3d 1207 (2013) (for tax valuation purposes, the goal is to value the reserves that are in the ground by discounting income over a period of time to reflect the production capabilities of those reserves).

The commission's approach was consistent with the instructions. It recognized that the rule of capture is a central tenet of oil and gas production. The commission appropriately considered the rule in gauging fair market value -- i.e., the amount a willing buyer and willing seller would agree to in an open market -- for the property rights taken by Northern. The commission valued those rights on the date of taking, just as a buyer or seller would, while taking into account the physical realities of production. Northern's "divide and conquer" approach, by contrast, would artificially devalue the significant gas reserves that it took by ignoring the ability of other landowners in the Extension Area to capture them. That approach would deny just compensation for landowners whose wells, but for the condemnation, would have captured the gas reserves. Cf. Doc. 903 at

2977 (Northern's counsel: "What we are taking on the Date of Taking is the real estate, and the real estate includes the economically recoverable hydrocarbons that were in the ground on the Date of Taking. Nothing more, nothing less.").

3. <u>Whether the commission failed to consider how the hydrocarbons impacted fair market value of the tracts</u>. (Doc. 918 at 10).

Northern argues the commission contradicted the instructions and the "unit rule" by assigning separate values to component parts of the properties and then adding them together to arrive at fair market value. In particular, Northern objects to the commission's addition of 100% of the value of recoverable hydrocarbons to the base land value of the well tracts. Northern argues at a minimum the commission should have discounted the value of the reserves by 15%. It says the uncontroverted opinions of two certified appraisers was that a 15% discount was appropriate in determining the hydrocarbons' impact on fair market value of the properties. It notes the testimony of appraiser Bernie Shaner that a 15% discount factor must be applied "as an entrepreneurial incentive reflecting the impact of the hydrocarbon value on the fair market value of each individual tract as a whole." Doc. 918 at 10-11.

The rationale for the 15% entrepreneurial incentive, as explained by Mr. Shaner, was as follows. "The probable purchaser[] for these subject properties, because they are agricultural properties, ... is going to be a farmer or maybe a hunter," for whom it would be "a

burden to take on the economically recoverable gas" in terms of financing the purchase of the property and/or development of it. These purchasers would probably not know what to do with the gas, what the market is, or how to get it sold, so "[i]t's just not something they want, typically." They could buy other agricultural property for far less money without taking on the added burden from the gas, so "you've got to have a little bit of an entrepreneurial incentive" to get them to buy this type of property. <u>See</u> Doc. 902, Tr. at 2771-75.

Appraiser James Gardner, who was retained by the Huff group, testified that oil and gas investors would be likely purchasers of the gas-producing properties. He said at one point that the market would apply a discount to the value of the gas reserves for the inherent risks in producing hydrocarbons. Doc. 906, Tr. at 3745-46. Gardner indicated he would "probably" apply a 15% discount. Doc. 907, Tr. at 3788.[3]

The commission declined to apply a 15% discount. The report indicates the commission concluded a discount was not warranted because the properties were already producing gas out of proven reserves. Moreover, the commission found that the gas reserves added value only to those tracts that had existing Viola wells and not to other tracts. That conclusion undermined Mr. Shaner's stated rationale for the entrepreneurial incentive, which was that the discount was

---

[3] Gardner was retained late in the case after appraiser Lee Jones was unable to continue as a witness for the Huff group. Gardner adopted Jones' conclusions. Before the commission, Gardner testified that if he had been performing the appraisal himself he would have discounted the gas in place and that "I suspect I'd probably look at about 15 percent." Doc. 907, Tr. at 3788.

necessary because the Extension Area tracts would typically be purchased by farmers for agricultural use. But for the relatively few tracts with producing wells and proven reserves, there would have been little or no added burden in terms of development or marketing of the gas. There was in fact a built-in stream of income from gas sales. Those particular tracts would have been utilized for oil and gas production as well as agricultural use, and oil and gas investors would have been among the prospective purchasers. Northern fails to explain why the entrepreneurial incentive was necessary for established gas-producing properties of this type.

As for Mr. Gardner's highly ambiguous (and apparently hypothetical) opinion about a 15% discount, there is no explanation in the record why a 15% discount for "inherent risk" would be appropriate for wells with this production history and potential. That is all the more true here, where the projected period of production was limited to a 13-month window in which the wells would produce all of the recoverable reserves that were in the Extension Area on the date of taking. The commission effectively addressed and rejected a risk reduction when it characterized the recoverable reserves in the Extension Area as proved and producing, and determined from market survey evidence that the impact on fair market value of the tracts was 100% of the unadjusted value of the reserves.[4]

Under the circumstances the commission's refusal to apply a 15%

---

[4] The term "100% unadjusted value" is slightly misleading. The recoverable reserves represented 80% of the total estimated reserves in the Extension Area. Additionally, the estimated income stream from future production was discounted to present value.

entrepreneurial discount was consistent with the evidence before it and consistent with its overall method of valuing the well tracts. Cf. U.S. v. 275.81 Acres of Land, More or Less, Situated in Stonycreek Tp., Somerset County, Pa., 2014 WL 1248205, 5 (W.D.Pa., 2014) (commission appropriately applied less of a discount to oil and gas properties than to other properties). There was evidence before the commission indicating that the market places distinct values on oil and gas properties that are producing out of proven reserves, and the unique circumstances of production behind these particular wells rendered an entrepreneurial discount inapplicable. See e.g., Brush Exh. 53.042. Cf. United States v. Corbin, 423 F.2d 821, 829 (10th Cir. 1970) ("Considering the distinct and separate approaches required to ascertain the values which contributed to the overall value of the property taken, we cannot say the separate report of each value and ultimate aggregation thereof with the stipulated value [of the land itself] was error.").

4. Whether compensation for buffer value is contrary to the instructions.

Northern argues the commission's award of $125 per acre for gas storage or buffer value is contrary to the instructions and the evidence. It notes the Commission was instructed to value the property based on a use independent of the condemnor's use or need for the property. Northern says no other storage operator had any interest in acquiring the Extension Area's Viola formation and, in any event, the Extension Area could not be used for storage or as a buffer zone

absent the water flood project undertaken by Northern. It argues the use of the Extension Area for storage or buffer zone was "unlikely, speculative and physically impossible on the Date of Taking," in addition to being legally unauthorized. Even if the court finds that the properties had some value as buffer acreage, Northern argues the Commission's addition of $125 per acre to the base value of the land violated the unit rule. Northern argues the court should instruct the Commission to award only the $50 per acre buffer value assessed by its appraiser. Doc. 918 at 13-16.

The project enhancement rule reflects a policy that the government (or other condemnor) must pay the fair market of the property taken but should not be required to pay "the enhanced price which its demand alone has created." United States v. Cors, 337 U.S. 325, 333 (1949). The special value or need of the condemnor for the property, as distinguished from its value to others, has long been excluded as an element of market value. Cors, 337 U.S. at 332. Thus, any enhanced value due to the condemnor's need for the land is disregarded. An owner "is not permitted to take advantage of the necessities of the condemning party." McGovern v. New York, 229 U.S. 363, 371-72 (1913). "It is the owner's loss, not the taker's gain, which is the measure of compensation...." United States ex rel. TVA v. Powelson, 319 U.S. 266, 281 (1943). See Northwest Pipeline Corp. v. 95.02 Acres of Land, more or less, in Power Co., Idaho, 2003 WL 25768634 (D. Idaho, Dec. 19, 2003).

There is a fine distinction, however, between enhanced value from the condemnor's need for the property and enhanced value from the

-17-

property's proximity or relation to an existing improvement. That point was made by the Supreme Court in a case where the condemnation of land for a reservoir project required that a railroad line be moved. When nearby land was condemned for the railroad line, the owners argued they were entitled to compensation for the enhanced value of property located near a reservoir. The Supreme Court rejected this argument because the reservoir project, from the beginning, contemplated condemnation of nearby land for a railroad line:

> If a distinct tract is condemned, in whole or in part, other lands in the neighborhood may increase in market value due to the proximity of the public improvement erected on the land taken. <u>Should the Government, at a later date, determine to take these other lands, it must pay their market value as enhanced by this factor of proximity</u>. If, however, the public project from the beginning included the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken any more than the owner of the tract first condemned is entitled to be allowed an increased market value because adjacent lands not immediately taken increased in value due to the projected improvement.

<u>United States v. Miller</u>, 317 U.S. 369, 376-77 (1943) (emphasis added).

<u>Miller</u> is certainly not identical to this case. But it lends legal support for the commission's view that the value of the Extension Area as a buffer zone "derives from [its] location near the Cunningham Field[,] separate and apart from this condemnation action." Doc. 888 at 61. There is no evidence that condemnation of the Extension Area was contemplated within the original plans for the Cunningham storage field. Under the rule of <u>Miller</u>, then, any enhanced value from proximity to the existing storage field is a legitimate

-18-

component of market value.

Here the value of the Viola formation in the Extension Area arises not only from its proximity to the storage field but from its physical connection to the field. (There is a saying that "geography is destiny," but for the Extension Area, its geology is destiny.) Because the Viola forms a single common reservoir throughout the Extension Area and the Cunningham Storage Field, neither area is entirely suitable for gas storage without the other. (Hence Northern's need to condemn the Extension Area). But this attribute of the property does not take on value merely because Northern has a need for it or because Northern has decided to condemn it. Its value arises because the character and location of the Extension Area make it useful -- and have always made it useful -- as a buffer zone for a storage field comprising both of these areas. See United States v. W.G. Reynolds, 397 U.S. 14, 16-17 (1970) (if land whose value is enhanced by a neighboring project "is later condemned, whether for an extension of the existing project or for some other public purpose, the general rule of just compensation requires that such enhancement in value be wholly taken into account...."). If Northern had never established this field, the entire area would still have had some value as a potential storage area for some other operator. This is true, moreover, notwithstanding that effective operation of this particular field may require some remedial measures, such as water injection wells, to inhibit migration out of the storage area.

Northern points out that no other storage operator has ever expressed interest in acquiring storage leases in the Extension Area.

-19-

That is not surprising, however, given that the area is useful for storage only if operated in tandem with the greater storage field long held by Northern. No other operator could effectively use the Extension Area without buying the entire field from Northern. And the absence of any particular offer to purchase the Cunningham Field does not prove that the Viola properties at issue lack any market value for buffer area. The evidence unquestionably showed there is an existing market for acquisition of underground properties for storage areas, and the Cunningham Field is a large and functional storage area. The viable storage and buffer area includes the Extension Area. If some other operator were to purchase the greater Cunningham Field, it would surely seek to obtain the Extension Area. That property is viable as part of a storage field and, under the evidence presented, it has some market value. Given evidence that there is a national market and demand for underground storage areas, it is reasonable to infer that another storage operator likely could obtain the area for storage if Northern decided to sell it or if Northern were out of the picture. Although there was no evidence that any other operator had expressed a current interest in the field, it still is "a reasonable possibility ... that another [operator] could acquire all lands or easements necessary" to operate the area as a storage field. Cf. Olson v. United States, 292 U.S. 246, 256 (1934). This reasonable prospective future use was properly considered by the commission in determining the fair market value of the properties and the value of the property taken by

Northern.[5]

The commission extensively reviewed the evidence concerning the value of storage leases. It noted evidence that prior to condemnation, Northern had been leasing acreage in the Extension Area for an annual rental of $22 per acre. A typical lease at that rate would have a net present value of $200 per acre, which the commission found to be higher than justified by comparable sales of property in the area. Doc. 888 at 68-69. At the other end of the spectrum, it rejected Northern's asserted value of $50 per acre because that figure was based on an assumption that the Extension Area was not useful for buffer acreage, an assumption contrary to the evidence. The commission settled on a figure of $125 per acre after considering the unit rule and the wide range of lease values presented. The commission's analysis on this point, which the court finds to be entirely reasonable and firmly supported by the evidence, plainly refutes Northern's argument that the commission violated the unit rule by including a $125 per acre payment in the overall fair market value of the property. The commission applied the unit rule and adjusted the compensation to reflect the limited overall impact of storage lease potential on the fair market value of the property.

    5. <u>Northern's ownership of Tract 2312610</u>. Northern bought this

---

[5] Although it would be incompatible to simultaneously use the Extension Area tracts for gas production and buffer acreage, under these circumstances gas production is appropriately considered an interim use of short duration, with use as buffer acreage to follow. This is so because all the gas currently in the storage area could be produced in a little over one year, and the potential subsequent use of the property as buffer acreage is sufficiently proximate to add to the current market value of the property.

tract on December 6, 2010. At the time of the purchase it was ostensibly subject to a lease held by VAL Energy. VAL had operated the McGuire 1-31 well on the lease but either "ceased producing" (according to Northern) or "temporarily interrupted production" (according to VAL) in July of 2010. The Commission determined that just compensation for the taking of this tract included $119,690 for economically recoverable hydrocarbons and $5,850 for salvage value of well equipment. Northern now argues that it had fee title to any hydrocarbons and that the award for hydrocarbons should be stricken.

Northern's argument is part of an issue that will be decided by the court in the next phase of the litigation. After the amount of just compensation is settled, the court must determine which interest owners are entitled to the compensation. At that point it may be necessary to resolve questions relating to oil and gas leases. Although as a technical matter Northern's argument does turn on whether or not there was any "taking" of the right to capture these hydrocarbons, that issue will effectively be resolved by the court in the next phase when it determines who is entitled to compensation. Accordingly the objection is denied without prejudice.

6. <u>Northern's asserted ownership of gas located on "adjoining property."</u>

Northern argues that because of the protection afforded "adjoining property" in K.S.A. § 55-1210(c), and because Northern obtained a FERC certificate and previously leased (or bought) some of the property within the Extension Area, "any and all gas that migrated to property adjoining Northern's leased or owned property in the 2010

-22-

Extension Area was, by virtue of K.S.A. 55-1210(c), gas that Northern owned.[6] Doc. 918 at 18.

The court previously found that Northern's possession of a FERC certificate and its lease (or purchase) of a minor portion of the 2010 Extension Area did not trigger any protection under subsections (a) or (c) of K.S.A. § 55-1210. Supra at p. 6-8. For the same reasons, the court rejects Northern's argument that these same facts triggered additional "adjoining property" protection within the Extension Area.

---

[6] None of the parties requested an instruction on "adjoining property" under K.S.A. § 55-1210(c). Nor is the court aware of any evidence presented to the commission dealing specifically with migration of gas to or from what Northern now argues is adjoining property.

Any attempt to instruct on adjoining property likely would have proved disastrous. That issue potentially implicates not only the current field expansion, but also the 2008 expansion and even the original boundaries of the field, all as impacted by the 1993 enactment of §55-1210 and any pre-existing property rights on the various dates of expansion. Cf. Northern Nat. Gas Co. v. Martin, Pringle, 289 Kan. 777, 217 P.2d 966 (2009).

In addition to multiple changes to the storage field boundaries (and corresponding changes to the "adjoining property") in this case, and in addition to the unsettled question of when the protection of § 55-1210 is triggered, the very term "adjoining property" has not been clarified by the Kansas courts. For example, application of this term to partial sections of land within the storage field was apparently not raised by the parties in ONEOK. But both the original Cunningham Field boundaries and the 2008 boundaries included one-quarter, one-half, and three-quarter sections of land within the field. Cf. Williams Nat. Gas Co. v. Supra Energy, Inc., 261 Kan. 624, 630, 931 P.2d 7 (1997) (adjoining meant any section adjacent to a storage field, so "any section of land which touched a section containing a storage field was adjoining."). It is apparent from examination of the storage field map that there can be no simple "one mile rule" for adjoining property as some of the prior briefs suggest.

The court notes Professor Pierce of Washburn Law School has commented that a surface-boundary rule of adjoining property, as applied to an underground storage reservoir, is "artificial and unworkable" and gives the term "a meaning reality cannot sustain." See 1 Tex. A&M L. Rev. 79, 83-84 (2014).

**Nash Oil & Gas objections** (Doc. 915).

1. Whether the commission erred in determining the volume of gas in the Extension Area on the date of taking.

Nash argues the Commission erred in estimating the amount of gas in the Extension Area. It contends the Commission erroneously accepted Randal Brush's opinions that the Expansion Area was saturated with water prior to 1978 and that only 1.4 BCF of gas migrated from the storage field to the 2010 Extension Area during initial fill-up. Among other things, Nash cites evidence that the Henrichs well in the Extension Area consistently produced native gas and Northern's prior statement to FERC indicating that about 17 BCF of gas migrated northward during fill up before the field was stabilized in 1984.

Nash's selective view of the evidence is far less persuasive than the comprehensive view taken by the commission. For example, the commission took account of: the numerous dry holes drilled in the Extension Area and the well logs prior to 1978; drill stem tests indicative of non-significant amounts of gas; well logs indicative of water in the Viola formation; the absence of any structures in the Extension Area that would have acted as a container for gas; gamma-ray neutron logs showing gas only in the top few feet of the Viola; data showing production in Extension Area wells "rising and falling in virtual lock-step with pressure in the storage field"; and evidence of defendants' post-1994 production of over 6 million barrels of water from the Extension Area and its immediate effect on migration from the field. See Doc. 888 at 27-36.

All of the foregoing evidence, which Nash does not take into

-24-

account, tends in one way or another to support the commission's finding that "the Extension Area was saturated with water prior to 1978" and that "no accumulation of native gas of any consequence existed there." Doc. 888 at 35. The existence of a small pocket of native gas around the Henrichs well, as indicated by the evidence, would not alter that conclusion. <u>See</u> e.g., Doc. 893, Tr. at 659, 661-65, 857.[7] Moreover, evidence was presented of a number of dry holes in and around the Extension Area prior to storage operations, indicating there was not a significant amount of recoverable gas there at the time. <u>See</u> e.g., Doc. 893, Tr. at 854-55; Doc. 892, Tr. at 467.

The commission was also persuaded by Randal Brush's estimate that about 1.4 BCF of gas migrated to the 2010 Extension Area before defendants commenced production there. As the commission noted, that opinion was supported by Northern's inventory analysis, which the commission found represents "a sound, reasonable approach to quantifying the gas migration out of the Viola within the Cunningham Field." Doc. 888 at 28. Brush's approach was based on differences between the volume of gas injected into the field and volume of gas withdrawn from the field, at a given pressure, over a period of time.

As recounted in the commission's report (Doc. 888 at 13-18), Brush's analysis showed that from the beginning of storage operations in 1978 until a stable field inventory volume was reached in 1984,

_____

[7] Nash criticizes the commission's failure to mention the Henrichs well in its report. (Doc. 915 at 3-4). There is no requirement, however, that a commission cite every piece of evidence, even if one of the parties thinks it is important. <u>See</u> <u>United States v. Merz</u>, 376 U.S. 192, 199 (1964) ("We do not say that every contested issue raised on the record before the commission must be resolved by a separate finding of fact.")

field inventory went from about 27 BCF to 44 BCF, indicating a loss of about 17 BCF from the main storage area between the two underground faults. About 10 BCF of that shift occurred in the first full year of operation of the field. Doc. 905, Tr. at 1059. A significant portion of the loss was later attributed to vertical migration within the storage field to the Simpson formation, which was eventually condemned by Northern. See Doc. 893, Tr. at 879. Northern's witnesses testified that their subsequent analysis showed that this original migration moved in several directions, including to the south, to the northwest toward the Park wells, to the north of the northern fault within the storage field, to the 2008 Extension Area, and on to the 2010 Extension Area. See e.g. Doc. 894, Tr. at 950-59.  The field inventory remained stable for almost ten years thereafter until defendants began production from the 2010 Extension Area. Starting around 1995, field inventory began increasing again, indicating additional loss of gas from the Cunningham Storage Field. The loss increased as defendants' production of water and gas from the Extension Area increased. Brush's calculations showed a total loss of about 20.7 BCF of gas from the beginning of stable operations in 1995 until the date of taking. The inventory analysis showed that, had it not been for defendants' production of water and gas, the Cunningham Storage Field inventory would have remained stable at about 44 BCF.

In estimating the amount of gas remaining in the 2010 Extension Area on the date of taking, Brush started with the foregoing 20.7 BCF of lost gas (i.e, gas that had migrated from the storage area since stable operations were lost in 1995), and then subtracted 15.2 BCF,

which represented defendants' total gas production from the Extension Area. That left 5.5 BCF of gas unaccounted for. To determine how much of the 5.5 BCF went to the 2010 Extension Area, Brush looked at defendants' production of 6.3 million barrels of water, and calculated that removal of that amount of water from the Viola would have been replaced by 3.15 BCF of migrating gas. The commission noted this was a conservative estimate in the sense that it assumed water was replaced entirely by migrating gas, rather than by a combination of gas and water, which was in fact more likely. The 3.15 BCF would have been in addition to whatever amount of gas was in the 2010 Extension Area prior to commencement of defendants' production in 1995.

In determining the amount of gas in the Extension Area prior to 1995, Brush first assumed that no appreciable volumes of gas existed in the Extension Area Viola prior to commencement of storage operations. As the commission noted, that assumption was "reasonable and supported by the evidence based on the multitude of dry holes and the available well logs from the 2010 Extension Area prior to 1978." See Doc. 888 at 17. Cf. Brush Exh. 10, ¶5 (KCC certifying that no recoverable native gas of any significance remained in the Viola formation in the Cunningham Storage Field boundaries). Brush then calculated the volume of gas that would have been necessary to increase pressure in the Viola from the approximately 500 psig [pounds per square inch gauge] existing when primary field production ceased in the 1970's, to the approximately 1,150 psig average pressure after the field was repressurized for storage operations. That calculation yielded an estimate of 1.4 BCF of gas in the 2010 Extension Area.

Brush's estimate of total gas in place in the 2010 Extension Area on the date of taking was thus 3.15 BCF plus 1.4 BCF, or 4.55 BCF.

Brush's estimate of the volume of gas remaining in the Extension Area, which attempted to synthesize the relevant information, represents the most reasonable and credible estimate in the record. Cf. United States v. 179.26 Acres of Land in Douglas County, Ks., 644 F.2d 367, 372 (10th Cir. 1981) ("there can be no absolutes in the speculative area of oil reserves"; "reliance must necessarily be placed on expert testimony.") This is true even though it did not, and probably could not, account for every bit of available information.[8] The commission independently found this estimate to be supported by the evidence and thoroughly explained why defendants' competing theories of gas volume were riddled with errors. See Doc. 888 at 29-34. Nash cherry picks a few bits of contrary data but makes no attempt to reconcile the greater weight of the evidence considered by the commission. For example, Nash does not explain why production in Extension Area wells was so dramatically impacted by storage field pressure if they were in fact producing from a large accumulation of gas in the Extension Area, as Nash claims. Nor does Nash explain its own expert's failure to take into account a multitude of evidence, including evidence of a relatively thin gas thickness layer in the

---

[8]  The commission observed that evaluation of underground migration "is far from an exact science." It noted that all of the parties' theories were likely wrong to one degree or another as they attempted to explain, with limited data, the movement of fluids thousands of feet underground and spread out over thousands of acres. As the commission noted, its role "was to determine which of the theories was the most accurate based on how well it explained and comported with all the available evidence." Doc. 888 at 10.

Extension Area, which led an exasperated commission to "the inescapable conclusion that [the expert's] work began with the objective of finding a place to put a large volume (perhaps 10-16 BCF) of gas in the Extension Areas and then he conducted his analysis to achieve that result." Doc. 888 at 34.

The commission's conclusion is supported by the record and represents the best available estimate on the evidence presented. It far surpasses in credibility Nash's highly speculative claim that the Extension Area held 7 to 13 BCF of gas in 1994. Doc. 915 at 5. The court adopts the commission's volume estimate and rejects Nash's claim of error.

2. <u>Whether the commission violated the project enhancement rule by failing to award the producers $1 million per month in lost gas production</u>.

Based on historical production, Nash contends the producers would have produced more than $1 million worth of gas per month had there been no condemnation. Nash argues the producers are now owed compensation of at least $12 million, because there was a twelve month period from when the wells were shut in by the preliminary injunction (in Case 08-1405) to the date of taking. Nash reasons such compensation is owed because the court instructed the commission that the project enhancement rule "prevents an interest owner from being placed in a ... worse position than he would have enjoyed had there been no condemnation." Doc. 915 at 6.

Nash's request for compensation "during that [one year] time
period of lost production" is in substance either a claim for damages
caused by the preliminary injunction or a claim that the injunction
amounted to a taking of its property. Insofar as it is a claim for
damages, it cannot be asserted here. The injunction was issued in Case
No. 08-1405, and any remedy for a claim that the injunction was
wrongfully issued belongs in that case, not in condemnation. See Doc.
691 at 32 ("Rule 65(c) 'creates a cause of action for the 'costs and
damages' incurred by the enjoined party should it later be determined
that the party was 'wrongfully enjoined or restrained'"). Insofar as
Nash is claiming that the preliminary injunction amounted to a taking
of its property, the court already rejected that argument when it
determined the date of taking. See Doc. 691 at 32-33 ("the court
concludes that the taking of defendants' property did not occur upon
issuance of the preliminary injunction shut in order, but on March 30,
2012, when Northern was granted a right of access to and possession
of the property."). In either event, Nash shows no basis for altering
the commission's award of just compensation.

3. Whether the commission erred in failing to award Vision
Investments of Pratt, LLC, compensation for lost transportation
income. Prior to the taking, Vision transported gas for Nash Oil &
Gas. After the taking, Vision lost this transportation income because
there was no longer any gas to transport. Doc. 915 at 7. Nash argues
the transportation income was "incident or appurtenant to" the
leasehold interests in the Viola and that compensation must be awarded

for it.

A similar claim was rejected in <u>United States v. 677.50 Acres of</u> <u>Land in Marion County, Kansas</u>, 420 F.2d 1136 (10th Cir.), <u>cert.</u> <u>denied</u>, 398 U.S. 928 (1970). In that case, Clear Creek was a company that constructed a pipeline to transport oil from leases in Marion County. It entered into division order contracts with various operators and royalty owners. The contracts said they were irrevocable until 4.5 million barrels of oil had been shipped through the line, which was designed to ensure that Clear Creek would recover its construction costs. Before Clear Creek could recoup its costs, however, five of the tracts were condemned, which prevented further use of the pipeline. In the condemnation, Clear Creek claimed its interest amounted to an equitable servitude on land and it sought compensation for the taking of that interest. Although a commission and the district court granted compensation, the Tenth Circuit reversed, stating:

> The division order contracts were not 'taken' by the condemnation action. Clear Creek, vis-a-vis the contracts, had neither an interest nor an estate in the condemned land; their contracts concerned only the oil after it was severed from the realty. Appellee [Clear Creek] could not compel production, sue for waste or do any of the things incident to ownership. Their contracts were merely frustrated and the fact that they were irrevocable for a period of time does not elevate their stature to an interest or estate in the condemned fees.

<u>677.50 Acres of Land</u>, 420 F.2d at 1138. After citing Supreme Court precedent that consequential damage from the frustration of a contract does not amount to a "taking," the court further noted that the United States was not bound by the contracts and could not enforce them. In

-31-

other words, the contracts "were not 'taken,' but ended." The court found Clear Creek's business loss did not amount to a taking of property and was not compensable. It also said the unit rule precluded the claim because the United States had already paid market value for the oil located in the properties taken, thus satisfying its obligation to pay just compensation.

The foregoing case and others[9] show that the commission correctly declined to award any compensation for Vision's asserted loss. Vision's loss of transportation income may have been a consequence of Northern's taking, but it did not constitute a taking of property from Vision or from Nash.

Nash argues in the alternative that the commission erred by failing to credit it with an amount representing the Vision transportation charge (30 cents per MCF). That fee was treated at trial as a Nash operating expense. Nash argues that if Vision is not allowed to recover the lost fees, Nash should receive a credit for the charge in its recovery. But the Vision transportation fee was clearly an expense that Nash would have continued to incur from its production of gas in the Extension Area. The fact that Vision cannot recover the fee is not a basis for ignoring an expense that Nash would have incurred had it continued production.

### L.D. Drilling, Inc. objections (Doc. 919)

---

[9] In 677.50 Acres of Land, for example, the Tenth Circuit cited other cases holding that consequential business losses are not compensable, including Stipe v. United States, 337 F.2d 818 (10th Cir. 1964), J.A. Tobin Constr. Co. v. United States, 343 F.2d 422 (10th Cir. 1965), and R.J. Widen Co. v. United States, 357 F.2d 988 (Ct. Cl. 1966).

1. <u>Whether the commission erred in rejecting the continuous migration theory</u>. Doc. 919 at 2-15.

In essence, the continuous migration (or continuous feed) theory postulated that, absent condemnation, defendants' wells would have steadily produced gas far into the future because they were being continuously replenished by migrating gas from the storage field. L.D. Drilling and other defendants argue the value of the well tracts should therefore be based on a projected twenty years' worth of production, at current production rates, which they contend is necessary to put them in the same economic position they would have enjoyed but for the condemnation. The net present value of such production would be around $97 million for the wells in the Extension Area.

The commission rejected the continuous migration theory on grounds that it was too speculative, that it failed to take into account Northern and FERC's likely response to continued migration, and that as a practical matter it would frustrate the purpose of condemning wells around a leaking storage field.

L.D. Drilling argues the commission's finding is contrary to Kansas law and must be set aside. Citing <u>ONEOK</u>, 296 Kan. 906 and <u>Northern Nat. Gas Co. v. ONEOK Field Svcs. Co, LLC, et al</u>., No. 2009 CV 111 (30th Jud. Dist., Aug. 15, 2014). The latter case held that L.D. Drilling and others did not convert storage gas by producing it from the Extension Area even after Northern obtained a FERC certificate. <u>See</u> Doc. 919-1. According to L.D. Drilling, Kansas law means that "absent the condemnation, all of the migrated gas in the

extension area -- whether ten years in the past, on the Date of Taking, or ten years into the future -- is subject to the rule of capture and that Northern retains title to none of the migrated gas." Doc. 919 at 6. L.D. Drilling thus argues it is entitled to compensation for all of the storage gas it could have produced in the future had there been no condemnation.[10] It proceeds to blast the commission for a conclusion that "flouts binding Kansas law," for limiting recovery to 13.76 months' worth of production ("an arbitrary figure plucked out of thin air"), for usurping the rights of the Kansas legislature and judiciary, and for using a "one-sided approach" that "does not meet even rudimentary tests of fairness."

The import of L.D. Drilling's continuous migration theory is that not only must Northern pay for all the storage gas defendants[11] have heretofore managed to draw out of the storage field, and not only must it pay them for gas that Northern is currently storing in its own storage field, but it must also pay them for storage gas that Northern has not yet acquired but which, absent condemnation, Northern would have purchased and stored in the field over the next twenty years. This is so, L.D. Drilling argues, because Northern was unable to stop gas from migrating out of the field and, under ONEOK, defendants were

_____

[10] It is not clear why, except perhaps out of a sense of modesty, L.D. Drilling has limited its estimate to twenty years' worth of future production.

[11] At this stage of the case, the court need not distinguish between the rights of mineral interest owners, on the one hand, and persons claiming an interest derived from the mineral interest owner (e.g, a gas well operator), on the other. The court therefore generically refers to "defendants" to mean any or all of the foregoing interest holders.

entitled to produce and lay claim to any and all storage gas they could possibly draw out of the storage field. It seems doubtful Kansas law would adopt such logic, but if it would, it would call to mind the legal analysis of Mr. Bumble, who upon being informed of a presumption in the law that his wife acted under his direction responded, "If the law supposes that ... [then] the law is a ass -- a idiot." See Charles Dickens, Oliver Twist.

The commission identified valid and persuasive reasons for rejecting the continuous feed theory, including its highly speculative nature. It defies logic and common sense to believe that absent condemnation, Northern would have sat on its hands for twenty years as defendants pillaged billions of cubic feet of gas from the storage field, or that FERC would have condoned such losses. L.D. Drilling suggests that Northern would have done so, notwithstanding defendants' large and increasing production, because there was no evidence that defendants' production made the field unprofitable and "Northern [could] simply pass any costs through to its customers...." Doc. 919 at 13. L.D. Drilling calls the commission's rejection of this view "entirely speculative." But if anything suffers from speculation, it is L.D. Drilling's "parasite theory" -- i.e., that Northern and FERC would have simply chosen to live with defendants' siphoning off huge quantities of gas from the storage field.

The commission reasonably inferred from Northern's history of zealous defense of the field that Northern would have undertaken additional measures to reduce the migration had it not had condemnation available. Doc. 888 at 52. Although evidence indicated

that lowering the storage field pressure and adding various production and water injection wells might not have stopped the migration entirely, such measures likely would have put a dent in defendants' production. And given evidence that FERC previously insisted that Northern come up with a more robust plan for halting migration, it is highly unlikely that FERC would have allowed the significant migration of gas to continue unabated. In fact, as the commission pointed out, FERC's prior comments can be construed as indicating it probably would have shut down the field if Northern's plan to curtail migration proved unsuccessful.[12] Had the field been shut down, all of the storage gas likely would have been withdrawn and defendants' source of production would have dried up. Defendants assign no weight to that possibility, however, and they ignore the significant legal and regulatory risks to a practice that some might consider questionable.[13] Cf. Blau v. Lehman, 368 U.S. 403, 419 (1962) (Douglas, J., dissenting)("'The goose that lays golden eggs has been considered a

---

[12] In FERC's June 2, 2010 Order (131 FERC ¶61,209), FERC noted that one intervenor argued that FERC should investigate whether the Cunningham Storage Field was no longer viable and whether it should require Northern to show cause why the field should not be abandoned. (Doc. 188-2 at 23, ¶65.) FERC agreed that the integrity of the storage field was substantially at risk, and expressed its concern about Northern's successive requests for expansion of the field and whether this cycle would continue in the future without controlling the migration of storage gas. (Doc. 188-2 at 27-28, ¶79.)

[13] A common law nuisance claim by Northern remains pending in the related case of Northern Nat. Gas Co. v. L.D. Drilling, Inc., et al., No. 08-1405 (D. Kan.). The court notes that in the 08-1405 case, in proceedings that occurred before the ONEOK ruling, L.D. Drilling strenuously denied that it was producing storage gas and its owner conceded that he did not think a well operator should be drawing gas out of a storage field. See No. 08-1405, Doc. 395 at 77, 82-83.

most valuable possession. But even more profitable is the privilege of taking the golden eggs laid by somebody else's goose.'") [quoting L. Brandeis, Other People's Money and How the Bankers Use It (1913)]. They cite no evidence that purchasers of oil and gas interests ever have or ever would be willing to pay twenty years' worth of current production for a well that was producing large quantities of storage gas. In sum, the court agrees with the commission that the continuous migration theory is too speculative to be credited.

L.D. Drilling complains that the commission "flouts" Kansas law, but it cites no comparable Kansas law involving condemnation and valuation of a well producing storage gas. The case closest to this one factually is Union Gas Sys., Inc. v. Carnahan, 245 Kan. 80, 88, 774 P.3d 962, 968 (1989), which is decidedly contrary to the continuous migration theory.[14]

On the date of taking, owners of the mineral interests had a right to produce any gas under their property. Northern took that right and must pay just compensation. Those owners had no property right, however, to any storage gas that was still in the storage field, nor can it be said that Northern took any such property from them. To the extent mineral owners or well operators expected to

_____

[14] This court previously found that Union Gas was no longer valid insofar as it held that landowners of non-adjoining property had no rights in storage gas under their property on the date of taking. See Doc. 810 at 21 (Union Gas "cannot relieve Northern of the obligation to pay compensation for storage gas in which defendants held a property interest. ONEOK made clear that ... defendants possessed a vested ownership interest in all of the gas – both native and storage – under their property."). But neither K.S.A. § 55-1210 nor any other authority gave defendants any prescriptive property right in storage gas outside of the Extension Area.

continue pulling gas out of the storage field, that is more properly characterized as a business expectation than a property right.

As the commission observed: "The Kansas Supreme Court has noted that, in the context of neighboring wells producing storage gas from leaking storage fields, 'all good things must eventually come to and end,' and condemnation appears to be that end." Doc. 888 at 54 (citing Union Gas Sys., Inc. v. Carnahan, 245 Kan. 80, 88, 774 P.3d 962, 968 (1989)). The court agrees. Whether the reason is because it would be speculative to award compensation for gas that defendants hoped to be able to draw out of the storage field in the future, or because Union Gas means the scope of defendants' property interest was limited to gas that was in place in the Extension Area on the date of taking, the court finds that just compensation for the taking of defendants' property must include the value of economically recoverable hydrocarbons in the Extension Area on the date of taking, but not the value of storage gas that defendants hoped or expected to draw out of the storage field in the future.[15]

As for defendants' repeated refrain that they must be put in the

_____

[15] The commission accurately pointed out that the continuous feed theory would thwart the very purpose of condemnation. If a condemnor had to pay up front for all gas that a nearby well operator could conceivably draw out of a storage field for the next twenty years, then "anyone who drills wells adjacent to a leaking storage field is assured of obtaining the long-term benefit of the leaking gas regardless of whether condemnation occurs or not." Doc. 888 at 53-54. Condemnation in that event would be a useless remedy. Well operators, meanwhile, would receive a bonanza at consumer expense from a legal rule benefitting those who purposely cause migration from a storage field, whether by pumping large quantities of water, fracking, or some other means. Because the court rejects the continuous feed theory, it need not address whether such a rule as applied here would run afoul of the Commerce Clause of the U.S. Constitution.

same economic position as if there had been no condemnation, they overlook two factors. First, the speculative assumption that they could have continued to produce storage gas far into the future is not justified for the reasons discussed previously. And second, the principle of placing an owner in the same position pecuniarily extends only to the property taken, and not to the opportunities which the owner may lose as a result of condemnation. See e.g., United States v. Sowards, 370 F.2d 87, 89 (10th Cir. 1966). Defendants may have lost the opportunity to draw more gas out of the storage field, but the commission's award represents just compensation for the property that was taken from them by Northern.

The commission reasonably and properly valued the gas in the Extension Area on the date of taking. Its projection that defendants would have produced all of that gas in a period of 13.76 months was not "an arbitrary figure plucked out of thin air," as L.D. Drilling fatuously suggests, but an extrapolation based on the evidence of well production rates and the commission's calculation of the volume of gas in the Extension Area. Doc. 888 at 57-60.

2. Whether the commission erred in excluding the Zink A1 well. The Zink A1 was an Extension Area Viola well shut in by L.D. Drilling on February 25, 2011 following the preliminary injunction issued by Judge Brown in Case No. 08-1405. L.D. Drilling recompleted the well in the Lansing-Kansas City Swope formation in September 2011 and began producing oil from that formation. The Zink A1 was originally included in the condemnation complaint, but it was voluntarily dismissed by Northern in October 2013. Doc. 733.

L.D. Drilling points out that the commission was instructed to give no consideration to the injunction issued by Judge Brown, and argues L.D. Drilling is therefore entitled to compensation based on the Zink A1's previous Viola production. It argues that the Viola production would have continued but for the injunction.

The commission found insufficient evidence to assign value to any Viola reserves that might be associated with the Zink A1. It pointed out there was no evidence in the record of the costs necessary to restore Viola production in this well; no showing of whether abandonment of the Swope oil production and recompletion in the Viola was economically justified; no evidence of how long it would have taken to recomplete the well; and no evidence as to how the reserves would be valued by a willing buyer. Doc. 888 at 77.

L.D. Drilling does not address any of these evidentiary shortcomings. Doc. 919 at 16-17. Instead, it argues that recompletion of the well would have been unnecessary had there been no injunction. But for the reasons stated by the commission, valuation of the Viola reserves attributable to Zink A1 production was rendered speculative by the lack of evidence about recompletion of this well in the Viola. It is one thing to value the properties as if the preliminary injunction had not been entered, but it is another to disregard the fact that on the date of taking L.D. Drilling had dedicated the well to production in another zone. The cost of recompletion was not a consequence of the injunction; it was a consequence of L.D. Drilling's voluntary decision to recomplete the well in another formation. Under the circumstances, the evidence failed to give the commission a basis

for assigning Viola reserves to the Zink A1 well tract.

**VAL Energy group objections (Doc. 917)**

1. <u>Whether the commission erred in valuation of eight well bores taken by Northern</u>. VAL contends the commission failed to follow the court's instructions in valuing these well bores. Specifically, it contends the commission ignored evidence of the before and after valuations of the well bores.

The commission found the existing wells would be valued by the market as part of the producing reserves associated with the wells, with no additional value attached to the well bores themselves except for the salvage value of the casing. The commission separately awarded compensation for the Viola reserves. It awarded only salvage value for the wells, which it found to be $5,850 for each well as testified to by Northern's expert. The commission rejected what it characterized as producers' attempt to obtain the cost of drilling replacement wells, pointing out there was no evidence of the productive potential of formations other than the Viola, so if the producers drilled replacement wells without any rights to the Viola they "would merely be drilling worthless holes in the ground." Doc. 888 at 71.

VAL contends it was not seeking the cost of replacement wells. Instead, it says it presented "evidence of the value of the wells before taking... [] in the form of the cost to drill the wells, and what a party would sell a completed well bore for in a producing formation." Doc. 917 at 5. VAL cites the testimony of its president, Todd Allam, who testified that the value of the well bores before taking was based on the costs associated with drilling, completing and

equipping those wells.

As the commission accurately pointed out, its valuation of the Extension Area gas reserves was based on a finding that the tracts contained proved, producing reserves. That valuation already took into account the fact that producing well bores were in place on the Extension Area well tracts. In other words, it took account of VAL's asserted evidence of "what a party would sell a completed well bore for in a producing formation." It would have been duplicative to grant an award above salvage value for the well bores. As for Mr. Allam's testimony concerning the cost of drilling wells, VAL cites no credible evidence of an existing market based on drilling costs that is separate and distinct from the valuation of producing reserves. The court finds that the commission considered and valued the well bores -- both before and after the taking -- and appropriately awarded an amount for salvage value that was supported by the evidence.

VAL's final contention is that the commission's award of only $5,850 per well confers a financial windfall on Northern that "flies in the face of this Court's instructions to pay the fair market value for any property interest taken." Doc. 917 at 8. As the court instructed, however, "[t]he fair market value of the interests taken, rather than the value to Northern ..., is the proper measure of just compensation." Doc. 848 at 14 (Instruction 9). Although the instructions allowed the commission to use a depreciated cost method of valuation, id. at 10 (Instruction 6), the court is persuaded that the commission selected the best and most appropriate method of valuation under the evidence. Cf. Olean-Nowata Oil Co. v. United

-42-

States, 351 F.2d 277, 278 (10th Cir. 1965) ("bare proof of expenditures is not generally accepted as proof of fair market value"). Moreover, VAL's "windfall" argument completely ignores the fact that producers' drilling costs were a necessary expense for obtaining their past production. Northern is no more required to pay producers' past production expenses than it is entitled to share in their past production. Regardless, the argument shows no error or infirmity in the commission's award.

## Pratt Well Service (PWS) group objections (Doc. 920)

1. Whether the commission erred by failing to award compensation for PWS's loss on its contract with Lumen. This argument is based on a PWS gas purchase contract with Lumen under which PWS may incur a penalty for failing to deliver at least 476,300 Mcf of gas from the Schwertfeger lease. Doc. 920 at 2. Under the contract, PWS dedicated the gas produced from its Schwertfeger 1-23 well to Lumen. PWS is unable to meet the delivery requirement because of the condemnation. Lumen has demanded that PWS pay almost $200,000 under the contract's penalty formula.

PWS argues the contract is appurtenant to the land because it is binding on PWS's successors. It contends the contract decreases the market value of the tract, as "no sane person would purchase the Schwertfeger Lease unless discounted for ... the penalty," and it argues that "the Commission's failure to award just compensation in relation to said decrease in market value violates the project enhancement rule." Doc. 920 at 3-4.

-43-

The court overrules this objection for the same reasons discussed with respect to the Vision Investments pipeline. PWS's gas purchase contract, like the division order contracts in <u>United States v. 677.50 Acres of Land in Marion County, Kansas</u>, 420 F.2d 1136 (10th Cir. 1970), was not "taken" by the condemnation. The gas purchaser, Lumen, had neither an interest nor an estate in the condemned land; its contract pertained to gas after it was severed from the realty. What PWS effectively seeks is to add the contractual penalty to the just compensation for the property that was taken, the very thing the court concluded was improper in <u>677.50 Acres of Land</u>. The commission's award already provides just compensation for the recoverable gas taken by Northern in the Extension Area; PWS is entitled to no additional compensation for its contractual penalty.

### **Huff group objections (Doc. 916)**

1. <u>Whether the commission erred in considering Northern storage leases as evidence of fair market value of buffer acreage</u>. In valuing the Extension Area tracts, the commission considered Northern's storage leases in the 2010 Extension Area as evidence of the fair market value of storage/buffer zone acreage. The Northern leases had a net present value of $200 per acre. After looking at sales of comparable fee properties, however, the commission concluded that $200 per acre was higher than what was justified. The commission settled on an award of $125 per acre for the buffer value of the Extension Area properties.

Huff argues the Northern leases were not competent evidence of fair market value because they were not entered into by well informed

-44-

buyers, they were not made in an open and competitive market, and they involved undue compulsion because they were made under threat of condemnation by Northern. Doc. 916 at 3; see Doc. 848 at 10 (instruction defining fair market value). None of these arguments is persuasive.

As the commission noted, several landowners on these Northern leases were represented by attorneys, including Lee Thompson, an experienced oil and gas lawyer in Wichita. Despite this, Huff argues the commission's finding that such purchasers were likely well informed "was legally insufficient and based upon speculation." Doc. 916 at 6. But it was permissible and reasonable for the commission to infer that purchasers represented by competent counsel were well informed as to fair market value. (When contemplating a lease offer, the fair market value of the lease rights would surely be one of the first questions a landowner would have for their attorney.) Similarly unpersuasive is Huff's contention that it is speculative to assume that counsel had any knowledge of underground gas storage values. Underground storage is a recurring feature of Kansas oil and gas law. An experienced lawyer would likely be familiar with such issues or be able to obtain appropriate information. See e.g., Beck v. Northern Nat. Gas Co., 170 F.3d 1018 (10th Cir. 1999) (award based on fair rental value of underground storage). See also Frederick v. Southern Star Cent. Gas Pipeline, Inc., 944 F.Supp.2d 1083 (D. Kan. 2013); Southern Star Cent. Gas Pipeline, Inc. v. 120 Acres Located in Rice County, Kan., 2012 WL 984271 (D. Kan. 2012); Kent v. Southern Star Cent. Gas Pipeline, Inc., No. 07-1105-MLB (D. Kan.); Southern Star

Cent. Gas Pipeline, Inc. v. 832 Mineral and Leasehold Acres of Land in Anderson County, Kansas, No. 08-1313-MLB (D. Kan.).[16] Likewise, it is not "pure speculation" to infer that a petroleum landman who entered into one of the leases was a well informed purchaser. Few people in Kansas would know more about mineral values, including storage rights, than a landman. Huff is essentially arguing that to be considered a well informed purchaser, there must be specific evidence that the buyer had knowledge equivalent to an industry expert. That has never been the standard -- whether the lease is above ground or below ground. The commission correctly concluded that the standard does not require perfect knowledge and that the purchasers on the Northern leases were likely well informed.

The Huff group also asserts there was no open and competitive market because only Northern was leasing Extension Area property. It also claims the Northern leases were made under duress as a result of Northern's condemnation authority. But in any potential storage area, leases are likely to be sought by only a single operator because of the exclusive nature of storage operations. And in Kansas and elsewhere such leases are typically obtained by utilities with the power of eminent domain. Cf. Bison Pipeline, LLC v. 102.84 Acres of Land in Campbell County, Wyoming, 516 Fed.Appx. 690, 2013 WL 8172006 (10th Cir. 2013) (under Wyoming law the "fact that property is purchased by one vested with the power of eminent domain does not preclude admission of evidence regarding the sale, provided the

---

[16] Attorney Lee Thompson represented landowners or other interest owners in all of the foregoing cases.

transaction was fair."). These factors do not preclude consideration of the Northern leases as indicators of market value. "Some speculation is inherent in the ascertainment of value of all resource property, be it mineral, oil, gas or otherwise, and if the quality of proof of value follows the custom of the industry, is the best available, and is sufficient to allow the jury or court to make an informed estimate as to the fact of value, such proof is sufficient to meet the burden." United States v. Silver Queen Mining Co., 285 F.2d 506, 510 (10th Cir. 1960). Under the circumstances, the commission did not err in considering the Northern storage leases as evidence of the market value of Extension Area properties. Cf. Home Gas Co. v. Miles, 79 Misc.2d 26, 31, 358 N.Y.S.2d 846 (1974) (value of property for underground storage rental was established by previous transactions by plaintiff in the field), order modified by 46 A.D.2d 562, 364 N.Y.S.2d 213 (N.Y.A.D. 1975).

2. Whether the commission improperly rejected the Brehm Field leases. Huff presented evidence of storage leases in the Brehm Storage Field, located about seven miles from the Cunningham Field. The Brehm leases provided for an annual rental of $97.67 per acre escalating at ten percent per year. The commission noted this figure was substantially higher than rentals on storage leases near the Cunningham Field, and it concluded that the Brehm leases were not representative of fair market value of buffer acreage in the Extension Area. The commission found the Brehm leases resulted from a unique set of circumstances, including that they were renewed shortly after the storage operator lost a significant amount of storage capacity because

-47-

its Yaggy Field suffered leaks that led to fires and explosions in Hutchinson, Kansas. Doc. 888 at 67.

The Huff group contends the commission's rejection of the Brehm leases was error. It points to an arbitration clause in the Brehm leases as evidence the commission erred in stating that a failure to renew the leases would have jeopardized that field. It also contends the commission engaged in speculation by connecting the amount of the Brehm rental to the Yaggy Field incident. Finally, Huff contends the $97.62 per year is the economic equivalent of what the Brehm leases paid going back to 1981, which it says disproves any suggestion that the $97.62 figure was anomalous or the result of unique circumstances at the time of the lease renewal. Huff submits that the Brehm leases are the best evidence of fair market value of buffer acres in the Extension Area and argues the commission must reconsider this evidence. Doc. 916 at 12.

Even assuming one or more of the commission's reasons for rejecting the Brehm leases as comparable does not withstand scrutiny, this does not warrant a remand. The issue is before the court on de novo review, and the court concludes from its review of the record that the Brehm leases are well in excess of the fair market value for the Extension Area tracts. For example, Huff's argument ignores evidence of comparable sales of fee properties around the Cunningham Field. As the commission noted, evidence of those sales would not even support a finding that the fair market value of Extension Area properties was boosted by a $200 per acre net present value, let alone the approximately $4,000 per acre net present value of the Brehm

-48-

leases. Under Huff's theory, fee simple acreage in this area should have been selling for upwards of $5,000 per acre. The fact that it sold for nothing like that undercuts Huff group's position, leaving it to claim that landowners must have been uninformed about "true" market values. But comparable sales of fee property in this area say more about the impact of storage lease rights on the fair market value of the condemned property than defendants' extrapolation from the Brehm Field leases.[17]

The court notes that the Brehm Field spans only about 640 acres -- a fraction of the size of the Cunningham Field -- and is used for local distribution. Other than its location, it bears little or no similarity to the federally regulated Cunningham Field. The Brehm leases also included rights to recover all hydrocarbons in all formations and had a rather incredible 10% escalator, which as Northern points out, well exceeds any other escalator in Kansas. Also, there was uncontroverted testimony that the secondary oil recovery rights covered by the Brehm leases allowed the operator to recover over $600,000 worth of oil from one formation. These dissimilarities and others provide substantial and valid reasons for concluding that the Brehm leases are not the best evidence of the fair market value of storage rights for the Extension Area tracts. The court concludes

---

[17] Similarly, as the commission recounted, landowners' expert William Henry claimed that only government lessors generally had the knowledge to be considered well informed. His review turned up only four such leases, none of which were in or close to Kansas. Those leases had wildly divergent annual payments ranging from $11.58 per acre per year to $125 per acre per year. Henry simply averaged these lease values in concluding that the fair market value of the Extension Area leases was $67.57 per acre per year, or a net present value of $2,000 per acre. See Doc. 888 at 65.

that the commission's finding of a net present value of $125 per acre for storage lease rights is supported by the evidence and represents just compensation for the taking of such rights by Northern.

3. Whether the commission erred by finding that all of the wells were shut in as a result of the impending condemnation. The Huff group objects to the commission's finding that the Extension Area wells "were essentially shut in as a result of the impending taking." See Doc. 888 at 47, n.23. Huff's concern is that this could be construed as a finding that the wells were shut in as a result of a court order, which in turn could have a bearing on whether or not the leases terminated. The latter issue is one the court may have to address when it apportions just compensation among the parties claiming an interest in the properties. Huff argues that the commission's finding was both contrary to the evidence (at least as to wells shut in during the summer of 2010) and beyond the scope of the commission's authority.

Huff acknowledges that the commission was directed to value the properties as if Judge Brown's preliminary injunction shutting in the wells had not been entered. It also concedes that "it may have been appropriate for the Commission to categorize the wells as 'producing' or 'non-producing' as of the Date of Taking" for purposes of valuation. Doc. 916 at 13. Not only was this appropriate, it was in fact required. Under the evidence, gas reserves must be placed into such categories in order to properly determine their value.

Huff's objection is conditional: "So long as the Commissioners were simply making clear that they were not considering Judge Brown's shut-in order, such a 'finding' would be appropriate. However, if the

-50-

Commissioners were attempting to make a finding about the subsistence of the leases as of the Date of Taking, which is a task reserved to the Court, such a finding is clearly inappropriate." Doc. 916 at 13, n.4.

The commission's finding was clearly made only for purposes of valuation of the gas reserves as of the date of taking. It conformed to the court's instruction to value the properties without regard to Judge Brown's shut-in order. It is germane only to proper valuation of the gas reserves and not to any issue relating to subsistence of the leases or apportionment of just compensation.

### Miller Trust objections (Doc. 924)

1. <u>The Miller Trust objects to the valuation of tract 4012711</u>. The Miller Trust, acting pro se, asserts that "[s]omething is wrong with the evaluation of [tract] 4012711." The court gathers the trust objects to the commission's determination that a neighboring tract with a Nash well on it was entitled to compensation of $1.7 million, while the Miller Trust tract was awarded compensation of only $10,000. The trust contends the tracts were essentially identical.

These tracts were not identical. The distinction is that the Nash tract had a producing Viola well on it, which allowed it to capture the gas reserves underlying both properties. The Miller tract had no well. Moreover, there was no evidence that the trust planned to or could put in a well, and no evidence that it could do so in time to capture any of the reserves that were in the Extension Area on the date of taking. The gas reserves therefore contributed to the fair market value of the Nash tract and not to the Miller tract.

**IV. <u>Conclusion</u>.**

This court assigned the commission an exceptionally difficult task. Even a routine condemnation presents difficult issues -- and this is no ordinary condemnation. Valuation of oil and gas properties has always caused difficulty in condemnation, and on top of that the Kansas law granting defendants a right to produce escaping storage gas, combined with the fact that the wells were in communication with an established storage field, make this an unprecedented case insofar as the court can tell.

Faced with this task, the commission proceeded to conduct extensive hearings in an expeditious and fair manner. It then produced a comprehensive and clear report that addressed a welter of arguments and issues arising from a complex set of facts. This would have been impossible without the combined expertise of the commissioners. The commissioners have not only rendered an important public service by their efforts; they have done so in exemplary fashion.

That is not to say that all of the parties -- or any of them for that matter -- are happy with the results. But that is not surprising: "Condemnation at best is an unhappy event aggravated by the inexactitude of expert opinion evidence forced into the subjective (and often unrealistic) beliefs of the parties as to value and damage." <u>Phelps Dodge Corp. v. Atchison, T.S.F. Ry. Co.</u>, 400 F.2d 20, 24 (10th Cir. 1968).

The commission's report is fundamentally sound and supported by the record. The commission thoroughly considered the evidence, the

-52-

instructions, and the parties' arguments. Its resulting determination represents a fair resolution that is both supported by the evidence and consistent with the constitutional requirements of just compensation. The court hereby denies the parties' objections to the report and adopts the report of the commission in its entirety.

No motions for reconsideration of this order, however styled, may be filed. In other words, the court will <u>not</u> revisit this Memorandum and Order for any reason.

IT IS SO ORDERED.

Dated this 4th  day of February 2015, at Wichita, Kansas.


s/Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE