IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

NORTHERN NATURAL GAS COMPANY,   )
                                )
                Plaintiff,      )   CIVIL ACTION
                                )
v.                              )   No.  10-1232-MLB-DWB
                                )
APPROXIMATELY 9117 ACRES IN PRATT, )
KINGMAN, AND RENO COUNTIES,     )
KANSAS, AND AS FURTHER DESCRIBED )
HEREIN;                          )
                                )
TRACT NO. 1062710               )
CONTAINING 80.00 ACRES MORE OR  )
LESS, LOCATED IN KINGMAN COUNTY, )
KANSAS, AND AS FURTHER DESCRIBED )
HEREIN; ET AL.,                 )
                                )
                Defendants.     )
_____ )

**MEMORANDUM AND ORDER**

Before the court are the following:

1. Northern Brief Regarding Pre-Judgment Interest (Doc. 949); Huff Group Response (Doc. 967); Meireis Group Joinder in Huff Response (Doc. 968); Producer-Defendants' Response (Doc. 969); Northern Reply (Doc. 976);

2. Summary Judgment Motions Concerning Validity of Leases - Val Group (Docs. 950, 951), Northern Response (Doc. 970), Huff Group Response (Doc. 974), Val Reply to Northern (Doc. 989), Val Reply to Huff Group (Doc. 990);
   - Pratt Well Service (PWS) Group (Doc. 952, 953), Huff Group Response (Doc. 972), PWS Reply (Doc. 987);
   - Nash Oil & Gas (Docs. 954, 955), Huff Group Response (Doc. 975), Sonja Sue Staab Response (Doc. 971); Nash Reply (Doc. 988), Nash Reply to Staab (Doc. 991);
   - L.D. Drilling, Inc. (Docs. 956, 957), Huff Response (Doc. 973), L.D. Drilling Reply (Doc. 992);

3. Northern's Motion to Reallocate Fees and Expenses (Doc. 959); Huff Group Response (Doc. 978); Producer-Defendants' Response (Doc. 981); Hudson Group Response (Doc. 986);

4. Huff Group's and Producer-Defendants' Motions for Attorney's Fees and Expenses (Docs. 961, 962) and Meireis

Group's and Hudson Group's Joinder in the motions (Docs. 964, 966); Northern's Response (Doc. 977);

5. Northern's Motion for Sanctions (Doc. 960); Huff Group Response (Doc. 984); Meireis and Hudson Groups' Joinder in Huff Response (Docs. 983, 985);

6. Joint Report on Allocation to Interest Owners in Tracts Without Wells (Doc. 963);

7. Producer-Defendants' Report on Division Between Royalty and Working Interest Owners in Tracts with Wells (Doc. 965).

## I. Introduction.

Northern brought this condemnation action under the Natural Gas Act (NGA), 15 U.S.C. § 717f(h), to expand its natural gas storage field near Cunningham, Kansas. Pursuant to authority granted by the Federal Energy Regulatory Commission (FERC), Northern sought to acquire over 9,000 subsurface acres in the Viola and Simpson formations of the designated Extension Area. The court granted a preliminary injunction allowing Northern to take possession of the property as of March 30, 2012. Doc. 464. The court subsequently held that the date of taking was March 30, 2012, the date Northern perfected a right to possession of the property. Doc. 691 at 34. A commission appointed by the court to determine just compensation for the property taken by Northern held extensive hearings and filed a report of its findings. Doc. 888. The court subsequently adopted the commission's report. Doc. 941.

The findings adopted by the court are summarized in Exhibit 3 of the commission's report, Doc. 888 at p. 84-85. The total compensation owed by Northern as of the date of taking was $7,310,427. Of that

amount, about $5.9 million was attributable to Extension Area tracts that had producing gas wells in the Viola formation. A little over $1 million was attributable to the storage lease potential of the property taken. Additional compensation was determined to be owing for well salvage ($46,800), surface damages ($178,540), buildings ($278,190), and well isolation costs ($51,000).

The court now has before it motions addressing most of the remaining issues in the case, including: whether prejudgment interest should be awarded as part of just compensation; whether oil and gas leases on a number of well tracts terminated prior to the date of taking; whether some of the commission costs paid by Northern should be reallocated to other parties; whether defendants are entitled to attorney's fees; whether Northern is entitled to sanctions against landowners' counsel; how the award on non-well tracts should be allocated; and how the award on tracts with wells should be allocated among the various interest owners.

## II. Prejudgment interest.

Northern took possession of the defendant property on March 30, 2012, but has yet to pay the owners just compensation. As the court has previously noted, when property is taken by a condemnor prior to payment of just compensation, the condemnor has an obligation to pay interest on the value of the property until just compensation is ultimately paid to the owner. Doc. 691 at 9 (citing United States v. Dow, 357 U.S. 17, 22 (1958)). "[I]f disbursement of the award is delayed, the owner is entitled to interest thereon sufficient to ensure that he is placed in as good a position pecuniarily as he would

have occupied if the payment had coincided with the appropriation." Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 10 (1984).

Interest is thus an element of just compensation owed for the taking of the property. See Seaboard Air Line Ry. Co. v. United States, 261 U.S. 299, 306 (1923) ("The addition of interest allowed by the District Court is necessary that the owner shall not suffer loss and have 'just compensation' to which he is entitled."). The Supreme Court has said that a "reasonable rate" of interest is appropriate in such circumstances. See United States v. Creek Nation, 295 U.S. 103, 111 (1935). In Seaboard Air Line, the court found that awarding interest at a rate established by state law was a "palpably fair and reasonable method" of awarding just compensation. 261 U.S. at 306. See also United States v. Rogers, 255 U.S. 163, 170 (1921) (the fact that the interest rate applied by the court "is in harmony with the policy of the state where the lands are situated does not militate against, but makes for, the justice and propriety of its adoption.").

After examining the various alternatives, the court concludes that the Kansas post-judgment interest rate provided for in K.S.A. § 16-204(e)(1) provides the appropriate measure of compensation. Kansas law applies this rate when an appeal from an initial condemnation award results in a greater award. K.S.A. § 26-511. Although the condemnation procedures used in this federal proceeding differ from the Kansas procedures, the Kansas judgment rate nevertheless provides a fair assessment of the compensation owed for the period from the taking of the property until ultimate payment of the condemnation award. Cf. Spears v. Williams Nat. Gas Co., 932 F.Supp. 259 (D. Kan.

1996) (in condemnation proceeding under the Natural Gas Act, court applied the judgment rate of K.S.A. § 16-204). Under the formula in K.S.A. § 16-204(e)(1), the applicable rate in this case is 4.75%, which is four percentage points above the federal reserve discount rate for the prior year.[1]

The court has considered but rejected the alternatives suggested by the parties. Northern, for example, argues that prevailing money market rates (0.70% for a 36-month CD) "would place the condemnees, as ordinary investors, in as good a pecuniary position as had there been no delay" in payment. Doc. 949 at 10. But as Northern itself recognizes, this has been a period of historically low interest rates during which cash equivalents like CDs have earned little or no return. During the same period, there were reasonably safe alternatives from which ordinary investors could generate more substantial returns. For example, other courts have awarded interest based upon long-term corporate bond yields. See e.g., Textainer Equipment Management Limited v. United States, 115 Fed.Cl. 708, 719 (Fed.Cl.2014) ("the court is persuaded that in this instance an objective 'reasonably prudent investor' would have sought yields consistent with the Moody's Rate."). See also Pitcairn v. United States, 547 F.2d 1106, 1124 (Ct.Cl.1976) ("[L]ong-term corporate bond yields are an indicator of broad trends and relative levels of investment yields or interest rates. They cover the broadest segment of the interest rate spectrum."). The court notes that in the period from April 2012 to present, long-term corporate bond yields have

---

[1] The judgment rate is published by the Kansas Secretary of State. See http://kssos.org/other/business_finance_rates.html#judgment.

generally been between 3.5% and 4.5%.[2] Under the circumstances, current CD yields and similar measures are not sufficient to ensure that property interest owners suffer no economic loss from the delay in payment over the past three years.

The Huff group and the producer-defendants, by contrast, urge the court to apply the 10% annual rate in K.S.A. § 16-201. Huff points out that the Kansas Supreme Court previously applied that statute to damages awarded in an inverse condemnation case. Herman v. City of Wichita, 228 Kan. 63, 612 P.2d 588 (1980). (At the time Herman was decided, it should be noted, the statute provided for 6% annual interest.). Aside from the fact that Herman was expressly limited to inverse condemnation claims, however, the 10% flat rate in K.S.A. § 16-201 takes no account of actual market conditions. It embodies an arguably punitive element that has no place in just compensation. And a 10% annual return is well above what a relatively safe investment would have earned over the period in question. Defendants are not entitled to a windfall return reflecting a risky investment for which they bore no risk.

Producer-defendants likewise urge the court to apply a 10% prejudgment interest rate because the commission discounted the value of the gas reserves in the Extension Area by 10%. Doc. 969 at 3-4. But the 10% discount applied by the commission was based on evidence that willing buyers and sellers typically apply such discounts in determining the market value of oil and gas properties. That fact says nothing about the appropriate level of prejudgment interest to

---

[2] Moody's Seasoned Aaa Corporate Bond Yield, https://research.stlouisfed.org/fred2/series/AAA.

compensate defendants for a delay in payment of just compensation.

The court's obligation is to award interest "sufficient to ensure that [the property owner] is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation." Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 10 (1984). The 4.75% annual interest rate provided for in K.S.A. § 16-204 accomplishes this. It takes into account actual market conditions for the period in question and provides a rate of return consistent with a relatively safe investment.

Northern contends that no interest should be imposed on $2,671,700 of the condemnation award because Northern deposited that amount with the court prior to the taking. It argues defendants had the ability to withdraw that sum (although none chose to do so), and that by analogy to Kansas condemnation procedures, interest should only be imposed on the difference between the total $7.3 million award and this $2.6 million deposit. See K.S.A. § 26-511.

This argument is not persuasive. Northern's deposit was required by the court as security for the injunction allowing Northern's up-front taking; it was not intended to be just compensation for the taking of the property.[3] (Northern was allowed to post a bond for the lion's share of the security.) See Doc. 464 at 25, 29. The cash deposit was required in part to allow well tract owners to avoid or mitigate the consequences of having their wells immediately taken. See

---

[3] In fact, Northern's proposed instructions to the commission specifically stated that the "deposits and bonds shall not be considered as evidence of the fair market value of the tracts before or after Northern's taking." Doc. 756 at 8. This language was included in the court's instructions to the commission. Doc. 848 at 14, Inst. 9.

Doc. 464 at 22. Additionally, the defendants who were eligible to withdraw the cash deposit faced practical barriers and were not at liberty to simply withdraw the funds. The court required that any party seeking to withdraw the funds show the "consent of any landowners, royalty owners, working interest owners and lienholders who have an interest in the tract...." Doc. 464 at 30. Property owners also faced liability if a withdrawal exceeded the ultimate determination of just compensation. These measures served to prevent pre-litigation disputes over the security deposit, but they also erected a significant hurdle in the path of any interest owner wanting to withdraw the funds. Unlike a garden variety condemnation, ownership of these tracts was splintered in such a way that withdrawal of the deposit was impracticable. The court concludes that Northern has an obligation to pay interest on the entirety of the condemnation award, including the cash deposit made prior to the taking.

Finally, the court concludes that the obligation to pay this interest continues until Northern pays just compensation to the owners of the property, and that the interest should be compounded annually to ensure that the owners are placed in as good a position as they would have enjoyed had payment coincided with the taking. Compounding is appropriate here given the significant delay between the taking and the payment of just compensation. See e.g., Hardy Storage Co., LLC v. An Easement to Construct, Operate and Maintain gas Transmission Pipelines, 2009 WL 900157, *8 (N.D. W.Va. 2009) (in action under the NGA, interest was compounded annually to fully compensate for the condemnation); Textainer Equip. Mgmt. Ltd. v. United States, 115 Fed.Cl. 708, 719 (Fed.Cl. 2014) ("Compound interest may be necessary

-8-

'to accomplish complete justice' under the Just Compensation Clause."); <u>520 E. 81st St. Associates v. State of New York</u>, 19 A.D.3d 24, 30, 799 N.Y.S.2d 1, 5 (N.Y.A.D. 1 Dept. 2005) (quoting <u>Bowles v. United States</u>, 31 Fed.Cl. 37, 52 (Fed.Cl. 1994)) ("because of the long delay since the date of taking in this case, the award of compound interest is not only proper, but its denial would effectively undercut the protections of the fifth amendment").

In sum, the court concludes that Northern owes interest on the value of the property taken ($7,310,427) from the date of taking on March 30, 2012, until the date just compensation is paid to the owners by Northern, at a rate of 4.75%, compounded annually.


**III. Summary Judgment on Validity of Leases**.

Several owners/producers with oil and gas leases in the Extension Area have filed summary judgment motions seeking a ruling that their leases were valid on the date of taking, such that they are entitled to share in the compensation paid for the tracts taken by Northern. Although the wells on these tracts were shut-in and were not producing at the date of taking, the producers argue that the leases remained valid for various reasons, including the effect of force majeure provisions. The Huff Group of landowners (and certain other landowners), on the other hand, contend that several leases terminated due to a lack of production and/or because the producers failed to pay shut-in royalties.[4]

---

[4] The parties have filed a joint report on factual stipulations pertaining to leases. Doc. 939. The report is exceptionally helpful in view of the complexity of issues and the history of the litigation. The court compliments counsel for their highly professional efforts

Val Group

The Val group argues that Val Energy's leases remained valid on the date of taking by virtue of the leases' force majeure clauses. Docs. 950, 951. It further argues that it would be inequitable under the circumstances to terminate the leases. In response, the Huff landowner group argues (as to the Branscom lease) that the force majeure clause did not apply, but even if it did that the lease terminated because Val failed to pay shut-in royalties to extend the lease. Northern makes a similar argument as to the McGuire lease and further contends that even if the lease remained valid, the Val lease interest was personal property and is not compensable in this action.

Uncontroverted facts. The court finds the following facts to be uncontroverted for purposes of summary judgment.

The Val Group defendants[5] held interests in three relevant leases: the McGuire lease (covering Tract No. 2312620), the Branscom lease (Tract No. 3302610), and the Riffey lease (Tract No. 4252611). Val Energy operated a producing well on each of these leases - the

---

in conferring with each other and in reporting to the court. The report discloses that the parties stipulated that seven leases remained valid and that one lease was invalid on the date of taking. There was no stipulation as to 16 leases, which are the subject of the summary judgment motions set forth above.

To the extent the parties' briefs have duplicated issues or claims concerning the validity of the leases, the court has generally addressed the issue only once within the following sections. The court's ruling with respect to one party or lease applies equally to any other party raising the same issue.

[5] The Val Group consists of: Allam Exploration, LLC; Apollo Energies, Inc.; Robert P. Bayer II; Hastings Oil & Gas Properties; Lies Exploration, LLC; David Munro; Brenda Brown Riffey; Larry D. Riffey; Dale L. Smith and Mae D. Smith Revocable Trust Dated 12-5-07; Eric D. Stinson Trust; Val Energy, Inc.; and Vosburgh Exploration. See Doc. 950 at 1.

McGuire 1-31, the Branscom 1 and the Riffey VI-25, respectively. Each well was completed in and producing gas from the Viola/Simpson formations prior to June 2010.

At the time Val drilled the McGuire 1-31 well in 2008, it was aware of litigation between Northern and various producers operating wells farther to the south. The McGuire 1-31 began producing in January 2009.

In December of 2008, Northern sued Val, L.D. Drilling, Inc., and Nash Oil & Gas, Inc. in federal court, claiming they were producing gas belonging to Northern that was migrating from Northern's Cunningham Storage Field. Northern Nat. Gas Co. v. L.D. Drilling, Inc., et al., Case No. 08-1405 (U.S. Dist. Ct., D. Kan.).[6] Northern alleged various state law tort claims, including conversion, nuisance, and civil conspiracy.

In September 2009, Lumen, the gas purchaser on the McGuire 1-31 well, suspended payments on gas purchases from Val and other producers because of Northern's claim that the gas belonged to Northern.

Northern filed an action in Pratt County District Court in December 2009 claiming that purchasers of gas from Val and other producers were converting gas belonging to Northern. On April 15, 2010, the judge in the state case ruled in a summary judgment motion that Northern did not have title to the disputed gas.

On June 2, 2010, FERC granted Northern a Certificate of Public Convenience and Necessity authorizing it to expand the boundaries of

_____

[6] Northern had filed an earlier case against L.D. Drilling and Val Energy. Case No. 08-1400 (U.S. Dist. Ct., D. Kan.). That case was consolidated with Case No. 08-1405. (Doc. 152 in Case No. 08-1405).

the Cunningham Storage Field by over 12,000 acres. The certificate allowed Northern to acquire by condemnation the Viola and Simpson formations underlying the Extension Area, including the acreage on which the three Val wells were operating.

On June 17, 2010, Northern filed a Motion to Enjoin Production in the federal "damage case" (D. Kan. No. 08-1405) asking the court to require operators to halt production from specified Extension Area Viola wells, including the three Val wells.

On June 30, 2010, the judge in the Pratt County District Court action ordered gas purchasers to continue holding gas purchase payments in suspense pending further order of the court. He certified his summary judgment ruling as a final judgment to allow an immediate appeal to the Kansas Supreme Court.[7]

On July 16, 2010, Northern filed the instant condemnation action (Case No. 10-1232).

Thereafter in July 2010, Val Energy shut-in its gas wells on the McGuire, Branscom and Riffey leases. The Val leases were all producing in paying quantities prior to being shut-in. Val would have continued to produce from these wells but for the foregoing events.

Prior to entry of the June 2, 2010 FERC order, Val Energy's president considered the interruption of gas payments by purchasers to be temporary. After the FERC order he believed it was inevitable that the property would be condemned.

On December 22, 2010, in the federal damage case, Judge Brown

---

[7] The ruling was subsequently affirmed by the Kansas Supreme Court. <u>Northern Nat. Gas Co. v. ONEOK Field Svcs. Co., LLC</u>, 296 Kan. 906, 296 P.3d 1106 (2013).

ordered Val and other operators to cease production from their Viola wells by February 21, 2011. (Case No. 08-1405, Doc. 420). The injunction was based on a finding that Northern was likely to prevail on a nuisance claim. The injunction prohibited gas production from the Viola and Simpson formations in the Extension Area, but not from other formations, pending resolution of the claims in Case No. 08-1405.

Each of the three Val leases included the following provisions [labeled by the court for ease of reference as the habendum, shut-in royalty, and force majeure clauses]:

> [Habendum clause] Subject to the provisions herein contained, this lease shall remain in force for a term of three (3) years from this date (called the "primary term") and as long thereafter as oil, liquid hydrocarbons, gas or other respective constituent products, or any of them is produced from said land or land with which said land is pooled.
>
> [Shut-in royalty clause][8] Where gas from a well producing gas only is not sold or used, lessee may pay or tender as royalty One Dollar ($1.00) per year per net mineral acre retained thereunder, and if such payment or tender is made it will be considered that gas is being produced within the meaning of the preceding paragraph.
>
> [Force majeure clause] All express or implied covenants of this lease shall be subject to all Federal and State Laws, Executive Orders, Rules or Regulations, and this lease shall not be terminated in whole or part, nor lessee held liable in damages, for failure to comply therewith, if compliance is prevented by, or if such failure is the result of, any such Law, Order, Rule or Regulation.

In December 2010, Northern acquired the fee title to the McGuire property (Tract 2312610), including title to the hydrocarbons located

---

[8] This provision was part of a royalty clause under which the lessee promised to pay the lessor a one-eighth royalty for gas used or sold.

thereon. The property was then subject to the McGuire lease. The three-year primary term of the lease had expired by that time but had been extended as a result of production from the McGuire 1-31 well.

The primary term of the Branscom lease ended on August 3, 2010.

Val has not tendered any shut-in royalty payments under any of the three leases.

<u>Whether the McGuire and/or Branscom leases terminated prior to the date of taking</u>.

The undisputed facts show that the McGuire 1-31 and the Branscom 1 wells were producing in paying quantities until they were shut-in toward the end of July 2010. The facts also show that Val's decision to shut-in its Extension Area wells resulted from litigation over the wells. The decision was due in large part to the suspension of payments by the gas purchaser. The purchasers initially suspended payment due to Northern's claims of title to the gas. The Pratt County District judge ruled in April 2010 that Northern had no title to the gas, but on June 30, 2010, he ordered the purchasers to hold all payments in suspense pending further order of the court.[9] In the same time frame, Northern obtained FERC authority to condemn the well tracts and it filed the condemnation action. It additionally moved for an injunction in the federal damage case to prevent further production. It is beyond reasonable dispute that these factors caused Val to shut-in its wells despite its desire to continue production.

---

[9] Although Lumen voluntarily suspended payments as of September 2009, Val continued production into the summer of 2010. The state court order prohibiting payments beginning June 30, 2010 and the accompanying state and federal court developments at that time, made it apparent that the suspension order would remain in effect for an extended period while the state case was appealed.

-14-

In light of these events Val's president understood that the suspension of payment was not a short-term measure and that the property was ultimately going to be condemned. A shut-in under these circumstances was not a "voluntary business decision" in the ordinary sense of that phrase.[10]

But whether voluntary or not, the effect of the shut-in is determined by the terms of the leases. Under the habendum clause quoted above, each Val lease was valid for three years and thereafter for as long as oil or gas was produced in paying quantities. Because production ceased in July 2010, the McGuire lease terminated at that time unless some other provision modified the habendum clause and effectively extended the term of the lease. See Pray v. Premier Petroleum, Inc., 233 Kan. 351, 353, 662 P.2d 255 (1983); D. Pierce, Kansas Oil and Gas Handbook § 9.22 ("If the habendum clause requires production of oil or gas to extend the lease, and there are no other lease provisions which extend the lease in the absence of production, failure to obtain and maintain the required production terminates the lease."). Similarly, the Branscom lease terminated in August 2010 unless it was extended by some provision of the lease.

Whether force majeure event occurred. The force majeure clause in each Val lease provided that the lease convenants were subject to "all Federal and State Laws, Executive Orders, Rules or Regulations,"

---

[10] The Huff group argues that because there was no court order in July 2010 that prohibited Val from continuing to produce, Val's decision to shut-in the wells was a voluntary business decision. That's like arguing that closing the air valve on a scuba diver's tank does not bar the diver from continuing to breathe. No operator could continue to produce gas for any appreciable length of time in the face of a court order cutting off all gas payments.

-15-

and "this lease shall not be terminated, in whole or in part, ... for failure to comply therewith, if ... such failure is the result of any such Law, Order, Rule or Regulation." Val contends the leases remained valid under this clause, despite the lack of production or shut-in royalties, while Huff argues that none of the events cited by Val amount to force majeure events (pointing out the clause said nothing about failures resulting from "motions" or "court orders") and, in any case, that those events did not cause Val's failure to pay shut-in royalties and therefore resulted in termination of the leases under the rule of <u>Welsch v. Trivestco Energy Co.</u>, 43 Kan.App.2d 16, 221 P.3d 609 (2010).

The purpose of a force majeure clause generally is "to relieve an oil and gas lessee from the harsh termination of the lease due to circumstances beyond its control that would make performance untenable or impossible." R. Eclavea, 38 Am.Jur.2d Gas and Oil §83 (Westlaw May 2015). <u>See</u> <u>also</u> 2 Summers Oil and Gas § 15:32 (3d ed.) ("In the context of an oil and gas lease, the purpose of a force majeure clause is to excuse the lessee from non-performance of lease obligations when the nonperformance is caused by circumstances beyond the reasonable control of the lessee, or when nonperformance is caused by an event which is unforseeable at the time the parties entered the contract."). Of course, the scope and effect of any force majeure clause depends upon its wording, but courts have construed these clauses in light of their general purpose and have limited them to circumstances beyond the lessee's control that cannot be overcome with due diligence. <u>See e.g.</u>, <u>Edington v. Creek Oil Co.</u>, 690 P.2d 970 (Mont. 1984) (although state commission ordered shut-in, force majeure clause did not save

the lease because the shut-in was required by saltwater seepage within the lessee's control).

Governmental actions, including orders to halt oil and gas production, have been held to constitute force majeure events. <u>See</u> Joan Teshima, <u>Gas and Oil Lease Force Majeure Provisions: Construction and Effect</u>, 46 A.L.R. 4th 976 (<u>citing</u>, <u>inter alia</u>, <u>Frost Nat. Bank v. Matthews</u>, 713 S.W.2d 365 (Tex.App. 1986) (force majeure clause prevented termination when wells were shut-in pursuant to orders of Railroad Commission). The particular force majeure clause at issue here is a fairly common one, <u>see</u> <u>Lightcap v. Mobil Oil Corp.</u>, 221 Kan. 448, 457, 562 P.2d 1 (1977), and the parties presumably intended it to have its commonly understood meaning. Although the few reported cases on this issue have dealt with administrative (as opposed to judicial) orders to halt oil and gas production, courts have characterized this clause as one directed at governmental action generally. <u>See</u> e.g., <u>Fransen v. Conoco, Inc.</u>, 64 F.3d 1481, 1488 (10th Cir. 1995) (noting that the clause excused any failure that was prevented by or that resulted from "any such governmental action."); <u>Watts v. Atlantic Richfield Co.</u>, 115 F.3d 785, 795 (10th Cir. 1997) (construing what the court termed the "governmental regulations clause").

The Val force majeure clause specifically provided that the lease shall not be terminated if the lessee's failure to comply was the result of any federal or state law. It is fair to say that Val's July 2010 shut-in was the result of the state court order suspending gas payments, coming as it did in the wake of FERC's condemnation decision, the filing of the condemnation suit, and Northern's motion

-17-

for an injunction to halt production. Huff contends that because the force majeure clause referred only to <u>executive</u> orders, a judicial order cannot qualify as a force majeure event. But the clause as a whole applies to failures resulting from federal and state "laws" -- in addition to rules, regulations, and executive orders -- and Val's shut-in is reasonably considered "the result of ... [a state] law." The order requiring suspension of gas payments was duly issued by a state court and had the force of state law. It was an intervening act by the state that prevented Val from continuing its ongoing production and thereby extending the lease.

The fact that executive orders but not court orders are specifically mentioned in the force majeure clause does not evince an intent to exclude all court orders from its scope. Executive orders are common in oil and gas production because executive agencies are typically given primary jurisdiction over oil and gas production. The specific mention of executive orders in this context reflects this reality, but does not reasonably imply an intent to exclude all other governmental orders from its scope. In fact, doing so would be contrary to the portion of the clause covering failures from "federal and state laws," which are governmental restraints enacted by legislatures and applied to specific cases by the courts. All of the items in this clause share a common trait: they are all forms of governmental restraint that can prevent a lessee from performing. Executive orders represent one such form; "state laws" represent another. Absent some indication of contrary intent not present here, the "state laws" that can rise to force majeure under this clause would reasonably include not only legislative enactments, but also

-18-

court decrees based on state or federal law. <u>Cf</u>. Restatement (Second) of Contracts § 264, comment. b (a basic assumption of a contract may be upset if performance is made impracticable by having to comply with a government order; for purposes of this rule "[a]ny governmental action is included and the technical distinctions between 'law,' 'regulation,' 'order' and the like are disregarded.")

The state court order requiring suspension of payments on Val's gas sales constituted "state law" within the meaning of this provision. It was beyond Val's control and resulted in Val shutting in its Extension Area wells. Had it not been for the indefinite deprivation of payment ordered by the court, Val would have continued to produce in July of 2010. In sum, the state court order was a force majeure event covered by the clause in the Val leases.

<u>Failure to pay shut-in royalties</u>. Huff contends that even if this is so, Val's failure to pay shut-in royalties when its production ceased was not excused by the force majeure clause, meaning the lease terminated under the habendum clause.[11] <u>Citing</u> <u>Welsch v. Trivestco Energy Co.</u>, 43 Kan.App.2d 16, 221 P.3d 609 (2009), rev. denied (Dec. 7, 2010).

The question of whether the lease terminated for failure to pay shut-in royalties in these circumstances is governed by Kansas law. <u>See</u> <u>Phillips v. Washington Legal Foundation</u>, 524 U.S. 156, 164 (1998) (the existence of a property interest is determined by state law). The

---

[11] Huff argues that any shut-in royalties on the Branscom lease were due at least by one year after the July 2010 shut-in. Doc. 974 at 9. For the reasons discussed infra, the court finds that the Branscom lease (whose primary term did not expire until August 3, 2010) was extended by the force majeure clause and that the failure to pay shut-in royalties did not terminate the lease.

court therefore looks to the final decisions of the Kansas Supreme Court for authority on this question. Absent such a decision -- and there is none on this point -- the court must make an "Erie guess" and determine in its best judgment how the Kansas Supreme Court would resolve the issue. See Cornhusker Cas. Co. v. Skaj, ___F.3d ___, 2015 WL 2348628 (10th Cir. 2015). In doing so, the court may consider state intermediate appellate decisions, decisions of other states, federal decisions, and the general weight and trend of authority. Armijo v. Ex Cam, Inc., 843 F.2d 406, 407 (10th Cir. 1988).

The Welsch decision by the Kansas Court of Appeals is the only Kansas case discussing the interplay between a force majeure and a shut-in royalty clause. In Welsch, the lessee shut-in a gas well after the gas purchaser ceased making payments and declared bankruptcy. The lessee did not pay shut-in royalties. In a subsequent action by the lessor to declare the lease terminated, a district court ruled that the bankruptcy was a force majeure event that prevented termination, and that the lessor was entitled to damages but not termination for the lessee's failure to pay shut-in royalties. The Kansas Court of Appeals reversed, finding among other things that the bankruptcy of the purchaser was not a force majeure event. Welsch, 43 Kan.App.2d at 28. The court went on to say that even if it had been a force majeure event, "the failure to exercise an option to pay shut-in royalties was not due to this purported force majeure event" and therefore was not excused by the force majeure clause,[12] such that the lease expired

---

[12] The force majeure clause in Welsch provided that the lessee "shall not be liable for delays or defaults in its performance of any agreement or covenant hereunder due to force majeure." Welsch, 43 Kan.App.2d at 28.

under the terms of the habendum clause.

Where a state intermediate appellate court has decided a question, a federal court should follow that decision absent convincing evidence that the state's highest court would decide otherwise. <u>Webco Indus., Inc. v. Thermatool Corp.</u>, 278 F.3d 1120, 1132 (10th Cir. 2002) ("[W]here an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that ... is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.")

A close examination of <u>Welsch</u> raises doubts about its application here. To begin with, <u>Welsch</u>'s finding that shut-in royalties were due after a force majeure event was clearly dicta because the bankruptcy of the gas purchaser was held <u>not</u> to be a force majeure event. <u>Welsch</u>, 43 Kan.App.2d at 29 ("we are not convinced the financial issues of a gas purchaser should be considered a force majeure event under this lease."). The <u>Welsch</u> panel rightly noted that the lack of a market due to the purchaser's bankruptcy was a circumstance covered by the shut-in royalty clause, not the force majeure clause. A shut-in royalty clause is designed to allow a lessee to keep a lease in effect when a well is capable of producing but there is no market for the gas, <u>see</u> <u>Levin v. Maw Oil and Gas</u>, 290 Kan. 928, 931, 234 P.3d 805 (2010), which is precisely what the lessee faced in <u>Welsch</u>. By contrast, Val's ability to produce was effectively thwarted by a governmental decree, which was a force majeure event under the Val lease.

To the extent there is any authority or commentary on this

specific point, it generally says that when a force majeure event halts production in the secondary term, the lessee is not required to pay shut-in royalties to keep the lease in effect. See Maralex Resources, Inc. v. Gilbreath, 134 N.M. 308, 318, 76 P.3d 626 (2003) ("If the cessation of production is caused by a force majeure event, then no shut-in royalties are due. [citing Sun Operating Ltd., infra] When production stops because of an event beyond the control of the lessee, both parties bear the burden of the loss of royalties from non-production. [cite omitted] In contrast, when the lessee shuts down operations for market reasons, the shut-in royalty clause applies and the lessee must compensate the lessor for lost production."); Sun Operating Ltd. Partnership v. Holt, 984 S.W.2d 277 (Tex.App.-Amarillo 1998) ("a shut-in royalty clause does not ipso facto take precedence over every other clause which may affect the term of the lease;" by including the phrase "anything in this lease to the contrary notwithstanding" in the force majeure clause, the parties evinced an intent to allow lessee to rely upon that clause to extend the lease); Frost Nat. Bank v. Matthews, 713 S.W.2d 365, 368 (Tex.App.-Texarkana 1986) (where railroad commission ordered shut-in, lease was extended by force majeure; although lessee paid shut-in royalties, such payments were not necessary to extend the lease); Williams & Meyers, Oil & Gas Law §633 (LexisNexis Matthew Bender 2014)("If the force majeure clause is applicable, then the payment of shut-in royalties is not required to keep the lease alive in the secondary term."); 38 Am.Jur.2d Gas and Oil § 84 ("If the cessation of oil and gas production is caused by a force majeure event, then no shut-in royalties are due under the lease.") (citing Miralex, supra).

Unlike the force majeure clause in <u>Welsch</u>, the Val lease provided that "this lease shall not be terminated in whole or in part" if compliance was prevented by law. Additionally, the habendum clause provided that it was "[s]ubject to the provisions herein contained," including, a fortiori, the force majeure clause. Construing these provisions as part of a whole, they evince an intent to extend the lease rather than terminate it so long as production in the secondary term was prevented by a force majeure event. <u>Cf</u>. <u>Central Nat. Res., Inc. v. Davis Operating Co.</u>, 288 Kan. 234, 244, 201 P.3d 680 (2009) (intent is gathered from examination of instrument as a whole). <u>See also</u> <u>Beardslee v. Inflection Energy, LLC</u>, 25 N.Y.3d 150, 2015 WL 1423473, *5 (N.Y. 2015) (force majeure clause would excuse failure to produce in secondary term of lease). The state court order preventing payment was a force majeure event that effectively prevented Val from continuing production. Under these circumstances, the Kansas Supreme Court would likely find that termination is contrary to the terms of the lease and that payment of shut-in royalties was not required to keep the lease in effect.

It is clear that Val would have continued to produce gas in and after July 2010 had it not been prevented from doing so by governmental decree.  Considering the particular terms of the Val leases, the court is convinced that the Kansas Supreme Court would not apply <u>Welsch</u>'s dicta in these circumstances, but would instead find that a force majeure event temporarily excused the absence of production and prevented termination of the Val leases up to the date of taking. This view is consistent with authority from other gas-producing jurisdictions, with the opinions of leading commentators,

-23-

and with the language of the Val leases. See <u>Peak ex rel. Peak v.</u> <u>Central Tank Coatings, Inc.</u>, ___ Fed.Appx. ___, 2015 WL 1069399, 3 (10th Cir. 2015) (when no controlling state decision exists, it is appropriate to look to appellate decisions in other states with similar legal principles). As noted by Williams & Meyers, Oil and Gas Law §683 (LexisNexis Matthew Bender 2014) [footnotes omitted]:

> Arguably the force majeure clause is inconsistent with clauses of limitation which operate automatically. However, a number of cases expressly or implicitly hold that a clause of limitation may be modified by a force majeure clause. We believe that the latter position is correct. In effect, the limitation provisions of the lease provide for automatic termination of the lease under certain circumstances, e.g., upon failure of production during the secondary term. The force majeure clause may properly be read as defining the event upon which the lease will terminate, e.g., "upon failure of production during the secondary term unless such failure was due to force majeure." Thus, the force majeure clause will modify not only the habendum clause, but [also] a shut-in gas royalty clause should the force majeure event cause a cessation of production of natural gas in the secondary term.

The terms of Val's lease excused Val's cessation of production after the state court ordered suspension of payment for gas sales. With the lease's production excused by this ongoing force majeure event, Val was not required to pay shut-in royalties to hold the lease.[13]

Lastly, Northern contends that even if the McGuire lease was valid on the date of taking, Val's interest in the lease is not

---

[13] In view of this conclusion the court need not address the parties' remaining arguments, including Val's contention that the condemnation action suspended Val's lease obligations because it constituted an attack on the title to the property. Doc. 990 at 8. The court notes that under the Val leases, the lessor warranted and agreed to defend the title to the lands described in the lease.

-24-

compensable. Northern points out that under Kansas law, an oil and gas lease is classified as personal property, while oil and gas in the ground are considered part of the realty and thus belong to the landowner. Northern argues that as the fee simple owner of all oil and gas remaining in the ground on this tract, it is entitled to compensation for all of the remaining gas, with Val having no standing or ownership claim to that property. Doc. 970 at 11-12.

Regardless of the fact that Kansas characterizes Val's ownership as personal property, Northern took that property under its condemnation authority and must pay just compensation for it. Northern cites no authority for its argument that condemnation of a tract covered by an oil and gas lease entitles the lessee to no compensation, and the court finds its argument unpersuasive. Northern may own the minerals underlying the tract, but it owned them subject to a valid oil and gas lease that granted Val a right to produce the minerals and to share in the proceeds from their sale. Val is now entitled to receive just compensation reflecting the value of the property taken from it. Cf. 26 Am.Jur.2d Eminent Domain § 318 ("In the absence of an agreement, the measure of damages for a leasehold interest taken under eminent domain is generally the fair market value of the leasehold or unexpired term of the lease...."). That value takes into account the lease rights assigned to Val by the former owner of the property, notwithstanding Northern's title to the minerals under the property.

For the foregoing reasons, Val's motion for partial summary judgment (Doc. 950) as to the validity of its oil and gas leases as to tracts 2312610, 3302610, and 4252611 is granted. The court finds

that Val's oil and gas leases as to these tracts were valid in the Viola and Simpson formations as of the date of taking. The court further finds that Val is entitled to a share of the just compensation owing for the taking of these tracts.

### Pratt Well Service Group (Doc. 952)

Pratt Well Service (PWS) group[14] moves for summary judgment confirming the validity of the Schwertfeger lease (covering Tract 1232611) as of the date of taking. It argues that the lease remained valid under the habendum clause, which provided that the lease would continue in effect after the primary term as long as oil or gas "is or can be produced." In response, the Huff group argues that the lease's shut-in royalty clause effectively limited that provision and made payment of shut-in royalties a condition for perpetuation of the lease. The Huff group contends the lease terminated because PWS failed to pay shut-in royalties.

Uncontroverted facts. PWS was the operator of the Schwertfeger lease. From March 2009 to June 2010, the Schwertfeger 1-23 well on this lease produced both oil and gas in paying quantities.

In June 2010, PWS's gas purchaser stated that it would no longer pay for gas produced from the Schwertfeger lease. It did so because of developments in litigation concerning the Extension Area, including Northern's claims that it owned the gas being produced and FERC's authorization for Northern to condemn the Viola formation in the Extension Area. As a result, PWS decided to halt production from the

---

[14] The group consists of Pratt Well Service, Inc., Iuka/Carmi Development, LLC, and I/C Investment Pool. Doc. 953 at 1.

Schwertfeger lease pending resolution of the litigation.

Had it not been for the condemnation and the litigation surrounding the Extension Area, PWS would have continued to produce oil and gas in paying quantities from the Schwertfeger lease. PWS's president, Kenneth Gates, planned to return the Schwertfeger 1-23 to production if the judicial uncertainty was removed.

The primary term of the Schwertfeger lease expired on July 13, 2009.

The Schwertfeger lease included the following provisions:

> [Habendum clause] This lease shall remain in force for a term of <u>three (3)</u> years (called "primary term") and as long thereafter as oil [or] gas ... is or can be produced.

> [Shut-in royalty clause] [part of a gas royalty clause[15] stating that the lessee shall pay the lessor a one-eighth royalty on proceeds from the sale of gas] If such gas is not sold by the lessee, lessee may pay or tender annually at or before the end of each yearly period during which such gas is not sold, as a shut-in royalty, ... an amount equal to one dollar per net mineral acre, and while said shut in royalty is so paid or tendered, it will be considered under all provisions of this lease that gas is being produced in paying quantities. The first yearly period during which such gas is not sold shall begin on the date the first well is completed for production of gas.

> [Cessation of production clause] If after the expiration of the primary term, production of oil or gas should cease from any cause, this lease shall not terminate if lessee commences additional drilling or reworking operations within one hundred-twenty (120) days thereafter, or if at the expiration of the primary term, oil or gas is not being produced on said land, but lessee is then engaged in drilling or reworking operations thereon, then in either event, this

---

[15] The Schwertfeger lease contained a separate royalty clause for oil produced from the premises.

-27-

lease shall remain in force so long as operations are prosecuted either on the same well or any other well thereafter commenced, with no cessation of more than one hundred twenty (120) consecutive days, and if they result in production of oil or gas, this lease shall remain in effect so long thereafter as there is production of oil or gas under any provisions of this lease.

Whether the Schwertfeger lease terminated prior to the date of taking. This court previously construed an identical habendum clause that extended a lease for as long as oil or gas "is or can be produced," finding this language "can only reasonably be interpreted to require actual production or the capability to produce...." Hunthauser Holdings, LLC v. Loesch, 2003 WL 21981969, *5 (D. Kan., May 1, 2003), reconsideration denied, 2003 WL 21981961 (D. Kan., June 10, 2003). The court relied in part on Anadarko Petroleum Corp. v. Thompson, 94 S.W.3d 550 (Tex. 2002), which similarly found that this type of clause will extend a lease beyond the primary term if a well is capable of production in paying quantities, even if the well is not actually producing.

Because the Schwertfeger 1-23 was capable of producing oil and gas in paying quantities when it was shut-in, and thereafter until the date of taking, the Schwertfeger lease remained valid on the date of taking unless some other provision effectively limited the habendum clause or otherwise caused the lease to terminate.

The Huff group argues that the shut-in royalty clause did so. It first notes that Anadarko, supra, distinguished a similar New Mexico case (Greer v. Salmon, 82 N.M. 245, 479 P.2d 294 (1970)) on the grounds that the Greer lease had a shut-in royalty clause. Anadarko, 94 S.W.3d at 556-57. Huff also suggests the Kansas Supreme Court would

not follow Anadarko, pointing out that in Levin v. Maw Oil & Gas, LLC, 290 Kan. 928, 948, 234 P.3d 805 (2010), the court declined to adopt Anadarko's understanding of when a well is "capable of production." Huff argues that the shut-in royalty clause in the Schwertfeger lease modified the habendum clause and established a condition that had to be satisfied to perpetuate the lease. To read it otherwise, Huff says, would be to allow the habendum clause to trump the shut-in royalty clause and render the latter meaningless, because it would never be needed to save the lease. Doc. 972 at 10.

As PWS points out, however, the Schwertfeger 1-23 was capable of producing oil as well as gas in paying quantities, and the capability to produce either one extended the lease under the habendum clause. The shut-in royalty clause applied only insofar as there was a failure to produce gas. Even assuming it was intended as a limitation on the habendum clause, then, the shut-in royalty clause did not terminate the lease, because the Schwertfeger 1-23 was still capable of producing oil. There is no inconsistency with the shut-in royalty clause in this instance, because that clause did not apply to production of oil. Moreover, the cessation of production clause can likewise be harmonized with the habendum clause, as Anadarko pointed out. Any apparent inconsistency between extending the lease when oil or gas "can be produced" [the habendum clause] and termination of the lease if actual production is not timely restored after a halt in production [the cessation clause], is resolved if the cessation clause is understood to apply only when a producing well holding the lease ceases to be capable of producing oil or gas in paying quantities. Anadarko, 94 S.W. 3d at 556.

Provisions in an oil and gas lease, like other contracts, must be construed together and harmonized if possible. <u>See</u> <u>Stady v. Texas Co.</u>, 150 Kan. 420, Syl.¶ 1, 94 P.2d 322 (1939). The construction outlined above reasonably harmonizes the habendum, shut-in royalty, and cessation of production clauses of the Schwertfeger lease. The court concludes that the lease was capable of producing oil in paying quantities from its June 2010 shut-in through the date of taking, and that the lease remained valid for that reason under the habendum clause. Neither the shut-in royalty clause nor the cessation clause caused the lease to terminate in these circumstances. The PWS group is therefore entitled to a share of the just compensation payable for the tract (no. 1232611) covered by the Schwertfeger lease.

<u>Nash Oil & Gas leases (Doc. 954)</u>

Nash Oil & Gas held the following five leases in the Extension Area: Holland, Trinkle, JC1, CRC, and Staab. Nash argues that the leases remained valid until the date of taking for several reasons. First, it argues that gas was "produced" within the meaning of the leases' habendum clauses by leaving the gas in the ground pending condemnation, as found by <u>Mich. Wis. Pipeline Co. v. Mich. Nat'l. Bank</u>, 324 N.W.2d 541, 544 (Mich.Ct.App. 1982). With respect to the Holland lease, whose habendum clause said the lease was extended so long as gas is "or can be produced," Nash further argues that the lease remained valid because the Holland well was capable of producing at all times. Second, Nash argues that both the state court order of June 30, 2010 and the federal court injunction entered by Judge Brown in December 2010 were force majeure events that prevented the leases

from expiring. Finally, Nash argues that finding the leases invalid would constitute an uncompensated taking of its property in violation of the Fifth Amendment.

The Huff group contends the three leases on tracts owned by its members (the Holland, Trinkle and JC1 leases) terminated. As it did previously, Huff argues there was no force majeure event preventing the operator from continuing to produce or from paying shut-in royalties. Sonja Sue Staab, the owner of the tracts covered by the CRC and Staab leases, similarly argues there was no force majeure event preventing Nash from continuing to produce in 2010 (pointing out that L.D. Drilling continued to produce until Judge Brown's injunction took effect in February of 2011), and that even after the injunction took effect nothing prevented Nash from exploring zones other than the Viola and Simpson.

Uncontroverted facts.

Nash held an interest in the following mineral leases: the Holland lease (tract 3262611), on which it operated the Holland 1-26 and Holland 2-26 wells; the Trinkle lease (tract 2362611) on which it operated the Trinkle-1 well; the JC1 lease (tract 4272611), on which it operated the JC1 well; the CRC lease (tract 2012711), on which it operated the CRC1 and CRC2 wells; and the Staab lease (tract 5352611), on which it operated the Staab 1 well.

All of the foregoing Nash wells were shut-in in July 2010, except for the CRC wells, which were not shut-in until November 2010. All of the wells were capable of producing gas in paying quantities when they were shut-in. All of the wells were shut-in as a result of developments in litigation, including FERC's June 2, 2010 certificate

-31-

authorizing Northern to condemn the property, Northern's motion for an injunction to halt production, Northern's claim of title to the gas, and the Pratt County District Court order of June 30, 2010 requiring purchasers to suspend all payments for gas from the wells.[16]

The intent of Nash Oil & Gas's president was to resume production from Nash's wells if the federal court denied Northern's request for an injunction and the state court restored ONEOK's ability to pay for natural gas.

Nash tendered shut-in royalties to the lessors on each of the foregoing leases on July 12, 2013, and on November 4, 2014. The lessor on the CRC and Staab leases rejected the tendered shut-in royalties.

Holland lease.

The Holland lease contained the following provisions:

> [Habendum clause] This lease shall remain in force for a term of Three (3) years and as long thereafter oil [or] gas ... is or can be produced.

> [Shut-in royalty clause] [part of a royalty clause requiring lessee to pay one-eighth of the value of gas used or sold] [W]here gas only is found and where such gas is not sold or used, lessee shall pay or tender annually at the end of each yearly period during which such gas is not sold or used, as royalty, an amount equal to the delay rental provided in paragraph 5 hereof, and while said royalty is so paid or tendered this lease shall be held as a producing lease under

---

[16] In May 2009, Northern filed a motion for a preliminary injunction in the federal court "damage case" to require Nash Oil to pay into court or place in escrow any proceeds from the sale of gas from four of its wells (CRC #1, CRC #2, Trinkle #1, and Staab #1). (Doc. 60, 08-1405). The court denied the motion on December 22, 2009, finding that Northern had failed to show irreparable harm if an injunction was not issued. (Doc. 166, 08-1405). The court noted that counsel had represented that as a result of Northern's case in state court, no runs from the wells would be paid to Nash pending full resolution of all issues. (Doc. 166 at 12-13).

> [the habendum clause]....
>
> [Force majeure clause] All provisions hereof, express or implied, shall be subject to all federal and state laws and the orders, rules, or regulations (and interpretations thereof) of all governmental agencies administering the same, and this lease shall not be in any way terminated wholly or partially nor shall lessee be liable in damages for failure to comply with any of the express or implied provisions hereof if such failure accords with any such laws, orders, rules or regulations (or interpretations thereof)....

<u>Trinkle Lease</u>.

The Trinkle lease contained the following provisions:

> [Habendum clause] This lease shall remain in force for a term of Three (3) years from this date (called "primary term") and as long thereafter as ... oil [or] gas ... is produced from said land....
>
> [Shut-in royalty clause] [part of royalty clause requiring payment of one-eighth royalty for gas sold or used] Where gas from a well producing gas only is not sold or used, lessee may pay or tender as royalty One Dollar ($1.00) per year per net mineral acre retained hereunder, and if such payment or tender is made it will be considered that gas is being produced within the meaning of the [habendum clause].
>
> [Force majeure] All express or implied covenants of this lease shall be subject to all Federal and State Law, Executive Orders, Rules or Regulation, and this lease shall not be terminate [sic] in whole or in part, nor leassee [sic] held liable in damages, for failure to comply therewith, if compliance is prevented by, or if such failure is the result of, any Law, Order, Rule or Regulation.

<u>JC1 Lease, CRC Lease and Staab Lease</u>.

The JC1, CRC, and Staab leases each contained provisions essentially identical to the above provisions of the Trinkle lease.

<u>Whether Nash's leases terminated prior to the date of taking</u>.

The court first rejects out of hand two of Nash's arguments. Nash

-33-

argues the court should apply the reasoning of <u>Mich. Wis. Pipeline Co.</u> <u>v. Mich. Nat. Bank</u>, 118 Mich.App. 74, 324 N.W.2d 541 (1982) and find that gas was still being "produced" despite the fact that the wells were shut-in. The plain meaning of "produced" cannot support such a finding. Leaving gas in the ground is the opposite of producing it.[17] Nash also argues that declaring its leases to be terminated would be an unconstitutional taking of its property. But if Nash's leasehold interests expired or terminated by reason of the terms of the parties' lease agreements -- terms that were agreed to by Nash -- then Nash could claim no property rights with respect to the leases.

Nevertheless, for the same reasons expressed with respect to the Val leases, the court concludes that the Nash leases remained valid up to the date of taking by virtue of a force majeure event. The state court order of June 30, 2010, which suspended all payments for sales of gas from Nash's wells, was an application of state law that resulted in Nash's inability to continue producing gas. That order, and the circumstances under which it was entered, effectively strangled Nash's ability to produce. It is true, as the Huff group

---

[17] The <u>Michigan-Wisconsin Pipeline</u> case is one of the few cases where a shut-in occurred in the face of a condemnation action. Although the court cannot accept the <u>Michigan-Wisconsin Pipeline</u> construction of the habendum clause, that case highlights the fact that condemnation is an extraordinary governmental act, and as such it may constitute a force majeure event. For example in <u>National Fuel Gas Supply Corp. v. Cunningham Nat. Gas Corp.</u>, 548 N.Y.S.2d 588, 600 (N.Y. Sup. 1989), the court concluded that condemnation of a leasehold was a "legal proceeding" that triggered the force majeure clause in a gas purchase agreement. The instant case is brought under the Natural Gas Act and is therefore application of a "Federal Law" within the meaning of Nash's force majeure clause. As <u>National Fuel</u> pointed out, it is not always easy to say when a condemnation occurs. The court need not decide that issue, however, because the state court order of June 30, 2010, was an application of state law that triggered the Nash force majeure clause.

argues, that the order was not an absolute bar to continued production -- as illustrated by Nash's continued production of the CRC wells until November of 2010. (By contrast, Judge Brown's injunction requiring the wells to be shut-in by February 21, 2011, was an absolute bar.). But nothing in the Nash force majeure clauses or in the law of force majeure generally requires absolute impossibility. Cf. Restatement (Second) of Contracts §261, comment d ("Although the rule stated in this Section is sometimes phrased in terms of 'impossibility,' it has long been recognized that it may operate to discharge a party's duty even though the event has not made performance absolutely impossible. This Section, therefore, uses 'impracticable,' the term employed by Uniform Commercial Code § 2-615(a), to describe the required extent of the impediment to performance. Performance may be impracticable because extreme and unreasonable difficulty, expense, injury, or loss to one of the parties will be involved.").

The court order prohibiting payment for gas sales effectively rendered Nash's production impracticable, which was sufficient to invoke the force majeure clauses. Those clauses applied to any failure that "accords with" state law (the Trinkle lease) or that "is the result of" such state law (the other Nash leases). Cf. Restatement (Second) of Contracts § 264, comment a ("It is 'a basic assumption on which the contract was made' that the law will not directly intervene to make performance impracticable when it is due.").[18] Under the force

_____

[18] The first illustration in this section of the Restatement provides: "1. A sells land to B, who, as part of the contract, promises that the land shall not be built upon. The land is taken by eminent domain under statutory authority and a building is built on

majeure clauses, Nash's failure to produce beginning in July 2010 was excused because that failure resulted from a state court order foreclosing payment.

The court further finds, again for the reasons previously expressed, that Nash was not required to pay shut-in royalties to hold the leases. Under the force majeure clause, Nash's failure to produce was excused because it resulted from a legal obstacle interposed by state law. The habendum clause requiring production to extend the lease was expressly made subject to the other clauses in the lease, including the force majeure clause. The production requirement of the habendum clause was excused and, by agreement of the parties, was not to be a basis for termination of the lease in whole or in part. Requiring Nash to pay shut-in royalties to keep the lease alive in these circumstances would hold the failure to produce against Nash and would essentially nullify the intent and benefit of the force majeure clause. See supra Frost Nat. Bank, 713 S.W.2d at 368 (lease was extended by force majeure where railroad commission ordered shut-in; payment of shut-in royalties was not required to extend the lease); Williams & Meyers, Oil & Gas Law §633 ("If the force majeure clause is applicable, then the payment of shut-in royalties is not required to keep the lease alive in the secondary term.").

The fact that Nash remained free to explore other zones (besides the Viola and Simpson) does not alter this conclusion. All of the force majeure clauses at issue state that if a force majeure event occurs, the lease shall not be terminated "in whole or in part" or

---

it. B's duty not to build on the land is discharged, and B is not liable to A for breach of contract."

shall not be terminated "wholly or partially." None of the parties have provided any authority dealing with a factual situation where a force majeure event affects only a part of a lease, e.g., a specific zone or zones, as is the situation in this case. The court has failed to find any such authority. However, the fact that all of the force majeure clauses in all of the leases in this case specifically state that a force majeure event will prevent the termination of a part of a lease can only mean that the part of the lease affected by a force majeure event will not terminate regardless of the circumstances pertaining to the other parts of the lease. Huff's argument that a lessee is nevertheless obligated in such circumstances to explore other zones to perpetuate the lease simply disregards this language. Huff focuses on other zones but essentially ignores the fact that the part of the lease covering the Viola and Simpson formations necessarily remains in force due to a force majeure event. Such an interpretation wholly disregards the "in part" language of the force majeure clauses. And all the court need determine here is whether the leases remained in effect as to the Viola and Simpson formations, since those are the formations to which the state court order, and later the federal court injunction, apply and which are the subject of this condemnation action. The court need not deal with the question of the other zones covered by the leases remain in effect as a result of the force majeure event or whether the lessees must take further actions to perpetuate the leases as to those other zones. That issue is for another day and another court to decide.

The Nash lease, like the other disputed leases, was not to be terminated in whole or in part if the operator's failure to produce

was the result of a force majeure event, which it clearly was. The production requirement of the habendum clause was thereby excused and the lease was extended by the ongoing force majeure. Under this language, Nash's lease clearly remained valid at least with respect to the Viola and Simpson formations.

In sum, the court finds that Nash's oil and gas leases as to tract 3262611 (the Holland lease), tract 2362611 (the Trinkle lease), tract 4272611 (the JC1 lease), tract 2012711 (the CRC lease), and tract 5352611 (the Staab lease) remained valid in the Viola and Simpson formations until the date of taking, and that Nash Oil & Gas is entitled to a share of the just compensation owed for the taking of those tracts.

### L.D. Drilling, Inc. Leases (Doc. 956)

There is a dispute as to the validity of five area leases held by L.D. Drilling, Inc. In arguing for the validity of these leases, L.D. Drilling relies upon now-familiar force majeure arguments. It also contends there are various equitable reasons why it should share in the compensation for the tracts. The Huff group denies the availability of any equity-based recovery, disputes the application of force majeure, and argues that the leases terminated pursuant to the terms of the shut-in royalty clauses.

Uncontroverted facts.

L.D. Drilling held the following leases (among others) in the Extension Area: Geesling (tract 1262611); Mezger (tract 4262611); Zink 1 (tract 1252611); Zink A (tract 1252611; and Zink B (tract 4242611).

The leases contain the following provisions:

-38-

Type 1 Habendum Clause (Zink leases)

This lease shall remain in force for a term of
three (3) years (called "primary term") and as
long thereafter as oil ... [or] gas ... is or can
be produced.

Type 2 Habendum Clause (Geesling & Mezger)

Subject to the provisions herein contained, this
lease shall remain in force for a term of two (2)
years from this date (called "primary term") and
as long thereafter as oil ... [or] gas... is
produced....

Type 1 Force Majeure Clause (Zink leases)

All provisions hereof, express or implied, shall
be subject to all federal and state laws and the
orders, rules, or regulations (and
interpretations thereof) of all governmental
agencies administering the same, and this lease
shall not be in any way terminated wholly or
partially nor shall the lessee be liable in
damages for failure to comply with any of the
express or implied provisions hereof if such
failure accords with any such laws, orders, rules
or regulations (or interpretations thereof). If
lessee should be prevented during the last six
months of the primary term hereof from drilling
a well hereunder by the order of any constituted
authority having jurisdiction thereover, the
primary term of this lease shall continue until
six months after said order is suspended.

Type 2 Force Majeure Clause (Geesling & Mezger)

All express or implied covenants of this lease
shall be subject to all Federal and State Laws,
Executive Orders, Rules or Regulations, and this
lease shall not be terminated, in whole or in
part, nor lessee held liable in damages, for
failure to comply therewith, if compliance is
prevented by, or if such failure is the result
of, any such Law, Order, Rule or Regulation.

Type 1 Shut-In Royalty Clause (Zink leases)

If such gas is not sold by the lessee, lessee may
pay or tender annually at or before the end of
each yearly period during which such gas is not
sold, as a shut-in royalty, whether one or more
wells, an amount equal to one dollar per net

-39-

mineral acre, and while said shut-in royalty is
so paid or tendered, it will be considered under
all provisions of this lease that such gas is
being produced in paying quantities. The first
yearly period during which such gas is not sold
shall begin on the date the first well is
completed for production of gas.
. . .
[Para. 17 of Addendum] Notwithstanding anything
in this lease form to the contrary, the shut-in
gas well royalty clause shall not have the effect
of extending the term of this lease for a period
in excess of three (3) years after the expiration
of the primary term.

Type 2 Shut-in Royalty Clause (Geesling & Mezger)

Where gas from a well producing gas only is not
sold or used, lessee may pay or tender as royalty
One Dollar ($1.00) per year per net mineral acre
retained hereunder, and if such payment or tender
is made it will be considered that gas is being
produced within the meaning of the [habendum
clause].
. . .
[Para. 13 of Addendum] Notwithstanding anything
herein to the contrary, no gas well may be held
by the payment of shut-in royalties for more than
three (3) years past the expiration date of this
lease, or past the completion of such shut in gas
well, whichever first occurs.

In December 2008, Northern sued L.D. Drilling and others in this
court (Case No. 08-1405), claiming nuisance (among other things)
arising from L.D.'s production of migrating storage gas. In December
2009, Northern filed a state conversion claim in Pratt County District
Court against ONEOK and other gas purchasers; the purchasers in turn
asserted indemnity claims against L.D. Drilling and other producers.
Although the state court granted summary judgment to the producers in
April 2010, on June 30, 2010 it ordered the purchasers to hold all gas
payments in suspense pending further court order, indicating that this
would preserve the status quo pending an appeal of the court's ruling.

On December 22, 2010, Judge Brown granted Northern's motion for

injunction in Case No. 08-1405, requiring the Extension Area producers to cease producing gas from their wells in the Viola/Simpson formations by February 21, 2011. On February 24, 2011, the Tenth Circuit Court of Appeals lifted a temporary stay of the order, meaning the injunction took effect on February 24, 2011. L.D. Drilling ceased production from its Extension Area wells on February 25, 2011, because it was legally required to do so. Had it not been for the injunction, L.D. Drilling would have continued to produce gas from these wells until the date of taking. The injunction did not expressly preclude L.D. Drilling from exploring or producing from other formations in the Extension Area.

The primary terms of the relevant L.D. leases all ended on or before April 30, 2006. The relevant L.D. wells (Geesling 1, Mezger 1&2, Zink 1, Zink A, and Zink B) were shut-in on February 25, 2011. L.D. Drilling tendered shut-in royalty payments on January 31, 2012 for all of the foregoing wells except the Zink A.

L.D. Drilling recompleted the Zink A well in the Lansing-Kansas City Swope formation in September 2011 and began producing oil from that formation. L.D. Drilling has not tendered a shut-in royalty payment under the Zink A lease.

Each of the Zink leases contained the following cessation of production clause:

> If after the expiration of the primary term, production of oil or gas should cease from any cause this lease shall not terminate if lessee commences additional drilling or reworking operations within one hundred twenty (120) days thereafter; or if at the expiration of the primary term oil or gas is not being produced on said land but lessee is then engaged in drilling or reworking operations thereon, then in either

-41-

> event, this lease shall remain in force so long
> as operations are prosecuted on the same well or
> any other well thereafter commenced with no
> cessation of more than one hundred twenty (120)
> consecutive days, and if they result in
> production of oil or gas, this lease shall remain
> in effect so long thereafter as there is
> production of oil or gas under any provision of
> this lease.

Whether L.D. Drilling's leases terminated prior to the date of taking. The court need not address L.D. Drilling's equity-based arguments because, for the reasons set forth below, it finds that the leases remained valid until the date of taking pursuant to their force majeure clauses. It bears pointing out, however, that to the extent the court retains any equitable discretion to determine the effects of its own injunctions (see L.D. Drilling argument, Doc. 957 at 10), that issue would merit serious consideration here were the leases not preserved under force majeure. The shut-in injunction entered by Judge Brown was clearly intended to freeze the status quo among the parties, not to alter their property rights. See Northern Nat. Gas Co. v. L.D. Drilling, Inc., 759 F.Supp.2d 1282, 1302 (D. Kan. 2010) ("[t]he court notes that any harm to the defendants from an injunction should be lessened by the remedy available in the condemnation action. In the condemnation, Northern will have to compensate the defendants for the taking of any of defendants' property, including any taking of the right to produce native gas or any other gas to which the defendants or their lessors hold title. In this limited sense, the status quo would actually be maintained by an injunction, because it may help to reduce current migration and 'freeze' the parties' respective rights to the gas currently found in the Expansion Area."). Using the injunction and the related condemnation as grounds for terminating the

-42-

producers' rights would raise substantial concerns.[19]

The Huff group again disputes the application of the force majeure clauses to a court order, but for reasons previously indicated the court finds that Judge Brown's preliminary injunction order halting production falls within the ambit of "Federal and State Laws," and that L.D. Drilling's failure to produce was the result of (and accorded with) "any such Law, Order, Rule or Regulation." Simply put, this was a forced halt in production required by governmental order and fell squarely within the scope of the force majeure clauses.

The causation element of the force majeure clauses was satisfied as well. The injunction prevented L.D. Drilling from continuing its production out of the Viola/Simpson formations. The force majeure clause provided that the lease was not to be terminated, in whole in part, for that failure. Huff's argument that the leases nevertheless terminated because L.D. failed to produce from other zones ignores that fact. It would nullify the effect of the force majeure clause with respect to L.D. Drilling's Viola/Simpson production. As the court noted previously, it need not determine here whether the leases terminated (or could terminate) with respect to any other zones. As far as the Viola/Simpson is concerned -- the only zone the court need address -- the force majeure clauses provided that the leases were not

---

[19] A fundamental premise underlying the valuation of the condemned tracts was that some tracts had producing Viola wells as of the date of taking. That premise took account of the fact that ongoing production had been interrupted by court intervention and by the condemnation. Absent that premise, the value of the well tracts at the date of taking would have been significantly reduced. Additionally, the same premise was a factor underlying the conclusion that the value of recoverable gas in the Extension Area should be attributed to tracts with producing Viola wells.

to be terminated for a failure to produce caused by a force majeure event.

Because the federal court injunction constituted a force majeure event under these leases, production under the habendum clause was excused and the leases remained valid during the period of force majeure. Payment of shut-in royalties was not required to extend the lease in these circumstances. See supra at Pp. 19-24. The three-year time limit on holding a lease under shut-in royalties was likewise inapplicable because the leases were held by force majeure. Finally, the cessation of production clause must also be construed in light of the force majeure clause. Although the former refers to a cessation of production "from any cause," its application must be understood to except a halt in production caused by a force majeure event -- an event for which the lease "shall not be terminated," lest this language of the force majeure clause be rendered a nullity. Under the circumstances, the court concludes that L.D. Drilling's leases remained valid in the Viola and Simpson formations on the date of taking.

In view of this finding, the court need not determine what effect the language of the Zink leases' habendum clause (extending the lease as long as oil or gas "is or can be produced") had on the validity of these leases.

**IV. Northern's Motion to Reallocate Fees and Expenses (Doc. 959)**.

In recommending the appointment of a commission in this case, Judge Bostwick noted Northern's acknowledgment that it expected to pay the "lion's share" of the commission's costs. Doc. 254 at 16. When the

court subsequently appointed the commission, it adopted the following standard for payment of the commission's fees and expenses: "Such compensation shall be paid by Northern Natural Gas Company, except that a portion may be payable by a defendant if Northern establishes that the defendant has unreasonably caused the commissioners to expend unnecessary time." Doc. 641 at 3.[20] See also Guardian Pipeline, LLC v. 295.49 Acres of Land, 2008 WL 2482005 (E.D. Wis. 2008) (standards for payment of special masters in Rule 53(g) would be applied since Rule 71.1 was silent on the issue).

Northern subsequently paid commission fees and expenses in the amount of $211,996.31 and additional expenses (including real-time reporting and transcript costs) of $53,728.80. Northern now seeks to recoup some unspecified portion of these payments, arguing defendants unreasonably and unnecessarily caused the commission to spend time considering testimony from Rod Anderson, a geologist who testified for defendants, and from William Henry, who gave opinions for landowners concerning storage lease values.

It is fair to say that the commission offered a blistering assessment of Anderson's testimony. Doc. 888 at 29-34 (finding that Anderson's analysis was conducted to reach a predetermined result; his map was "unworthy of belief, and any analysis based on that map is inexorably tainted."). The commission also rejected William Henry's

---

[20] Defendants contend the court has no authority to make them pay such costs because Rule 71.1(l) provides that costs are not subject to Rule 54(d). The court's disposition makes it unnecessary to decide that issue, but the court notes that even if Rule 71.1 does not authorize it, other sources could justify reallocation of costs for unreasonably causing delay and expense in court proceedings, including Rule 11, 28 U.S.C. § 1927, and the court's inherent authority.

opinions concerning comparable gas storage leases. Doc. 888 at 65-67. But the court rejects Northern's premise that the presentation of these witnesses unreasonably wasted the commission's time.[21] This case appears to be unique in terms of the number of variables affecting the taking and the determination of just compensation. The court cannot fault defendants for their efforts to establish the value of the property taken from them by Northern, including the volume of gas left within the Extension Area on the date of taking. It is clear that the case required a series of estimates or educated guesses by experts, as the commission itself acknowledged:

> [W]e feel it appropriate to note that the evidence overwhelmingly showed, and the experience of several of the commissioners (three of whom have petroleum engineering backgrounds) confirmed, that evaluation of the physical phenomena associated with the underground migration of fluids in hydrocarbon reservoirs is far from an exact science. Instead, it is often an exercise in trial and error in which seemingly reasonable approximations are initially made based on limited, even scant, data, and then revised, or discarded altogether as additional wells are drilled and new data is collected that invariably conflicts to some degree with prior models and assumptions. Out of this inherently iterative process, the parties in this case have molded their respective theories and models. We have little doubt that all of them are wrong, just as any theory that attempts to describe the intricate details of thousands upon thousands of acres of land located thousands of feet below the surface of the earth, based on a few dozen penetration points that are themselves less than one foot in diameter, will invariably be wrong in the sense of technical precision. Rather, our role in this regard was to determine which of the

---

[21] Northern also argues that defendants wasted the commission's time with a portion of the testimony of J.P. Dick. (Doc. 959 at 5-6). However, Northern fails to mention that the commission found Dick's analysis was useful in determining the recoverable reserves associated with individual well tracts. Doc. 888 at 57-59.

> theories was the most accurate based on how well
> it explained and comported with all the available
> evidence.

Doc. 888 at 9-10.

The use of Anderson and Henry's testimony to attempt to fill these knowledge gaps and provide a basis for valuation was not beyond the pale, even if they were rejected (sometimes emphatically) by the commission. It also bears pointing out that the commission similarly rejected various theories offered by Northern, including its assertion that well tracts should be valued without considering pressure support from the Cunningham Field, something the commission considered "completely divorced from the physical realities in and around the field" and "a fiction that we find unworkable and inappropriate." Doc. 888 at 54. The fact is that all sides in this case faced extremely difficult hurdles in terms of gathering and presenting proof.

Northern has not shown that defendants unreasonably caused the commissioners to expend unnecessary time. Under the circumstances, it is appropriate that Northern as the condemnor should bear the costs associated with the condemnation proceeding. Northern's motion to reallocate costs and fees is denied.

## V. **Various Defendants' Motions for Attorneys' Fees (Docs. 961, 962, 964, 966)**.

Several defendants contend they are entitled to an award of attorneys' fees, citing as authority K.S.A. § 55-1210(c)(3) and K.S.A. § 66-176. These arguments are unavailing.

The Fifth Amendment forbids the taking of private property for public use without "just compensation." The compensation owed under

this provision is the monetary equivalent of the property taken; it does not take into account the benefits or detriments to the owner from the taking. See Monongahela Nav. Co. v. United States, 148 U.S. 312, 326 (1893). Indirect costs to the property owner caused by the taking are generally not part of the just compensation to which he is constitutionally entitled. United States v. Bodcaw Co., 440 U.S. 202, 203 (1979). "Thus, [a]ttorneys' fees and expenses are not embraced within just compensation...." Bodcaw, 440 U.S. at 203 (quoting Dohany v. Rogers, 281 U.S. 362, 368 (1930)).

As the Supreme Court noted in Bodcaw, one could argue as a matter of fairness that a landowner should be able to recover reasonable litigation costs incurred in the taking of his property, but such compensation is a matter of legislative grace rather than a constitutional requirement. Bodcaw, 440 U.S. at 204. And there is no provision for an award of attorneys' fees in the Natural Gas Act -- the act upon which this action is based -- nor have defendants identified any other federal law that would permit an award of attorneys' fees in this case.[22] See Williston Basin Interstate Pipeline Co. v. Property Interests Necessary to Conduct Gas Storage Operations, 2010 WL 5104991, *3 (D.Mont. 2010) (American law does not provide for the award of attorney fees absent a contractual or statutory provision to the contrary, and there is no basis for attorneys' fees in the Natural Gas Act or Fed. R. Civ. P. 71.1); Guardian Pipeline, LLC v. 295.45 Acres of Land, 2008 WL 1751358, *6. (E.D. Wis. 2008) (Rule 71.1

---

[22] Attorneys' fees and other expenses are recoverable when a condemnor acting under federal law fails to acquire the property. See 42 U.S.C. § 4654(a).

-48-

has no fee-shifting provision that allows the owner to recover attorneys' fees from the condemnor).

Defendants' reliance on state law is unavailing in a proceeding governed by federal law and procedures. Perhaps the state statutes they cite authorize attorneys' fees in similar actions under state law, but they have no application in this action under the NGA.[23] See Irick v. Columbia Gas Transmission Corp., 2008 WL 191324, 3 (W.D.Va. 2008) (state law providing for attorneys' fees was inapplicable to action under the NGA).

The court concludes for the foregoing reasons that defendants are not entitled to an award of attorneys' fees in this action.


VI. **Northern's Motion for Sanctions (Doc. 960)**.

Northern argues that landowners' counsel should be sanctioned under Rule 16(f)(2). It seeks total fees and expenses of $66,162. The request stems from landowners' replacement of their expert appraiser (Jones) shortly before commission hearings began. Northern argues that it incurred unnecessary expenses as a result of the late substitution, including (among other things) costs associated with the deposition of the substitute appraiser (Gardner), preparing rebuttal to his opinions, and preparing cross-examination of his opinions. Northern faults landowners' counsel Steve Robison for failing to be more vigilant with respect to the preparation of expert reports from Jones

---

[23] The court notes that some of the defendants are seeking attorneys' fees under K.S.A. § 55-1210(c)(3) in the state court proceedings that decided the question of title to the gas that migrated from the storage field. See Case No. 08-1405, Docs. 534-8, 534-10, and 534-13.

and for delaying the request to substitute another expert.

Rule 16(f) authorizes a court to issue any order, including a discovery-type sanction, if a party or its attorney fails to obey a scheduling or other pretrial order. Additionally, the court must order the party or its attorney to pay the reasonable expenses, including attorneys' fees, incurred because of any noncompliance with Rule 16, unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust.

There can be no reasonable dispute that the need to substitute for Jones, and the attendant logistical problems that came with it, arose because of Jones' deteriorating health. Robison's affidavit explains that he and his firm had used Jones a number of times in the past and Jones had always provided good reports and effective testimony. When Jones was first contacted about this case, he was recovering from back surgery and was on pain medication. Robison recognized that Jones' abilities were somewhat impaired at that time, but he believed the problem would be resolved when Jones stopped using pain medication. Doc. 984-1 at 2. Robison states that he had a series of conferences with Jones about his report, during which Jones at times appeared in command of his responsibilities and at other times appeared to have difficulty. Jones told Robison that he was tapering off his pain medication.

Robison received Jones' draft report in December 2013 and produced it, although it contained numerous errors. Robison subsequently worked with Jones and produced revised reports in January, March and April of 2014. In February 2014, Robison first informed Northern's counsel that Jones might not be able to testify.

Jones had told Robison, however, that he had stopped taking pain
medications in early 2014, and Robison expected that Jones' mental
capabilities would improve. Doc. 984-1 at 4. Robison again spoke with
Northern's counsel about a possible need to replace Jones just prior
to Jones' deposition on March 3, 2014. Robison states that it became
apparent to all during Jones' deposition that he was not able to
testify competently. During the deposition Jones indicated he was
taking 16 different medications, although he had previously told
Robison he was only taking three.

In March 2014, Robison also learned through consultation with
Jones' doctor that Jones had conditions that impaired his mental
abilities and that he was medically unable to perform as an expert
witness. On March 28, 2014, Robison and other counsel for landowners
filed motions to substitute Gardner for Jones. The motion represented
that Gardner had agreed to adopt Jones' opinions. The court held a
hearing on April 7, 2014, and deferred any question of sanctions, but
determined that landowners could substitute the witness with the
understanding that Gardner would adopt Jones' opinions and that
Gardner should produce a report by April 21, 2014, and also undergo
a deposition.

Gardner's deposition was taken on May 14, 2014, during a break
in the commission hearings. In his subsequent testimony before the
commission, Gardner offered various opinions, including "corrections"
of what he said were clear "typographical errors" in Jones' reports
relating to base values of properties. Gardner testified that he
confirmed with Jones that these were in fact inadvertent errors. In
the course of the hearings Northern objected on numerous occasions

-51-

that Gardner was offering opinions that went beyond or contradicted Jones' opinions. Commissioner Broomes ruled on these various objections and generally limited Gardner to matters that were covered at his deposition. <u>See</u> <u>e.g.</u>, Doc. 906 at 166-67 (Tr. Pp. 3633-34).

With the benefit of hindsight it might be said that landowners' counsel could have acted sooner to affect the substitution. But all things are clear in hindsight. The court cannot fault counsel for believing that Jones' initial impairments were due to surgery and medication and that they would improve over time. Nor can the court agree with Northern's attempt to characterize counsel's work with Jones as dilatory or deficient. Jones' health problems were beyond counsel's ability to control or predict. The court notes that Robison's attempt to continue working with Jones evinces an intent to comply with the established scheduling order rather than to derail it or disregard it. On the other side of the coin, the court is not persuaded that Northern incurred much difficulty or extra work in coping with the late substitution. It is true that a fair amount of confusion was caused by the various versions of Jones' reports that were circulated, as well as by Gardner's adoption and "correction" of certain matters in those reports. But Northern's capable counsel handled these matters in stride, and much of its asserted extra work likely would have occurred no matter who ultimately ended up testifying for landowners at the hearing.

Even where a party fails to comply with a scheduling order, the court may elect to deny a request for expenses where the party shows that its actions were substantially justified or that the circumstances render an award of expenses unjust. Fed. R. Civ. P.

16(f)(2); <u>Sager v. Johnson County Community College</u>, 2012 WL 280638, 2 (D.Kan. 2012). The court concludes that the belated substitution of Jones was substantially justified and that it would be unjust in these circumstances to award Northern's claimed expenses of $66,162. Robison acted reasonably and with reasonable promptness in seeking to substitute for Jones once it became clear that he would be unable to testify. Counsel's failure to accurately predict Jones' health is not grounds for requiring him to pay Northern's attorneys' fees. Moreover, Northern's attorneys capably handled the substitution and likely would have incurred most of the same expenses regardless of who testified for landowners at the hearing. Finally, it would be unjust in the context of this condemnation to saddle the landowners or their counsel with additional expenses that ultimately spring from Northern's taking of the landowners' property for a public purpose. Northern's motion for sanctions is therefore denied.


**VII. <u>Joint Report on Non-Well Tracts (Doc. 963)</u>.**

The three landowner groups represented in this action are: the Huff group, the Meireis group, and the Hudson group. As to non-well tracts owned by members of these groups, the groups have now stipulated concerning the appropriate allocation of the condemnation award among their various members having ownership interests in non-well tracts.

As to Huff group members, the agreed-upon allocation for non-well tracts is set forth in Doc. 963-1.

As to Meireis group members, the agreed-upon allocation is set forth in Doc. 963-2.

As to Hudson group members, the agreed-upon allocation is set forth in Doc. 963-3.

The court hereby adopts Docs. 963-1, 963-2, and 963-3 as representing the appropriate allocation of the condemnation award among property interests holders in the listed non-well tracts. Prejudgment interest shall be included on the award in accordance with this order.

## VIII. Joint Report on Well Tracts (Doc. 965).

Defendants L.D. Drilling, Inc., Nash Oil & Gas, Inc., Pratt Well Service, Inc., and Val Energy, Inc., and their associated interest holders in Extension Area gas leases, have filed a joint report with the court. (Doc. 965). All interest owners represented by counsel have agreed that the condemnation award for the "oil and gas value" on well-tracts should be allocated such that the royalty and overriding royalty interests will not be burdened with any of the operating expenses found by the commission.

These parties have further agreed that such a division would be appropriate as to tracts with oil and gas leases that the parties stipulated were valid on the date of taking (in Doc. 939), and appropriate for tracts covered by oil and gas leases which the court subsequently determines to be valid. Doc. 965 at 1. Inasmuch as the court has now determined that the non-stipulated leases were in fact valid on the date of taking, and all interested parties have stipulated to or waived any further challenge to the accuracy of the figures provided in Doc. 965-1, the court hereby adopts Doc. 965-1 as representing the appropriate allocation of the "oil and gas value" of

the condemnation award as to the tracts and interest owners set forth in that exhibit.

## IX. <u>Conclusion</u>.

The court determines that Northern must pay interest on the condemnation award, at a rate of 4.75%, compounded annually, from the date of taking until the payment of just compensation.

The court determines that the oil and gas leases discussed in Section III of this order remained valid on the date of taking as discussed above. The lessees are accordingly entitled to share in the just compensation awarded for oil and gas value on the specified well tracts. The motions for summary judgment on this issue from Val group (Doc. 950), Pratt Well Service group (Doc. 952), Nash Oil & Gas (954), and L.D. Drilling, Inc. (Doc. 956) are granted.

Northern's motion to reallocate fees and expenses (Doc. 959) is denied.

The defendants' motions or requests for attorneys' fees are denied.

Northern's motion for sanctions (Doc. 960) is denied.

The court adopts the allocations of the condemnation award amongst interest owners set forth in Docs. 963-1,963-2, and 963-3, and in Doc. 965-1.

A motion for reconsideration of this order is not encouraged. Any such motion shall not exceed 5 double-spaced pages and shall strictly comply with the standards enunciated by this court in <u>Comeau v. Rupp</u>, 810 F.Supp. 1172, 1174 (D. Kan. 1992).

IT IS SO ORDERED.

Dated this 8th day of July 2015, at Wichita, Kansas.


s/Monti Belot

Monti L. Belot

UNITED STATES DISTRICT JUDGE