IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

NORTHERN NATURAL GAS CO.,
   Plaintiff,

v.

APPROXIMATELY 9117.53 ACRES in Pratt,   No. 10-1232-JTM
Kingman, and Reno Counties, Kansas,
as further described herein;

TRACT NO. 1062710, containing 80.00 acres
more or less, located in Kingman County,
Kansas, and as further described herein,
 *et al.*,
   Defendants.

MEMORANDUM AND ORDER

   This condemnation action is before the court on competing dispositive motions by plaintiff Northern Natural Gas (Dkt. 1079) and the defendants (Dkt. 1081). After submitting the matter for consideration by Special Commissioners, the court first awarded compensation for Northern's condemnation of oil and gas rights in 2015 (Dkt. 1000, 1014). This award was modified on appeal by the Tenth Circuit, substantially diminishing the award owing to defendants. (Dkt. 1046).

   Following the appeal, this court conducted a January 8, 2018 hearing to determine the issues remaining in light of the Tenth Circuit's order. The court rejected the defendants' argument that the matter should be deferred pending the resolution of

ongoing state litigation. (Dkt. 1060, at 2). After further argument, the court then issued a new Order (Dkt. 1076) which comprehensively summarized the status of the litigation.

In the Order, the court again concluded (*id*. at 4-5) that it was bound by the conclusions of the Tenth Circuit, and was not free to defer additional rulings in the possibility that new decisions by the Kansas state courts may alter the legal landscape. The court further concluded that the calculation of just compensation must exclude the value of Northern's storage gas is the 2010 Extension Area on the date of taking, and that "the amount of the award attributable to that storage gas can be determined with reasonable accuracy from the existing record and from the factual finding of the Commission without a retrial of the case." *Id*. at 9.

The court identified the following issues remaining in the action: (1) the amount of just compensation (reducing the value of the award by the amount of storage gas); the amount, if any, which Northern might set off against that award; and (3) any other potential adjustments to the award, including the amount of interest. *Id*. at 10. The court directed the parties to file dispositive motions on those remaining issues, and they have done so. The court has reviewed those submissions and the extensive record, and finds that the record supports an award of compensation as provided herein.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment,

the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Having reviewed the extensive record, the court finds that a sufficient basis for determining just compensation exists. The Commission's Report makes findings as to the amount of recoverable gas (both native gas and storage gas) present in the 2010 Extension Area on the Date of Taking, the amount of recoverable gas in the 3,040 Acres subject to Northern leases on the Date of Taking, and a methodology for calculating just compensation. The Report (Dkt. 888) identifies the underlying data used in its calculations.

Included in the evidence submitted to the Commission was the testimony of Dr. Paul Boehm. The Commission found Dr. Boehm's evidence persuasive, particularly with reference to the amount of native gas in the extension area. (Dkt. 888, at 33 n. 18). This court and the Tenth Circuit have also relied on Dr. Boehm's conclusions. *See N. Nat. Gas Co. v. L.D. Drilling,* No. 08-1405 (Dkt. 420, at 14-16) (noting that "Defendants have cited no gas composition evidence to contradict Dr. Boehm's opinions"); *N. Nat. Gas Co. v. L.D. Drilling,*, 697 F.3d 1259, 1267 (10th Cir. 2012) (Dr. Boehm's report provided "strong and clear evidence that ... wells even in the northern portion of the expansion area [are] producing primarily storage gas, even though some of those wells are more than 6 miles from the underground fault").

The plaintiff also attaches to its motion an affidavit by its expert Randal Brush, who advances several conclusions based upon his own expertise, publicly availableinformation, evidence submitted to the Commission, and the Commission's Report to determine the economic value of oil and native gas for the 2010 Extension Area.

4

(Dkt. 1080 Exh. 1, at ¶¶ 7, 13-14). Brush's methodology takes the same approach as that used by the Commission in the August 26, 2014 Report to the court, which indicated that the Extension Area outside the Northern leases contained some 2.89 Bcf of recoverable gas. (Dkt. 888). The court has carefully reviewed the underlying materials, and finds that Brush's calculations present reliable and persuasive portrait of the oil and native gas, and that his conclusions are further evidence to support the condemnation judgment.

From the total volumes as determined by the Commission and by the court, Brush subtracted the gas underlying the Northern lease and the escaped storage gas located under the 2010 Extension Area on the Date of Taking. Using the same methodology employed by the Commission, Brush calculated the value of the economically recoverable native gas and oil under the tracts with wells in the 2010 Extension Area.

Having determined the amount of recoverable native gas for producing wells in the relevant area, Brush determined the amount of cash flow, with allowances for taxes, operating costs and appropriate discounts, to arrive at a value of economically recoverable oil and gas for each producing well. These calculations establish that only the following wells contained native gas in economically recoverable amounts:

**Table 1**

| Tract | Well | Value ($) |
|---|---|---|
| 4232611 | Meireis 1-23 | 12,720 |
| 2262611 | Young 1 & 1-26 | 30,840 |
| 4242611 | Zink B | 11,610 |
| 1232611 | Schwertfeger 1-23 | 123,630 |
| 3302610 | Branscom 1 | 29,650 |

5

The Producers raise several objections to these conclusions. Primarily, they argue that, because the court had previously ruled (Dkt. 810) that compensation would be awarded for both storage and native gas, they "were not afforded the opportunity" to present evidence before the Commission as to the amount of native gas n the Extension area. (Dkt. 1086, at 4). The Producers also complain that the issue of native gas as documented by Dr. Boehm manifests itself in only "[a] single footnote in the Commissioner's Report." (Dkt. 1081, at 4).

The Producers have failed to show that they were prevented from presenting evidence as to the amount of native gas in the Extension area. All of the citations to the Commission hearing (Dkt. 1081 at 5-7) are simply instances in which Commissioner Broomes *overruled* objections to evidence discussing native gas. Evidence of native gas was admitted because it was integral to Dr. Boehm's calculations as to the amount of native gas. (Tr. Vol. 2 at 317).

Thus, although the instructions issued by the court provided that compensation was to be based on the total amount of recoverable gas, the native gas in the Extension area remained essential to the Commission's methodology and calculations. Producers had ample motivation to present their own evidence of native gas to counter the testimony of Dr. Boehm. They did not present evidence before the Commission, and, indeed, present no Statement of Facts in their Dispositive Motion (Dkt. 1081) and present

6

no new evidentiary materials as to the amount of native gas in their Response (Dkt. 1086) to Northern's Statement of Uncontroverted Facts.

The court also rejects the Producers' argument that these conclusions as to the paucity of native gas find no substantial grounding in the Commission's Report.[1] The Commission observed that "the pressure and production data clearly showed that there simply could not be a large volume of gas in the 2010 Extension Area supporting production from the wells therein." (Dkt. 888, at 33). In particular, the court noted exhibits from Brush revealing "an uncanny relationship between production rates for the 2010 Extension Area wells and the pressure in the Cunningham Field," including one exhibit which "showed an extraordinary correlation between field pressure and production rate from the 2010 Extension Area, with the overall rate of Viola production from the relevant wells rising and falling in virtual lock-step with pressure in the storage field." *Id.*

It is in the course of this discussion that the Commission explicitly references Dr. Boehm's conclusions:

> Northern also presented evidence of gas compositional analysis performed by another expert, Dr. Paul Boehm. Dr. Boehm observed that native Viola

---

[1] The Commission documented the absence of purely native gas in the Extension Area before the beginning of the Cunningham Storage Field. Citing Dr. Boehm, the Commission expressly noted a 1985 "gas sample … was almost entirely storage gas, which would be unexpected if the 2010 Extension Area contained a large volume of native gas prior to fill-up of the Cunningham Storage Field." (Dkt. 888, at 18 n. 5). The Commission characterized as "reasonable and supported by the evidence" Dr. Brush's view that the "no appreciable volumes of gas existed within the Viola in the 2010 Extension Area prior to commencement of storage operations in 1978. *Id.* at 17.

> gas could be analytically distinguished from storage gas based on the fact that the native gas contained helium, while storage gas did not. By measuring the helium content of gas samples from wells in the 2010 Extension Area, Dr. Boehm was able to quantify the percentage of native gas in each sample. His analysis showed that wells located near the center of Cook's gas location map rapidly transitioned from producing measurable amounts of native gas to essentially 100% storage gas, while wells located near the boundaries of Cook's gas location map tended to show a much slower transition from native gas to storage gas. This behavior was consistent with a small volume of gas accumulating in the 2010 Extension Area, the composition of which was rapidly changing from some combination of native and storage gas to almost all storage gas as production in that area increased. A slower transition in wells located on the flanks of Cook's gas location map was likewise consistent with native gas being pushed toward the outer boundaries of the accumulation area as storage gas continued to migrate up from the south. Conversely, had the 2010 Extension Area contained a large accumulation of native gas prior to migration, the rate of compositional change in the gas samples would have been much slower as storage gas diluted the larger volumes of helium-containing native gas.

*Id*. at 33 n. 18 (record citations omitted).

In reaching its conclusions, the Commissioner directly rejected the opinions of defendant's expert Rod Andersen, finding his approach "riddled with fatal flaws," and that given "the abundance of contradictory evidence" his conclusions were "unworthy of belief." *Id*. at 29, 34. In contrast, the Commission accepted the testimony of Dr. Boehm (Dkt. 891, 892), and used his analysis (which included calculation as to native gas) in reaching its compensation award. The court finds no grounds for concluding that the compensation award for native gas at the time of taking should be other than the amounts previously indicated.

The Producers do put forward alternative calculations (Dkt. 1081, at 9-16) for the native oil and gas in the Extension area. However, the court finds these do not provide any reliable basis for determining just compensation. Against accepted industry methodology, the Producers' calculations consider separately native oil and gas in the valuation process, rather than considering the economic viability of each well as a producing unit. Their estimate of oil values is particularly unreliable because these are set forth without allowing for the costs of oil production, and rest on an assumption that such oil would be recovered without reference to reduced gas recovery from Northern leased tracts. The court finds that defendants have filed to show a reliable basis for estimating the value of native oil in the Extension area.[2]

Similar concerns exist as to Producers' suggestions as to the value of native gas in the Extension area. Those suggestions rest on calculations which deviate from the methodology approved by the Commission. "Recognizing the physical reality that the 2010 Extension Area has always been, and will probably always be, in pressure communication with the Cunningham Field," the Commission observed, "the appropriate way to value the oil and gas reserves therein on the Date of Taking is by allocating those reserves to the wells from which they would ultimately be produced with the aid of pressure support from the Cunningham Field." (Dkt. 888, at 55).

---

[2] In this respect the court finds persuasive the analysis of Randal Brush. *See* Aff., at ¶¶ 18-25 Dkt. 1085-2.

The Producers' substitute methodology is not reliable, containing errors similar to those in their estimates of oil values, and further exaggerating recovery by sharing costs with storage gas which is not subject to compensation.[3] In sum, the court finds no reliable evidence which would undermine the valuations for native gas set forth previously.

The court finds that Northern is entitled to set off for storage gas produced after the June 2, 2010 FERC certificate. Such a set off is appropriate under *Union Gas Sys., Inc. v. Carnahan*, 245 Kan. 80, 88, 774 P.2d 962 (1989). In that case, the court agreed that a set off may be appropriate for the subsurface migration of minerals after certification but before condemnation.

The court in *Union Gas* addressed the contention that the district court had erred in failing to set off from the compensation award for the value of Union's migrated gas taken after certification (on January 13, 1986). The court wrote:

> [T]he question remains as to [Union's] rights to its own gas from January 13, 1986, to April 9, 1987. Since Union established itself as a public utility and was authorized to store its gas underground by the Commission certificate issued on January 13, 1986, it thereafter acquired a changed status. Its operation was given official sanction and its gas was identified. Thereafter it became an exception to the rule of capture expressed in *Anderson* [*v. Beech Aircraft Corp.*, 237 Kan. 336, 699 P.2d 1023 (1985)].
>
> Cross-appellants, relying on the rule of capture, legitimately took advantage of Union's pressurizing the Squirrel horizon under the DeTar land without authority and recovered both previously unrecoverable native gas and Union's injected gas which had migrated onto the DeTars' property. They then sold the gas to Salem and Scissortail, who in turn sold

---

[3] Brush Aff., at ¶¶ 26-33.

> it to Williams, who then sold it to Union for reinjection into the North field. This created a clever circle of purloined production, and a successful one under the rule of capture as stated in *Anderson*. But all good things must eventually come to an end. This scheme ended when Union received its certificate of authority from the Commission on January 13, 1986. The law abhors a forfeiture. So, as soon as Union's storage operation became authorized and its gas identifiable, the gas was no longer *ferae naturae* and subject to the rule of capture. The title to Union's captured gas remained in Union. Thus, *Union did not forfeit its natural gas produced after January 13, 1986, even though it acquired no title to the DeTars' property until the date of taking, April 9, 1987. Consequently, we hold Union is entitled to a setoff for the value of its injected gas produced by cross-appellants after January 13, 1986*. The value of its gas is the selling price less its share of the cost of production, including a reasonable rental for the use of the DeTars' land.

245 Kan. at 88-89 (emphasis added).[4] The defendants cite to no authority which would compel a different result, and the court finds no justification for failing to award a set off on the principles identified in *Union Gas*.

Accordingly, what remains is to determine the amount of set off. Under *Union Gas*, 245 Kan. at 89, this amount is "the selling price less its share of the cost of production, including a reasonable rental for the use of the [owners'] land." The court concludes the set off may be appropriately calculated in this case without reference to rental values. Such rental values take the form of compensation for migrated gas, and may be correctly awarded as damages given the counterclaims by the Producer and Landowner defendants in No. 08-1405-JTM and associated cases, which is currently set for trial later this year.

---

[4] *See also N. Nat. Gas v. L.D. Drilling*, 862 F.3d 1221, 1230 (2017) (citing the set off analysis in *Union Gas*).

11

This conclusion is consistent with the law of the case. In 2011, Judge Brown determined in the condemnation action that "[t]he sole purpose of this action will be the determination of the appropriate enforcement of the Certificate … and the payment of just compensation to the owners of any property." (Dkt. 187, at 8-9). Beyond this, any defendants' "claims against Northern for occupation or use of their property for storage gas migrating onto the property between June 2, 2010, and the date of taking of the property should be asserted, if at all, in an action separate from this condemnation." *Id*. at 8.

Applying this standard, the court finds that an appropriate set off may be determined on the basis of the record. Calculated on a per tract basis for each interest owner, Northern is entitled to set off the following amounts for storage gas produced after the Certification date:

Table 2

| Lease | Operator | Tract | Set-off |
| --- | --- | --- | --- |
| Brown A-1 | LD Drilling | 1352611 | 434,960 |
| Geesling 1 | LD Drilling | 1262611 | 169,950 |
| Martin 1 | LD Drilling | 1362611 | 344,810 |
| Meireis 1-23 | LD Drilling | 4232611 | 80,730 |
| Mezger 1&2 | LD Drilling | 4262611 | 420,830 |
| Milton 1 LD | LD Drilling | 3252611 | 21,830 |
| Moore 1-27 | LD Drilling | 1272611 | 19,280 |
| Stanton 1 | LD Drilling | 2252611 | 263,090 |
| Young 1 & 1-26 | LD Drilling | 2262611 | 399,550 |
| Zink 1 | LD Drilling | 1252611 | 79,460 |
| Zink A | LD Drilling | 1252611 | 21,680 |
| Zink B | LD Drilling | 4242611 | 7,320 |
| CRC 2 | Nash Oil & Gas | 2012711 | 81,190 |

| | | | |
|---|---|---|---|
| Holland 1-26 | Nash Oil & Gas | 3262611 | 6,540 |
| Trinkle 1 | Nash Oil & Gas | 2362611 | 4,050 |
| Riffey V1-25 | Val Energy | 4252611 | 26,370 |

Northern is not entitled to a set off for any of the other tracts in the action.

As a result, Northern owes a compensation award of $0 as to Tracts 2012711, 1252611, 2252611, 3252611, 1262611, 2262611, 4262611, 1352611, 1362611, as its right of set off for such tracts exceeds the amount of any award. For the remaining tracts, Northern shall pay as just compensation the amounts shown in Table 3 (attached), which after set off as provided herein, reflects an award of $1,143,388.

Northern owes interest on this amount from the date of taking until payment at a rate of 4.75% compounded annually. While defendants challenge this interest rate, the amount was explicitly awarded by this court in is prior Order (Dkt. 1000, at 55) and was not challenged on appeal.

Finally, the court notes that the Estate of L.D. Davis has moved (Dkt. 1090) for certification of the court's prior Order (Dkt. 1083) for interlocutory appeal. In that Order, the court denied the Estate's argument (Dkt. 1068) that it had been improperly substituted for L.D. Davis following his 2016 demise. The court first determined that it had no jurisdiction to grant the relief sought, as the substitution was approved by the Tenth Circuit on August 29, 2016 while the matter was on appeal. Even if it had jurisdiction, the court observed, it was unlikely to grant the relief sought as the circumstances of the case presented a strong argument that the Estate had waived any defense of a lack of personal service. (Dkt. 1083, at 3-4).

The court finds that no certification should issue under 28 U.S.C. § 1292(b). The statute provides that the court can authorize an immediate appeal as to "a controlling question of law," if there is "a substantial ground for difference and appeal" and such appeal "will materially advance the ultimate termination of the litigation." None of these requirements is present.

First, the Estate has failed to show that the court's conclusion as to a lack of jurisdiction — the decisive factor in the denial of the defendant's motion — is in any way a matter open to substantial doubt. The Estate has supplied no authority for concluding that this court has the jurisdiction to revisit the issue.

Moreover, the court finds no grounds for concluding that a separate appeal would advance the early termination of this condemnation action. Rather, as noted elsewhere in this Order, the issues in the condemnation action have been narrowed in the wake of the Tenth Circuit's ruling, and the evidentiary record presents a sufficient basis for determining just compensation.

Any request for reconsideration of the present Order shall comply with the standards previously adopted by the court. (Dkt. 1000, at 55). Any response to such request shall comply with the same standards.

The court also takes note of the process previously employed for the adoption of a final judgment, including the requirement that plaintiff Northern serve copies the summary judment Order on all unrepresented parties. (Dkt. 1001). Northern is directed to provide such notice for this Order. The parties shall also work towards completion of

an agreed Final Order of Judgment modeled on that entered September 15, 2015 (Dkt. 1013) which is consistent with the conclusions herein.

IT IS ACCORDINGLY ORDERED this 29th day of March, 2019, that the defendant Estate of L.D. Davis's Motion for Certification (Dkt. 1090) is denied, as is defendants' Dispositive Motion (Dkt. 1081); plaintiff's Motion for Summary Judgment is granted as provided herein.

/s/J.Thomas Marten
J. Thomas Marten, Judge

# Table 3
## Just Compensation Owed Per Tract

| Tract | Just Compensation ($) |
|---|---|
| 2062710 | 10,125 |
| 3062710 | 24,360 |
| 1012711 | 32,975 |
| 4012711 | 10,000 |
| 1022711 | 9,966 |
| 2022711 | 17,531 |
| 3022711 | 2,375 |
| 4022711 | 8,436 |
| 5022711 | 1,504 |
| 1032711 | 17,380 |
| 2032711 | 19,900 |
| 4032711 | 12,500 |
| 5032711 | 10,000 |
| 1042711 | 19,925 |
| 2042711 | 20,000 |
| 1092711 | 20,000 |
| 1102711 | 10,000 |
| 3102711 | 10,000 |
| 6102711 | 20,000 |
| 1222611 | 20,000 |
| 2222611 | 20,000 |
| 3232611 | 234 |
| 4232611 | 13,308 |
| 5232611 | 973 |
| 1242611 | 20,000 |
| 2242611 | 20,000 |
| 3242611 | 20,000 |
| 4242611 | 27,291 |
| 4252611 | 8,509 |
| 3262611 | 20,485 |
| 1272611 | 3,717 |
| 2272611 | 10,004 |
| 3272611 | 31,350 |
| 4272611 | 33,350 |
| 5272611 | 9,998 |
| 3332611 | 10,000 |

| | |
|---|---:|
| 4332611 | 10,000 |
| 1342611 | 20,000 |
| 2342611 | 10,000 |
| 3342611 | 10,000 |
| 4342611 | 20,000 |
| 5342611 | 20,000 |
| 2352611 | 20,000 |
| 3352611 | 10,000 |
| 4352611 | 10,000 |
| 5352611 | 23,000 |
| 2362611 | 30,834 |
| 3362611 | 23,000 |
| 1302610 | 19,750 |
| 2302610 | 18,375 |
| 3302610 | 62,654 |
| 4302610 | 9,625 |
| 1312610 | 19,500 |
| 2312610 | 82,484 |
| 3312610 | 19,500 |
| 1232611 | 157,486 |
| 3152711 | 984 |